No. 24-271

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

X Corp.,
*Plaintiff-Appellant,*

v.

Robert A. Bonta,
in his official capacity as Attorney General of California,
*Defendant-Appellee*

---

On Appeal from the United States District Court
for the Eastern District of California
No. 2:23-cv-01939-WBS-AC; Hon. William B. Shubb

---

## BRIEF OF PROFESSOR EUGENE VOLOKH AND
## PROTECT THE FIRST FOUNDATION AS *AMICI CURIAE*
## IN SUPPORT OF APPELLANT AND REVERSAL

Gene C. Schaerr
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* Professor Eugene Volokh and Protect the First Foundation state that they have no parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Gene C. Schaerr*
Gene C. Schaerr
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE*.................................1

RULE 29(a)(4)(E) STATEMENT .................................................................1

SUMMARY OF ARGUMENT ......................................................................2

ARGUMENT ...................................................................................................5

    I.    AB 587 authorizes unconstitutional viewpoint-discriminatory government action. ...........................................5

        A.    AB 587 targets unpopular viewpoints, pressuring social media companies to censor them............................5

        B.    The law facially singles out some disfavored viewpoints. .............................................................................7

        C.    The law's purpose is to restrict those disfavored viewpoints. .......................................................................13

        D.    This attempt to combine law and public pressure on particular viewpoints violates the First Amendment....................................................................16

    II.    AB 587's viewpoint discrimination is categorically prohibited under the First Amendment, or at least triggers strict scrutiny, which it cannot satisfy. ......................20

CONCLUSION ..............................................................................................24

CERTIFICATE OF COMPLIANCE .........................................................26

CERTIFICATE OF SERVICE....................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Brown v. Kemp,*
   86 F.4th 745 (7th Cir. 2023) ....................................................... 17, 19, 20

*Children of the Rosary v. City of Phoenix,*
   154 F.3d 972 (9th Cir. 1998) ................................................................ 8

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
   473 U.S. 788 (1985) ............................................................................ 28

*Cummings v. Missouri,*
   71 U.S. 277 (1867) ......................................................................... 2, 21

*Erznoznik v. City of Jacksonville,*
   422 U.S. 205 (1975) ............................................................................ 28

*First Nat'l Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978) ............................................................................ 28

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ....................................................................... 29

*Interpipe Contr., Inc. v. Becerra,*
   898 F.3d 879 (9th Cir. 2018) .............................................................. 17

*Junior Sports Magazines Inc. v. Bonta,*
   80 F.4th 1109 (9th Cir. 2023) ....................................................... 26, 28

*Kennedy v. Bremerton Sch. Dist.,*
   142 S. Ct. 2407 (2022) ....................................................................... 29

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
   567 U.S. 298 (2012) ............................................................................. 5

iii

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993) ................................................................... 28

*Madsen v. Women's Health Ctr.*,
  512 U.S. 753 (1994) ................................................................... 18

*Matal v. Tam*,
  582 U.S. 218 (2017) ..................................... 11, 12, 13, 15, 16, 30, 31

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ............................................................... 27, 28

*Minnesota Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) ............................................................... 25

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ........................................... 3, 4, 22, 23, 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................. 5

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ................................................................. 27, 28

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ................................................................... 25

*Police Dep't of City of Chicago v. Mosley*,
  408 U.S. 92 (1972) ..................................................................... 28

*Prete v. Bradbury*,
  438 F.3d 949 (9th Cir. 2006) ...................................................... 4

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ........................................... 8, 9, 12, 17, 20

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................... 25

iv

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................8, 9, 10, 16, 29

*TGP Communs., Ltd. Liab. Co. v. Sellers*,
No. 22-16826, 2022 WL 17484331, 2022 U.S. App. LEXIS 33641
(9th Cir. Dec. 5, 2022) .................................................................17, 26

*United States* v. *Schwimmer*,
279 U.S. 644 (1929) ...............................................................................31

*Waln v. Dysart Sch. Dist.*,
54 F.4th 1152 (9th Cir. 2022).................................................................22

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) ...............................................................................22

*Wooley v. Maynard*,
430 U.S. 705 (1977) ...............................................................................21

## Statutes

15 U.S.C. § 1052(a) ...................................................................................9

California Business & Professions Code §§22675-81..........................2,6,7

## Other Authorities

Google, *Youtube Policies: Harassment & Cyberbullying Policies*,
https://support.google.com/youtube/answer/2802268?hl=en ...............12

Michael Shellenberger et al. "CTIL Files    #1," P Public,
(https://public.substack.com/p/ctil-files-1-us-and-uk-military-
contractors) .............................................................................................11

*Radicalization*,                                    Dictionary.com,
https://www.dictionary.com/browse/radicalization .............................11

Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 .......21

X [Twitter] Help Center, *Abuse and Harassment*, https://help.twitter.com/en/rules-and-policies/abusive-behavior ........ 12

## STATEMENT OF INTEREST OF *AMICI CURIAE*

Professor Eugene Volokh is the author of the textbook *The First Amendment and Related Statutes* (7th ed. 2020), as well as over 100 academic articles, most of which discuss free speech law. His work has been cited in opinions in eight U.S. Supreme Court cases and in more than 300 lower court opinions.

Protect the First Foundation (PT1) is a nonprofit, nonpartisan organization that advocates for First Amendment rights in all applicable arenas. PT1 thus advocates on behalf of people from across the ideological spectrum, including those who may not even agree with the organization's views.

## RULE 29(a)(4)(E) STATEMENT[1]

No party or counsel for a party authored this brief in whole or in part. No person or entity other than *amici*, their members, or their counsel in this matter has made any monetary contributions intended to fund the preparation or submission of this brief.

---

[1] In accordance with Circuit Rule 29-2(a), all parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

California Assembly Bill 587 violates the First Amendment's stringent prohibition on viewpoint discrimination. And AB 587 does so by leaning on social media companies to do the government's dirty work, either through fear of fine or public pressure. But "what cannot be done directly [under the Constitution] cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 325 (1867).

Specifically, AB 587 facially distinguishes certain viewpoints by requiring social media companies to define viewpoint-based categories of speech. The law also requires these companies to report their policies as to those viewpoints, but not other viewpoints, as well as any actions they took to flag, moderate, deprioritize, restrict, or remove just those viewpoints on or from their platforms. And the Attorney General will make those reports public.

The intent behind the law is clear from its legislative history, comments by its enforcer (Attorney General Rob Bonta), and common sense. That intent is to strongarm social media companies to restrict certain viewpoints—to combine law and public pressure to do something

2

about how platforms treat those particular viewpoints, and not other viewpoints. That confirms that the facial viewpoint classification in the statute is indeed a viewpoint-based government action aimed at suppressing speech—and that violates the First Amendment.

To be sure, the strongarming comes from a combination of a government-imposed disclosure requirement and the likely public reaction to that information. But the Supreme Court made clear in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), that such combined schemes presumptively violate the Constitution:

> It is not sufficient to answer, as the State does here, that whatever repressive effect compulsory disclosure of names of petitioner's members may have upon participation by Alabama citizens in petitioner's activities follows not from state action but from private community pressures. The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold.

*Id.* at 463. That logic applies here: Compulsory disclosure of a platform's policies and actions is "the initial exertion of state power," which is likely (and intended) to cause the "private community pressures."

The result is a law that is categorically barred under the First and Fourteenth Amendments, even without strict scrutiny. Alternatively, AB 587 at least triggers strict scrutiny, which it cannot satisfy because the Supreme Court has repeatedly made clear that government has no compelling interested in censoring even offensive and hateful views.

In short, whatever standard is applied, AB 587 offends the Constitution. "The First Amendment creates an open marketplace in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) (cleaned up). That constitutional protection prevents the government from putting a thumb on the scale. Indeed, speech the government disfavors is shielded by the First Amendment not *despite* that disfavor but *because* of it. "The best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is the one deciding which ideas should prevail." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (cleaned up).

4

## ARGUMENT

## I. AB 587 authorizes unconstitutional viewpoint-discriminatory government action.

AB 587's unconstitutionality is apparent from an examination of (a) the particular viewpoints targeted by the law; (b) what the law itself does to target those viewpoints; (c) what the law's proponents and enforcer say they intended; and (d) how the Supreme Court and other courts have dealt with analogous governmental efforts to marshal public pressure against certain disfavored viewpoints.

### A. AB 587 targets unpopular viewpoints, pressuring social media companies to censor them

AB 587 mandates that social media companies report whether they define, and if so, what are their definitions of the following speech:

- "Hate speech or racism";

- "Extremism or radicalization";

- "Disinformation or misinformation";

- "Harassment";

- "Foreign political interference";

- "Controlled substance distribution"

Cal. Bus. & Prof. Code § 22677(3)(a). Further, AB 587 requires "[a] detailed description of content moderation practices used by the social media company for that platform, including" the company's policies for the "categories" listed above. *Id*. § 22677(a)(4)(A). The companies must also report information about any content the company flagged and the number of "actioned items" on the categories just noted. *Id*. § 22677(a)(5)(A). And "actioned" is defined as "tak[ing] some form of action, including, but not limited to, removal, demonetization, deprioritization, or banning, against the relevant user or relevant item of content." *Id*. § 22675(a).

This information and more must be reported to the Attorney General twice a year. *Id*. § 22677(b). And the AG will make the reports available to the public on its official website. *Id*. § 22677(c). Should a company fail to timely submit a report or "[m]aterially omit[] or misrepresent[] required information in a report," it is liable for civil penalties up to $15,000 per violation per day and an injunction may be levied by a court. *Id*. § 22678(a)(1) & (2).

On its face, then, AB 587 targets disfavored viewpoints and pressures social media companies to censor them.

## B. The law facially singles out some disfavored viewpoints.

Given this statutory scheme, AB 587 implicates the First Amendment's prohibition on viewpoint discrimination, which occurs when "the government targets not subject matter, but particular views taken by speakers on a subject." *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 1998) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Most if not all the "categories" listed in section 22677(3)(a) refer to particular disfavored viewpoints. This becomes clear from the Supreme Court's case law on viewpoint discrimination. One example is *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). There the ordinance at issue prohibited speech that "arouses anger, alarm or resentment on the basis of race, color, creed, religion or gender." *Id.* at 379 (citation omitted). And the Court determined that ordinance engaged in viewpoint discrimination. *Id.* at 391. That's because "fighting words . . . would seemingly be usable . . . [by] those arguing in favor of racial, color, etc.,

7

tolerance and equality, but could not be used by those speakers' opponents." *Id*. So, because the ordinance prohibited "fighting words that contain . . . messages of 'bias-motivated' hatred," it was viewpoint based. *Id*. at 392.

So too in *Rosenberger*.  In that case, a university, which normally subsidized the printing costs of student publications, refused to provide funding for a student newspaper that offered a Christian perspective. 515 U.S. at 823. The university defended its policy because it prohibited funding of all religious activities. *Id*. at 825. But the Court rejected this reasoning. Instead, *Rosenberger* determined that "[r]eligion may be a vast area of inquiry, but it also provides[] . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id*. at 831. Hence, "[i]t is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Id*.

The Court also analogized the broad topic of religion to other "complex and multifaceted" issues, observing that, "[i]f the topic of debate

is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Id.* On that basis, the Court found the university policy to be viewpoint discriminatory. *Id.* at 845-46.

Finally, *Matal v. Tam*, 582 U.S. 218 (2017), points the same way. There, an Asian-American band sought a federal trademark for the name of their band: The Slants. *Id.* at 223. The term "slants" is derogatory for those of "Asian descent." *Id.* And so the Patent and Trademark Office refused to register the trademark because federal law prohibited trademarks that "disparage or bring into contempt or disrepute any persons living or dead." *Id.* (cleaned up) (quoting 15 U.S.C. § 1052(a)).

Reversing, the Court noted that its "cases use the term 'viewpoint' discrimination in a broad sense, and in that sense, the disparagement clause discriminates on the bases of 'viewpoint.'" *Id.* at 243 (plurality opinion); *id.* at 247-48 (Kennedy, J. concurring, joined by Ginsburg, Sotomayor, and Kagan, JJ) (agreeing that the federal law at issue "constitutes viewpoint discrimination"). Granted, "the clause evenhandedly prohibits disparagement of all groups." *Id.* at 243

9

(plurality opinion). "But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint." *Id*. Thus the disparagement clause was found to be viewpoint discriminatory. *Id*. at 247.

These cases make clear that, for First Amendment purposes, the categories listed in section 22677(a)(3) of AB 587 constitute "viewpoints." Take the category of "racism." According to AB 587, social media companies do not have to define or report their actions related to speech that speaks *well* of a particular race, or says all races are equally good. And under the cases discussed above, that means classifying speech under the category of "racism" is engaging in viewpoint discrimination. *See, e.g., R.A.V.,* 505 U.S. at 391 (holding an ordinance was viewpoint discriminatory because it allowed speech "in favor of racial, color, etc., tolerance and equality," but not speech opposing such).

Likewise, hate speech is negative speech about a particular group, but positive speech about that group—call it "love speech"—is not covered by AB 587. *See Matal*, 582 U.S. at 243 (concluding that a law prohibiting speech that disparaged a group or all groups was "viewpoint

10

discrimination" because "[g]iving offense is a viewpoint"). On that basis, the Fifth Circuit found that a government policy removing social media posts that used "hate speech of all types and comments that are considered inappropriate" was "viewpoint discriminatory." *Robinson v. Hunt Cty.*, 921 F.3d 440, 449 (5th Cir. 2019). Of course, racist and hate speech are (justifiably) offensive to many, but "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969).

Similarly, what makes speech "[e]xtremism" is its viewpoint; either it refers to advocacy of out-of-the-mainstream views, or, in certain locutions, advocacy of violence. Thus, to target "extremist" speech as opposed to moderate or peace-loving speech is viewpoint discrimination. The same goes for "radicalization," which is defined as "the act or process of becoming more extreme." *Radicalization*, Dictionary.com, https://www.dictionary.com/browse/radicalization.

So too for "[d]isinformation or misinformation," which are generally used to refer not just to literally false factual assertions, but also to

11

viewpoints that are seen as outside the scientific mainstream, or to ones seen as overemphasizing some evidence at the expense of other evidence. *See, e.g.,* Michael Shellenberger et al. "CTIL Files #1," P Public, (https://public.substack.com/p/ctil-files-1-us-and-uk-military-contractors) ("Most misinformation is actually true, but set in the wrong context.") (quoting misinformation security expert Sarah-Jayne Terp). And "[h]arassment," like hate speech, refers to particular viewpoints—telling someone they are stupid would be harassing but telling them they are brilliant would not. *Cf. Matal*, 582 U.S. at 243 ("Giving offense is a viewpoint."). "Insults," for instance, are considered harassment.[2]

Nor does it matter that AB 587 targets all hate speech, racism, extremism, harassment, etc., or such speech directed at all groups—the law is still engaged in viewpoint discrimination. *See Rosenberger*, 515

---

[2] *See*, *e.g.*, Google, *Youtube Policies: Harassment & Cyberbullying Policies*, https://support.google.com/youtube/answer/2802268?hl=en (defining "harassment" to include, for instance, "prolonged insults or slurs based on [people's] physical traits or protected group status, like age, disability, ethnicity, gender, sexual orientation, or race"); X [Twitter] Help Center, *Abuse and Harassment*, https://help.twitter.com/en/rules-and-policies/abusive-behavior (defining "abuse and harassment" to include "use of insults . . . to target others").

U.S. at 831 ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one."); *Matal*, 582 U.S. at 243 (concluding a law was still viewpoint discriminatory despite "evenhandedly prohibit[ing] disparagement of all groups").

In sum, AB 587, on its face, distinguishes speech based on viewpoint. That means the law is categorically prohibited, or at least must satisfy strict scrutiny.

## C. The law's purpose is to restrict those disfavored viewpoints.

What is clear from the text is reinforced when considering AB 587's purpose, as admitted by California legislators and Attorney General Bonta: The law is designed to pressure social media companies to censor speech the government disfavors. So "[e]ven if the statutory text were not enough to show viewpoint discrimination, and here it is, evidence outside the statutory text may help to 'elevate [that] possibility to a certainty.'" *Brown v. Kemp*, 86 F.4th 745, 783 (7th Cir. 2023) (quoting *R.A.V.*, 505 U.S. at 394). *Accord Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (holding that, in determining whether viewpoint

13

discrimination is present, "[i]f . . . the law includes indicia of discriminatory motive, we may peel back the legislative text and consider legislative history and other extrinsic evidence to probe the legislature's true intent."); *TGP Communs., Ltd. Liab. Co. v. Sellers*, No. 22-16826, 2022 WL 17484331, 2022 U.S. App. LEXIS 33641, at *10 (9th Cir. Dec. 5, 2022) ("In evaluating claims of viewpoint discrimination, '[w]e thus look to the government's purpose as the *threshold consideration*.'") (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994) (emphasis added)).

For instance, AB 587's lead author declared that the law is an "important first step" to make sure that "social media companies . . . moderate or remove hateful or incendiary content" from their sites. 4-ER-405. He further observed that AB 587 was designed to "pressure" these companies to "eliminate hate speech and disinformation." 4-ER-405. And he tweeted that the law would "address . . . concerns that platforms aren't doing enough to stop the spread of misinformation and hate speech." 6-ER-932.

14

This understanding of the bill is echoed by the Assembly Committee on Judiciary Report, which hoped that, "if social media companies are forced to disclose what they do in . . . regard [to how they moderate content], it may pressure them to become better corporate citizens by doing more to eliminate hate speech and disinformation." 4-ER-405. And that report's counterpart, the Senate Judiciary Committee Hearing Report, quotes an official sponsor of the bill (the Anti-Defamation League) as declaring that AB 587 enables "policymakers [to] take meaningful action to decrease online hate and extremism." 4-ER-431. This is appropriate evidence for this Court to consider in determining the constitutionality of this bill. *See Brown*, 86 F.4th at 783 (looking at comments by government officials and senate and house sponsors of the bill in determining it was viewpoint discriminatory).

The bill's enforcer, like its drafters, also viewed the effect of AB 587 similarly, with AG Bonta noting that the bill "may result in public pressure on social media companies to . . . eliminate hate speech and disinformation on their platforms." 5-ER-704 (internal quotations omitted). And AG Bonta has acted on this understanding, sending a letter

15

to various social media companies that emphasized their "responsibility" and "duty" to fight "dissemination of disinformation," which he viewed as "dangerous." 6-ER-1062-63, 1070. To make sure his message was heeded, he added that the "California Department of Justice will not hesitate to enforce" AB 587. *Id.*

Thus, AB 587's makers and enforcer make two things clear. First, the purpose of the law is to reduce speech the government disfavors. Second, the mechanism for the removal is pressure—both from the public and from the Attorney General. "Again, the statutory text alone shows viewpoint discrimination, but these statements" from the relevant legislative history "that reading 'a certainty.'" *Brown*, 86 F.4th at 783 (quoting *R.A.V.*, 505 U.S. at 394). And "where the text itself discriminates, legislative history that expresses an intent to discriminate bolsters the presumption of constitutional infirmity." *Id.* at 783 n.8. That is true here, as it was there. *Id.*

### D. This attempt to combine law and public pressure on particular viewpoints violates the First Amendment

AB 587, while more sophisticated than a government censor board, is just as unconstitutional. After all, "what cannot be done directly cannot

16

be done indirectly. The Constitution deals with substance, not shadows." *Cummings v. Missouri*, 71 U.S. 277 (1867). Thus, just as California could not directly prohibit the viewpoints noted above, it likewise cannot indirectly do so by getting others to do its constitutional dirty work. And to make matters worse, the specific avenues that AB 587 provides to achieve the government's goal of censored speech have been deemed by the Supreme Court to be unconstitutional in related contexts.

For example, AB 587 mandates through force of draconian financial penalty that social media companies engage in public speech by providing a semi-annual report that is then published to the world on a government website. Such viewpoint-based compulsions are compelled speech and thus constitutionally suspect. *See Wooley v. Maynard,* 430 U.S. 705 (1977) (holding that mandatory state motto on license plate was constitutionally compelled speech); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) (holding that mandatory pledge to the U.S. flag for school students was unconstitutionally compelled speech).

17

Additionally, the Supreme Court has found the mechanism of social pressure to be constitutionally problematic in the First Amendment context. For example, in *NAACP v. Alabama*, to discourage the NAACP from conducting activities in the state, Alabama subpoenaed the organization's membership lists, which the NAACP refused to release and was thus fined $100,000. 357 U.S. at 452-454. Even though Alabama "ha[d] taken no direct action to restrict the [First Amendment] right of petitioner's members . . . (this) d[id] not end inquiry into the *effect* of the production order." *Id*. at 461 (emphasis added) (citation omitted).

That's because, the Court observed, "[i]n the domain of these indispensable liberties, whether of speech, press, or association, . . . abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *Id*. Thus, even without direct action, the Court worried about "the practical effect of discouraging' the exercise of constitutionally protected" rights, "the possible deterrent effect upon such freedoms," or "possible unconstitutional intimidation of the free exercise of the right." *Id* (cleaned up).

18

Revealing the NAACP's membership lists, the Court worried, would subject the organization to various "manifestations of public hostility." *Id*. at 462. Finding the state's reason for demanding such lists to be insufficiently justified, the Court held the Constitution was violated. *Id*. at 466.

That same concern is present here. California, rather than seeing the fomenting of public hostility towards social media companies as a constitutional bug, views it as a necessary feature to eliminate disfavored speech. But, just as with *NAACP v. Alabama*, where the Constitution did not allow the government to force disclosures that would gin up public hostility against people who support certain causes, so too with AB 587. Generating *either* massive fines or public "pressure," a euphemism for public hostility, triggers the most exacting scrutiny our Constitution demands. Otherwise, the "indispensable libert[y]" of free speech is in danger. And AB 587's *combination* of compelling speech and leveraging public hostility to restrict speech only make the law more constitutionally suspect.

19

**II. AB 587's viewpoint discrimination is categorically prohibited under the First Amendment, or at least triggers strict scrutiny, which it cannot satisfy.**

As the Supreme Court has stated in recent years, viewpoint discrimination is so odious to the Constitution that it does not even deserve strict scrutiny; rather, it is categorically prohibited. For example, in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018), the Court clarified that "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *See also Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (applying strict scrutiny to *content* discrimination but declaring that "restrictions based on viewpoint are prohibited"). True, these cases involved traditional public fora, but the same rules apply to government regulations of private speakers using their own property as much as to regulations of speakers on government-owned traditional public forum property. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 165-72 (2015) (evaluating a restriction on signs, whether posted on private property or public property, by interchangeably citing traditional public forum cases as well as ones that do not involve the government as property owner).

20

This Court, in a limited pubic forum context, likewise noted that "the First Amendment provides even stronger protection against viewpoint discrimination" than the strict scrutiny content-based restrictions receive. *TGP Communs.,* 2022 U.S. App. LEXIS 33641, at *10. "[C]ourts have always viewed attempts to regulate viewpoints with even greater suspicion than regulating content." *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1124 (9th Cir. 2023) (Van Dyke, J, concurring)). Thus, "[a] restriction on speech is unconstitutional if it is 'an effort to suppress expression merely because public officials oppose the speaker's view.'" *TGP Communs.*, 2022 U.S. App. LEXIS 33641, at *10 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). *See also Junior Sports*, 80 F.4th at 1124 (Van Dyke, J, concurring) ("[T]he Supreme Court has described the First Amendment as almost universally 'forbid[ding] the government [from] regulat[ing] speech in ways that favor some viewpoints or ideas at the expense of others.' Viewpoint discrimination falls only a little short of being per se invalid under the First Amendment.") (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)); Rodney A.

21

Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 (referring to viewpoint discrimination as a "pocket of absolutism" in First Amendment jurisprudence).[3] Thus, there is no need to apply strict scrutiny—AB 587 violates the Constitution once it is deemed to be viewpoint discriminatory—as it is, for reasons discussed above.

Alternatively, because AB 587 engages in viewpoint discrimination, it is at least subject to strict scrutiny. *See Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022). To satisfy that exacting standard, the government must show that AB 587 "serve[s] a compelling interest and [is] narrowly tailored to that end." *Id.* at 1163 (quoting *Kennedy v.*

---

[3] *See also* Junior Sports Magazines Inc., 80 F.4th at 1124 n.1 (Van Dyke, J, concurring) ("The Supreme Court has repeatedly emphasized the First Amendment's near-absolute prohibition on laws that restrict speech based on the viewpoint of the speaker.") (citing *Fowler v. Rhode Island*, 345 U.S. 67, 69-70 (1953); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785-86 (1978); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48-49 (1983); *Members of City Council*, 466 U.S. 789, 804 (1984); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993); *Rosenberger*, 515 U.S. 819, 828-29 (1995); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019)).

*Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022)). And the state cannot meet that burden.

As noted above, the government interests put forth for the law are to "eliminate hate speech and disinformation," 4-ER-405, "moderate or remove hateful or incendiary content," *id.*, "stop the spread of misinformation and hate speech," 6-ER-932, "decrease online hate and extremism," 4-ER-431, and fight the "dissemination of ["dangerous"] disinformation," 6-ER-1062-63, 1070.

But these interests are not compelling under viewpoint discrimination case law. For instance, the *Matal* Court determined that not only was a government "interest[s] in preventing underrepresented groups from being bombarded with demeaning messages," or in "encouraging racial tolerance" not compelling, they were not even substantial interests. 582 U.S. at 245. In other words, a government "interest in preventing speech expressing ideas that offend . . . strikes at the heart of the First Amendment." *Id*. at 246.

23

AB 587 similarly fails to reflect a compelling government interest given that its underlying interests are of the same stripe. So AB 587 cannot satisfy strict scrutiny.

## CONCLUSION

California is seeking to reduce what it views to be odious speech on social media platforms. No doubt many applaud this effort. Still, our Constitution does not protect only what is popular. While "[s]peech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful," yet "the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal,* 582 U.S. at 246 (quoting *United States* v. *Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). The district court's decision should be reversed.

February 21, 2024                    Respectfully submitted,

                                     /s/ GENE C. SCHAERR

                                     GENE C. SCHAERR
                                     SCHAERR | JAFFE LLP
                                     1717 K Street NW, Suite 900
                                     Washington, DC 20006
                                     Telephone: (202) 787-1060
                                     gschaerr@schaerr-jaffe.com

         *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Circuit Rules 32-1 because:

    ☒    this brief contains 4,306 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*

    ☐    this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, *or*

    ☐    this brief has been prepared in a monospaced spaced typeface using (state name and version of word processing program) _____ with (state number of characters per inch and name of type style) _____ _____.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2024, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

February 21, 2024                    */s/Gene C. Schaerr*
                                      Gene C. Schaerr

                                      *Counsel for Amici Curiae*