No. 24-271

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

X CORP.,

*Plaintiff-Appellant*,

v.

ROBERT BONTA, in his official capacity as
Attorney General of California,

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:23-cv-01939 (Hon. William B. Shubb)

BRIEF OF *AMICI CURIAE*
FIRST AMENDMENT AND INTERNET LAW SCHOLARS
IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

G.S. Hans
CORNELL LAW SCHOOL
Myron Taylor Hall
Ithaca, NY 14853
(607) 254-5994

Jake Karr
TECHNOLOGY LAW AND POLICY CLINIC
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
(212) 998-6042
jake.karr@nyu.edu

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION & SUMMARY OF ARGUMENT ...............................................2

ARGUMENT ...................................................................................5

I.    Platform transparency laws serve a variety of important state interests. ....... 5

    A.    Platform transparency mandates promote consumer protection by ensuring consumers can make informed choices in the marketplace. ........................................................................ 6

    B.    Platform transparency mandates promote democratic self-governance by keeping citizens apprised of platforms' impacts on democracy, public discourse, and society. .......................................... 10

    C.    Platform transparency mandates promote public health and safety by alerting users to risks stemming from social media usage............ 14

II.    *Zauderer* provides the proper standard to analyze platform transparency laws like AB 587 that compel purely factual and uncontroversial commercial disclosures................................................................. 17

    A.    AB 587 at most compels commercial speech linked inextricably to commercial activity. ...................................................... 19

    B.    AB 587 compels purely factual and uncontroversial disclosures that do not impose an undue burden on platforms' First Amendment interests................................................................. 21

CONCLUSION .................................................................................27

CERTIFICATE OF COMPLIANCE ..........................................................28

i

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)...................................................................6

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
  916 F.3d 749 (9th Cir. 2019) .......................................................26

*Beach v. Ocwen Fed. Bank*,
  523 U.S. 410 (1998)....................................................................8

*Buckley v. Valeo*,
  424 U.S. 1 (1976)........................................................... 10, 11, 13

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022) ........................................................23

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980)......................................................... 5, 19, 21

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ................................................ *passim*

*Friedman v. Rogers*,
  440 U.S. 1 (1979)......................................................................19

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995)....................................................................23

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*,
  512 U.S. 136 (1994).............................................................. 25, 26

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010)....................................................................11

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019)..................................................................8

*Nat'l Ass'n of Wheat Growers v. Bonta*,
　　85 F.4th 1263 (9th Cir. 2023) ........................................................ 22, 23, 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
　　585 U.S. 755 (2018) ................................................................... *passim*

*Nationwide Biweekly Admin., Inc. v. Owen*,
　　873 F.3d 716 (9th Cir. 2017) ............................................................ 20, 26

*NetChoice, L.L.C. v. Paxton*,
　　49 F.4th 439 (5th Cir. 2022) .................................................................21

*NetChoice, LLC v. Att'y Gen., Fla.*,
　　34 F.4th 1196 (11th Cir. 2022) ...........................................................22

*No on E v. Chiu*,
　　85 F.4th 493 (9th Cir. 2023) ..............................................................11

*Ohralik v. Ohio State Bar Ass'n*,
　　436 U.S. 447 (1978) ........................................................................19

*Prager Univ. v. Google LLC*,
　　951 F.3d 991 (9th Cir. 2020) ..............................................................20

*S.F. Apartment Ass'n v. City & Cnty. of S.F.*,
　　881 F.3d 1169 (9th Cir. 2018) ..............................................................6

*United States v. Harriss*,
　　347 U.S. 612 (1954) ..........................................................................11

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
　　425 U.S. 748 (1976) ............................................................................6

*W. Va. State Bd. of Educ. v. Barnette*,
　　319 U.S. 624 (1943) ..........................................................................25

*Zauderer v. Off. of Disciplinary Couns. of the Sup. Ct.*,
　　471 U.S. 626 (1985) ................................................................... *passim*

**Statutes**

15 U.S.C. § 78n ..................................................................................7

iii

15 U.S.C. §§ 1451–61 ..............................................................7

15 U.S.C. §§ 1601–67f.........................................................7, 8

Cal. Bus. & Prof. Code § 22675 ......................................3, 17

Cal. Bus. & Prof. Code § 22676 ...........................................3

Cal. Bus. & Prof. Code § 22677 ................................... *passim*

Cal. Bus. & Prof. Code § 22680 ..........................................13

Cal. Health & Safety Code § 38532 .............................. 15, 23

**Other Authorities**

Charisse L. Nixon, *Current Perspectives: The Impact of Cyberbullying on Adolescent Health*, 5 Adolescent Health Med. & Therapeutics 143 (2014)..............................................................................16

Daphne Keller, *Platform Transparency and the First Amendment*, 4 J. Free Speech L. 1 (2023) ..............................................12

David Lazer et al., *Meaningful Measures of Human Society in the Twenty-First Century*, 595 Nature 189 (2021) ..............................12

Jay J. Van Bavel et al., *How Social Media Shapes Polarization*, 25 Trends Cognitive Scis. 913 (2021) ............................12

*Our Range of Enforcement Options*, X....................................21

*Policies and Standards*, Wash. Post......................................18

*Standards and Ethics*, N.Y. Times.......................................18

*Terms of Service*, Facebook ..............................................20

*Terms of Service*, X.......................................................20

*The X Rules*, X .............................................................9

U.S. Dep't of Homeland Sec., *Countering False Information on Social Media in Disasters and Emergencies* (2018)............................................................16

X Corp., *California Terms of Service Report*, Off. Att'y Gen., Cal. Dep't Just. (Jan. 1, 2024) ..........................................................................................24

Yu-Tung Lan, Yuan-Chien Pan & Yu-Hsuan Lin, *Association Between Adolescents' Problematic Online Behaviors and Self-Harm Risk*, 317 J. Affective Disorders 46 (2022) ............................................................16

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are the following law professors and scholars of the First Amendment and Internet law. *Amici* write to provide the court with scholarly expertise on the complexities of social media platform regulation and its intersection with the First Amendment. They share an interest in making sure that the law thoughtfully balances First Amendment protections for speech and governments' legitimate interests in promoting greater social media platform transparency.

**Hannah Bloch-Wehba**
Associate Professor of Law
Texas A&M University School of Law

**Julie E. Cohen**
Mark Claster Mamolen Professor of Law and Technology
Georgetown University Law Center

**G.S. Hans**
Associate Clinical Professor of Law
Cornell Law School

**Woodrow Hartzog**
Professor of Law
Boston University School of Law

**Frank Pasquale**
Professor of Law
Cornell Law School and Cornell Tech

---

[1] No party's counsel authored this brief in whole or in part, no person other than *amici* and their counsel contributed money to fund the preparation or filing of this brief, and *amici* file this brief with the consent of the parties. Fed. R. App. P. 29(a). *Amici* would like to thank Rebecca Delaney and Sophie Liao, law students in NYU's Technology Law and Policy Clinic, for their significant contributions to this brief.

## INTRODUCTION & SUMMARY OF ARGUMENT

*Amici* urge this Court to affirm the district court and preserve states' abilities to demand—on behalf of consumers and citizens—greater transparency from the dominant social media companies that directly impact our economy, democracy, and public health. This case is not, as Plaintiff-Appellant X Corp. and its *amici* argue, about state regulation of platforms' editorial discretion. California's Assembly Bill ("AB") 587 neither attempts to dictate how platforms moderate content nor forces them to express any message with which they might disagree. Rather, this case is about one state's attempt to compel disclosures that relate directly to the commercial activities of powerful corporations—that is, the terms under which social media platforms offer their services and make them available to users. As the Fifth and Eleventh Circuits have already recognized, *Zauderer v. Office of Disciplinary Counsel of the Supreme Court*, 471 U.S. 626 (1985), provides the proper framework for analyzing platform transparency laws like AB 587. Holding otherwise could forestall any future transparency measures contemplated by California, other states, or Congress.

Under AB 587, the largest social media platforms must publish their "terms of service"—defined as the policies that "specif[y], at least, the user behavior and activities that are permitted" and "that may subject the user or an item of content to being actioned"—"in a manner reasonably designed to inform all users . . . of the

2

existence and contents of the terms of service." Cal. Bus. & Prof. Code § 22675(f), 22676. They must also submit a semiannual report to the California Attorney General that includes their current terms of service, a description of any recent changes to the terms, and additional, limited disclosures regarding their content moderation activities under the terms. *Id.* § 22677. These disclosures include a detailed description of content moderation practices as well as a statement as to whether the terms of service define six categories of content: (A) hate speech or racism; (B) extremism or radicalization; (C) disinformation or misinformation; (D) harassment; (E) foreign political interference; and (F) controlled substance distribution. *Id.* § 22677(a)(3)–(4). If the terms define any of these categories, the report must include the definitions themselves—whatever they may be—along with data reflecting the number of flagged, actioned, and appealed items of content belonging to these categories. *Id.* § 22677(a)(3), (5).

Platform transparency laws like this one serve a variety of important and well-established state interests. Among other interests, compelled disclosures protect consumers by giving users the information they need to choose the social media platforms they want to use and to understand what constitutes acceptable use. They facilitate democratic self-governance by informing users about the ways in which platforms impact the information ecosystem and political outcomes. And they promote public health and safety by alerting users to the risks of social media usage.

This Court should not hamstring governments by removing transparency as a tool for the public interest.

These laws also comport with First Amendment doctrine and principles. To the extent AB 587's reporting requirements involve speech, that speech is at most commercial speech related to platforms' commercial activity—that is, the terms under which platforms offer and provide their services—triggering *Zauderer* scrutiny. Under this standard, the compelled disclosures are purely factual because they seek accurate information about existing policies and practices. They are uncontroversial because the government neither prescribes a correct answer nor levies liability where a platform's terms of service are silent on a matter.

*Amici* do not suggest that all platform transparency laws can and should withstand constitutional scrutiny. Platforms should be free to set their content moderation policies and decide how to apply them beyond the reach of government encroachment or coercion. Some transparency laws may impose far too great a burden on that First Amendment-protected freedom to survive *Zauderer* scrutiny. Other "transparency" laws may appear valid on their face but are unconstitutional in their intent or effect. AB 587 is not such a law. The Court should not foreclose California's modest effort to promote social media platform transparency.

## ARGUMENT

### I. Platform transparency laws serve a variety of important state interests.

To assess whether a law satisfies any level of First Amendment scrutiny, a court must consider the relevant state interests. *See, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980) (requiring the government to "assert a substantial interest to be achieved" by regulations of commercial speech). Even the most compelling government need cannot sustain a law whose means are ill-designed to achieve it. And some goals are impermissible for the government to seek to achieve at all.

X Corp. and its *amici* argue that requiring transparency about content moderation policies falls into that latter, impermissible category: the state's *real* purpose, they contend, is to change how social media platforms exercise their editorial discretion. Not so. Platform transparency laws like AB 587 serve myriad well-established, important state interests, including consumer protection, democratic self-governance, and public health and safety. Accepting X Corp.'s arguments to the contrary would place those interests off limits when it comes to the main services offered by the largest social media companies.

5

### A. Platform transparency mandates promote consumer protection by ensuring consumers can make informed choices in the marketplace.

Courts have consistently recognized the state interest in requiring providers of goods and services to give consumers the information they need to decide what they want to consume and how. The Supreme Court has repeatedly affirmed this valid state interest in informing and "preventing deception of consumers." *Zauderer*, 471 U.S. at 651; *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion) (noting the state interest in both "regulat[ing] commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices" and "requir[ing] the disclosure of beneficial consumer information"). In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, the Court even observed that the individual's interest in consumer information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." 425 U.S. 748, 763 (1976).

This interest is heightened when governments seek to facilitate the re-balancing of information and power asymmetries in the marketplace. In *San Francisco Apartment Ass'n v. City & County of San Francisco*, for example, this Court upheld a city ordinance that "require[d] landlords to provide tenants with a form that describes tenants' rights with respect to buyout negotiations and agreements, and lists the contact information for tenants' rights organizations." 881

6

F.3d 1169, 1177–78 (9th Cir. 2018). In doing so, this Court explained that the measure appropriately served the state interest in leveling the playing field in negotiations by "improving the bargaining position of tenants" relative to landlords—"who are generally more sophisticated and have more information"— and "ensuring that tenants are apprised of their rights." *Id.* at 1179.

The government's authority to compel disclosures in the interest of consumer protection is not only well settled, but it also undergirds much of today's economy. Point-of-sale warnings and product labels are commonplace requirements that help consumers decide which goods to buy. *See, e.g.*, Fair Packaging and Labeling Act, 15 U.S.C. §§ 1451–61 (recognizing that "[i]nformed consumers are essential to the fair and efficient functioning of a free market economy" and requiring that consumer labels contain "accurate information as to the quantity of the contents" and "facilitate value comparisons"). Compelled disclosures are likewise foundational to the financial industry, where information is complex and asymmetrical. The Truth in Lending Act compels lenders to present information in a manner designed to be more comprehensible to the general public. *See* 15 U.S.C. §§ 1601–67f. The Securities Exchange Act of 1934 compels companies to file proxy statements with the Securities and Exchange Commission to disseminate to the public and prohibits false or misleading statements. *See* 15 U.S.C. § 78n(a).

The social media marketplace is no different. As with consumer goods and financial products, more information enables social media users to make informed choices and to protect themselves against the unilateral contracts of adhesion that platforms often present to them. *See e.g.*, *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (noting that the purpose of the Truth in Lending Act is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices" (quoting 15 U.S.C. § 1601(a))). To choose a platform and decide how they use it, potential and existing users need information about what content is allowed and not allowed on each platform, why content is removed, and how that happens. *See, e.g.*, *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672–73 (2019) (noting the importance of product labels for informing consumers of the uses and risks associated with products). Content moderation policies contain this information. Terms of service purport to govern how platforms enforce these policies. Compelled transparency disclosures, like those mandated by AB 587, give users centralized access to the terms of service. This enables users to choose which platforms to join and how to use them. Put simply, terms of service are the social media equivalents of product labels.

AB 587's reporting provisions—which require platforms to consolidate their policies in one place, and to call out any changes they have made to the policies since their last report—advance the state's consumer protection interest in at least three ways. First, rather than forcing users to navigate across multiple hyperlinked or referenced webpages to understand what a platform's content moderation policies are and how they work, *see, e.g.*, *The X Rules*, X, https://help.twitter.com/en/rules-and-policies/x-rules, the reporting requirement ensures that users can access all of the information in an easily accessible, centralized location. Additionally, users do not need to complete a page-by-page redlining exercise to understand how terms have changed over time.

Second, the required reports enable individuals to compare policies among and between platforms. Consumers can use the information to decide whether and which platforms to join. Just as product labels on pharmacy shelves help consumers determine which over-the-counter cold medication will work best for their needs, clear and centralized publication of terms of service enable users to shop around more efficiently. When a user agrees to X Corp.'s terms of service, she enters into a commercial relationship that disproportionately favors X Corp., which can control what that user sees and hears and what that user can say. Giving that user access to a terms of service report that can improve her position vis-à-vis X Corp. is a legitimate government interest.

Third, requiring that companies provide data to back up their stated content moderation policies helps consumers figure out if and how they are actually enforced. For example, AB 587 asks companies to report the total number of flagged and actioned items of certain categories of content, including actioned items that were removed, demonetized, or deprioritized. Cal. Bus. & Prof. Code § 22677(a)(5)(A)(i)–(vii). These quantitative measures help make platform policies and practices clear to users.

Since consumer protection is one of the state interests driving transparency mandates, the Court should not foreclose states' abilities to protect consumers when ruling on the instant statute's constitutionality.

### B. Platform transparency mandates promote democratic self-governance by keeping citizens apprised of platforms' impacts on democracy, public discourse, and society.

Courts have also held compelled disclosures justified where they advance goals of democratic self-governance. In a series of cases concerning democracy and elections, the Supreme Court has made clear that states have a vital interest in enabling and encouraging citizens to engage in, and preserving the integrity of, the political process. In *Buckley v. Valeo*, the Court explained that "facilitat[ing] and enlarg[ing] public discussion and participation in the electoral process" are "goals vital to a self-governing people." 424 U.S. 1, 92–93 (1976). Accordingly, states have an interest in disclosure requirements that "provide[] the electorate with

10

information" to "curb[] the evils of campaign ignorance and corruption." *Id.* at 66–68; *see also United States v. Harriss*, 347 U.S. 612, 625–26 (1954) (acknowledging a "vital national interest" served by lobbying reports that shed light on "who is being hired, who is putting up the money, and how much"); *John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) (upholding compulsory disclosure of names of signatories to electoral referendum petitions that serves the state interest in "preserving the integrity of the electoral process"); *No on E v. Chiu*, 85 F.4th 493, 506 (9th Cir. 2023) (noting voters' interest in knowing who funds political ads).

The Supreme Court has recognized that the types of disclosures the government can compel to further this interest include recurring reports with data necessary to demonstrate whether and how a policy is applied in practice. The law examined in *Buckley*, for example, complemented direct campaign contribution limits with recurring reports to the Federal Election Commission. The Court deemed these compelled reports constitutional as an "essential means of gathering the data necessary to detect violations" of the statute's caps on direct contributions. *Buckley*, 424 U.S. at 67–68. In other words, restrictions alone were insufficient to "safeguard[] against the appearance of impropriety" and eliminate the "opportunity for abuse inherent in the process of raising large monetary contributions," *id*. at 30, and the legislative remedy reflected the utility of data-driven disclosures.

11

The state interest in promoting democratic self-governance is relevant to the largest social media platforms, which host forums for public discourse and debate that directly impact our democracy and political life. *See* David Lazer et al., *Meaningful Measures of Human Society in the Twenty-First Century*, 595 Nature 189, 190 (2021) ("[Platforms] have the potential to alter important patterns of human society, such as the speed of information flows, the scope of media production, and the actors responsible for defining public opinion."). Yet these impacts are often poorly understood, even by the researchers who study them. *See* Jay J. Van Bavel et al., *How Social Media Shapes Polarization*, 25 Trends Cognitive Scis. 913, 914 (2021) ("Little is known about the underlying recommendation algorithms due to lack of transparency on the part of social media companies."). So it is no surprise that voters themselves have a limited understanding of these impacts on their political opinions, engagement with political discourse, and political outcomes. *See* Daphne Keller, *Platform Transparency and the First Amendment*, 4 J. Free Speech L. 1, 74 (2023) ("Without better information about the role platforms play, [citizens] are individually and collectively impaired in the project of democratic self-governance."). To bridge this information gap, individuals need greater transparency "to shape their understanding of and participation in public discourse, elections, and other building blocks of democracy." *Id.* at 53.

Platform transparency laws like AB 587 promote the collective "informational interest," *Buckley*, 424 U.S. at 81, by compelling disclosures that enable citizens to better understand how social media platforms influence the information ecosystem and political outcomes. The target group of AB 587 substantiates the importance of this concern. The statute limits applicability to social media companies with at least $100 million in gross revenue, and it carves out platforms where user interactions are "limited to direct messages, commercial transactions, [or] customer reviews." Cal. Bus. & Prof. Code §§ 22680–81. This means the statute applies only to large social media platforms that facilitate forum-like discourse where democratic ramifications are most prevalent.

AB 587's data reporting requirements similarly promote this interest. *See id.* § 22677(a)(5)(A). Without information about how platforms give effect to their moderation policies, individuals do not have enough information to understand their impacts on public discourse and political processes. Platforms' actions speak louder than their words, and platforms' data sheds light on their actions. AB 587's conditional data reporting requirements—including the total number of flagged and actioned items, the number of times actioned items were viewed by users, and the number of times actioned items were shared—promotes an informed and engaged citizenry. *See id.*

Therefore, democratic self-governance, like consumer protection, is an important state interest in the context of platform transparency. Rejecting laws that promote this interest could foreclose states' abilities to help create the background conditions necessary for engaged and informed civic participation in democracy.

### C. Platform transparency mandates promote public health and safety by alerting users to risks stemming from social media usage.

Finally, the Supreme Court and this Circuit have explained that compelled disclosures can serve the state interest in protecting the health and safety of the public. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018) ("*NIFLA*") ("[W]e do not question the legality of health and safety warnings long considered permissible . . . ."); *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("*CTIA II*") ("There is no question that protecting the health and safety of consumers is a substantial governmental interest."). In *CTIA II*, the Ninth Circuit rebuffed a First Amendment challenge to an ordinance that required cell phone retailers to inform prospective consumers that cell phones may expose them to radio-frequency radiation exceeding Federal Communications Commission ("FCC") guidelines. This Court first noted that the FCC had an interest in "protecting the health and safety of cell phone users in the United States . . . by adopting a highly protective policy, setting low [radio-frequency exposure] limits . . . and compelling cell phone manufacturers to disclose information to cell phone users that will allow them to avoid exceeding those limits." *CTIA II*, 928 F.3d at 845.

14

"After finding that cell phone users are largely unaware of the FCC policy and of the information in their user manuals," the City of Berkeley took the additional step of compelling cell phone retailers to make related disclosures in their stores. *Id.* The Court held that the City's ordinance "further[ed] th[e] same interest" in public health and safety. *Id.*

Governments across the United States, including California, regularly draw upon their authority to promote public health and safety in enacting and enforcing compelled disclosure laws. For example, California's Climate Corporate Data Accountability Act requires any business with "total annual revenues in excess of one billion dollars ($1,000,000,000) and that does business in California" to disclose three categories of emissions. Cal. Health & Safety Code § 38532(b)(2), (c)(1). The stated purpose of this compelled disclosure is to "maximize access for consumers, investors, and other stakeholders to comprehensive and detailed greenhouse gas emissions data." *Id.* § 38532(c)(1)(B). The statute does not dictate acceptable or unacceptable quantities of emissions; it simply asks that large companies provide factual information about their emissions with the government to share with consumers.

Platform transparency mandates like AB 587 similarly promote the state interest in public health and safety. Research suggests that social media use implicates serious health and safety concerns. In particular, several studies show that

15

social media exacerbates mental health issues, especially among adolescents. *See, e.g.*, Yu-Tung Lan, Yuan-Chien Pan & Yu-Hsuan Lin, *Association Between Adolescents' Problematic Online Behaviors and Self-Harm Risk*, 317 J. Affective Disorders 46 (2022) (finding that cyberbullying victimization and perpetration were independently associated with increased risk of self-harm in adolescents); Charisse L. Nixon, *Current Perspectives: The Impact of Cyberbullying on Adolescent Health*, 5 Adolescent Health Med. & Therapeutics 143 (2014) (noting that adolescents targeted by cyberbullying report higher rates of depression, anxiety, loneliness, and suicidal behavior). Other reports point to social media's potential impacts on public safety. *See, e.g.*, U.S. Dep't of Homeland Sec., *Countering False Information on Social Media in Disasters and Emergencies* 5–9 (2018), https://www.dhs.gov/sites/default/files/publications/SMWG_Countering-False-Info-Social-Media-Disasters-Emergencies_Mar2018-508.pdf (finding that incorrect or out-of-date information in social media posts can hinder emergency responses to natural disasters).

Like the Climate Corporate Data Accountability Act's mandatory emissions disclosures, platform transparency laws like AB 587 require disclosures that may directly concern matters implicating public health and safety. In the same way the notices in *CTIA II* alert consumers to potential health and safety hazards of carrying a cell phone, information about content moderation policies and practices enables

16

users to better understand potential threats that social media use may pose to mental health or safety. Accepting X Corp.'s arguments would undermine states' abilities to compel disclosures that serve the state interest in public health and safety in the context of social media.

## II. *Zauderer* provides the proper standard to analyze platform transparency laws like AB 587 that compel purely factual and uncontroversial commercial disclosures.

The proper First Amendment test for transparency laws that require social media platforms to disclose information about their terms of service comes from *Zauderer*, which governs compelled disclosures of commercial speech. 471 U.S. 626 (1985). When platforms like X Corp. offer and make available terms of service to users, they engage in commercial activity. And a law requiring companies to share information about those terms—including "the user behavior and activities that are permitted" and those "that may subject the user or an item of content to being actioned" under the terms, Cal. Bus. & Prof. Code § 22675(f)—compels only commercial disclosures. So long as those disclosures are "factual" and "uncontroversial," courts should apply *Zauderer*'s relaxed standard to ensure that modest but important transparency measures like AB 587 can survive constitutional scrutiny.

X Corp. overstates its case by arguing that the future of editorial discretion is at stake. Unlike the voluntary editorial standards of news organizations like the *New*

17

*York Times*, *see Standards and Ethics*, N.Y. Times, https://www.nytco.com/company/standards-ethics, or the *Washington Post*, *see Policies and Standards*, Wash. Post, https://www.washingtonpost.com/policies-and-standards, which describe how their newsrooms approach their journalism and which would squarely implicate editorial discretion if the government compelled disclosures about them, terms of service reflect the commercial relationship between platforms and their users, and reports providing details about them are commercial disclosures. This Court should not conflate, as X Corp. does, a disclosure that attaches to commercial products or services with one that attaches to editorial discretion.

*Amici* take seriously the threat that even indirect regulation of social media platforms may pose to editorial discretion. But the *Zauderer* standard accounts for and sufficiently protects the First Amendment interests of the platforms. First, it requires courts to ensure the existence of a "substantial" state interest to which the law must be "reasonably related." *Zauderer*, 471 U.S. at 651; *see, e.g.*, *NIFLA*, 585 U.S. at 76–77 (finding "purely hypothetical" the state's interest in ensuring "pregnant women in California know when they are getting medical care from licensed professionals" where the services that trigger the compelled disclosure "do not require a medical license"). Second, it requires courts to explicitly evaluate the "burden" that the law would have on platforms' protected editorial discretion. A

18

platform transparency mandate that makes the costs of content moderation too high or otherwise drowns out or unduly encroaches on editorial discretion would be unconstitutional under *Zauderer. See NIFLA*, 585 U.S. at 778. In contrast, a law like AB 587, which requires disclosure of a platform's existing terms and facts about their enforcement, compels only commercial speech and does not dictate—directly or indirectly—content moderation policies or practices. As such, AB 587 is subject to and meets the *Zauderer* standard, and this Court should uphold the trial court's determination that it does not violate the First Amendment.

### A. AB 587 at most compels commercial speech linked inextricably to commercial activity.

Commercial speech doctrine provides "a limited measure of protection" to speech that is "linked inextricably to commercial activity." *Friedman v. Rogers*, 440 U.S. 1, 10 n.9 (1979); *see also CTIA II*, 928 F.3d at 842 (explaining that a disclosure that "relates to the service or product provided" is commercial speech). Recognizing that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity," *Friedman*, 440 U.S. at 10 n.9 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)), the Supreme Court has noted that commercial speech includes "speech proposing a commercial transaction" as well as "expression related solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561–62; *accord Va. State Bd. of Pharmacy*, 425 U.S. at 762.

19

The Ninth Circuit has applied this doctrine to a wide range of speech related to commercial activity. Targeted, individualized solicitations are commercial speech. *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d. 716 (9th Cir. 2017). Contract negotiations are commercial speech. *S.F. Apartment Ass'n*, 881 F.3d at 1177–78. Retail product warnings are commercial speech. *CTIA II*, 928 F.3d at 845. Significantly for the instant case, this Court has already suggested that "statements concerning [a platform's] content moderation policies" are commercial speech. *Prager Univ. v. Google LLC*, 951 F.3d 991, 999–1000 (9th Cir. 2020) (noting that although "YouTube's statements concerning its content moderation policies do not constitute 'commercial advertising or promotion,'" as required for a claim under the Lanham Act, "[n]ot all commercial speech is promotional").

Platforms engage in commercial activity when they offer and make available terms of service to their users. *See, e.g.*, *Terms of Service*, X, https://twitter.com/en/tos ("These Terms of Service ("Terms") are part of the User Agreement—a legally binding contract governing your use of X."); *Terms of Service*, Facebook, https://www.facebook.com/legal/terms ("These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the Meta Products or Products), except where we expressly state that separate terms (and not these) apply."). Platforms' terms of service are quite literally "the terms under which [their] services will be available."

20

*Zauderer,* 471 U.S. at 651. Platforms engage in further commercial activity when they seek to enforce those terms according to their policies that specify permitted user behavior and activities. *See, e.g.*, *Our Range of Enforcement Options*, X, https://help.twitter.com/en/rules-and-policies/enforcement-options ("We take action to suspend an account if we determine that a user has engaged in repeated violations of our policies and/or violated specific policies that cause significant risk to X.").

AB 587's reporting provisions thus compel commercial speech because they require social media companies to disclose information that is related to their commercial activity and reflects their commercial interests. *See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561–62. Companies must submit semiannual reports including their platforms' terms of service as well as information about their current content moderation policies, practices, and enforcement mechanisms. Cal. Bus. & Prof. Code § 22677(a). These reporting requirements directly relate to the companies' advertised and ongoing commercial relationships with their users.

## B. AB 587 compels purely factual and uncontroversial disclosures that do not impose an undue burden on platforms' First Amendment interests.

Despite X Corp.'s contentions, *Zauderer* remains the doctrinal standard by which statutes compelling factual and uncontroversial disclosures about social media platforms' terms of service should be assessed. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) (applying *Zauderer* to general disclosure

21

requirements and finding that they compel factual and uncontroversial information from social media platforms), *cert. granted in part on other grounds*, 144 S. Ct. 477 (2023); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022) (same), *cert. granted in part on other grounds*, 144 S. Ct. 478 (2023). In *Zauderer,* the Supreme Court held that, while "[u]njustified or unduly burdensome disclosures might . . . chill[] protected commercial speech," "disclosure requirements [that] are reasonably related to the State's interest in preventing deception of consumers" pose no comparable risk. 471 U.S. at 651. Instead, as this Court has held, the government may compel "'purely factual and uncontroversial information' that relates to the service or product provided" so long as "the compelled disclosure is 'reasonably related' to a substantial government interest." *CTIA II*, 928 F.3d at 842 (quoting *NIFLA*, 585 U.S. at 786; *Zauderer*, 471 U.S. at 651). That standard governs transparency mandates that, like AB 587, compel purely factual and uncontroversial information about social media platforms' content moderation policies and practices.

The Ninth Circuit has defined both "purely factual" and "uncontroversial." A disclosure is "purely factual" if "it only require[s] the disclosure of accurate, factual information." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1276 (9th Cir. 2023). This aspect of the *Zauderer* test bars "the government from compelling others to disseminate false, deceptive, or misleading commercial disclosures." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 n.12

(9th Cir. 2022) ("*CERT*"). A compulsory disclosure is controversial if it forces a private actor to speak on a debated issue about which she does not want to speak, especially if the compelled speech forces her to take a side with which she disagrees. *Compare NIFLA*, 585 U.S. at 769 (finding controversial a compelled statement that forced clinics opposed to abortion to disclose information about abortion— "anything but an uncontroversial topic" (quotation marks omitted)), *and Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995) (finding that the state "may not compel affirmance of a belief with which the speaker disagrees"), *with CTIA II*, 928 F.3d at 845 (finding uncontroversial a compelled statement that did "not force cell phone retailers to take sides in a heated political controversy"). This Circuit explicitly defines "controversial" speech as that which "improperly elevates one side of a legitimately unresolved debate." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1278; *accord CERT*, 29 F.4th at 478. The Court has also stated that just because a "purely factual statement can be tied in some way to a controversial issue" does not make it "for that reason alone, controversial." *CTIA II*, 928 F.3d at 845; *see, e.g.*, Cal. Health & Safety Code § 38532 (requiring emissions disclosures, which do not become controversial simply because climate change is a related controversial topic).

AB 587's reporting provisions trigger *Zauderer* scrutiny. First, they compel purely factual information and data related to platforms' terms of service with users

and the policies and practices that purportedly govern enforcement of those terms. That information is factually accurate and not misleading because it merely sheds light on a social media platform's existing terms of service, including what a user can and cannot do on the platform and how the platform seeks to enforce its policies in practice.

Second, AB 587's reporting provisions compel uncontroversial information because they neither begin nor participate in a debate about what the correct definitions of content categories or best moderation practices should be. *See Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1278. The statute does not dictate what categories must be in platforms' terms of service, much less how they must be defined; it simply asks what the platforms put in their existing terms of service, and how they enforce those terms. Under AB 587, a company can choose not to define any of the speech categories listed, or to define it any way they want. Cal. Bus. & Prof. Code § 22677(a)(3). If they offer no definition, they face zero consequences. Indeed, X Corp. has already complied with the law in this fashion, explaining in its recent report submitted to the California Attorney General: "The current version of the X Terms of Service does not define 'hate speech' or 'racism.'" X Corp., *California Terms of Service Report* 1, Off. Att'y Gen., Cal. Dep't Just. (Jan. 1, 2024), https://oag.ca.gov/sites/default/files/X%20Corp.%20-%20Q3%202023%20California%20TOS%20Report.pdf/X%20Corp.%20-

24

%20Q3%202023%20California%20TOS%20Report.pdf. A company that chooses to define a listed content category is equally compliant, regardless of what that definition is.

If AB 587 sought a particular or "right" answer, this would be a different case. Such a law would "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion [and] force citizens to confess by word or act their faith therein"—the ultimate vice of a compelled speech law—and would be subject to heightened scrutiny. *Zauderer*, 471 U.S. at 651 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

Moreover, even platform transparency laws that trigger *Zauderer* scrutiny may not survive it. Though a more relaxed standard, *Zauderer* is sufficiently protective of platforms' editorial discretion because it provides courts with two safety valves to ensure that compelled disclosures do not unconstitutionally chill or infringe on protected speech. First, the disclosures must be "'reasonably related' to a substantial governmental interest." *CTIA II*, 928 F.3d at 842 (quoting *Zauderer*, 471 U.S. at 651). They must "remedy a harm that is 'potentially real not purely hypothetical.'" *NIFLA*, 585 U.S. at 776 (quoting *Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*, 512 U.S. 136, 146 (1994)). Moreover, the disclosures must extend "no broader than reasonably necessary." *Id.* (quoting *In re R.M.J.*, 455 U.S. 191, 203

(1982)). "Otherwise," they "risk 'chilling' protected speech." *Id.* (quoting *Zauderer*, 471 U.S. at 651).

Second, the statute cannot be "unduly burdensome when balanced against its likely burden on protected speech." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019). "The Supreme Court made clear in *NIFLA* that a government-compelled disclosure that imposes an undue burden fails for that reason alone." *Id.* Courts will find a statute unduly burdensome when its compelled disclosures "drown[] out [the speaker's] own message." *NIFLA*, 585 U.S. at 778 (finding that the government's compelled abortion disclosure "'effectively rules out' the possibility of having [a pro-life] billboard in the first place" since the "unlicensed facility must call attention to the notice, instead of its own message" (quoting *Ibanez*, 512 U.S. at 146)); *see also Owen*, 873 F.3d at 734 (finding "relatively brief disclosures" not unduly burdensome because they did "not rule out Nationwide's ability to send its solicitation letters, effectively or otherwise").

*Zauderer* does not provide carte blanche for states to regulate content moderation through indirect means. *Zauderer* would not apply to a compelled disclosure that forced platforms to adopt unwanted messages or policies or weigh into a controversial public debate. And where *Zauderer* does apply, its standard is sufficiently protective of platforms' First Amendment interests. If a compelled disclosure statute serves as nothing more than a pretext for an illegitimate effort to

26

control platforms' editorial discretion, or if it otherwise imposes too great a burden on such discretion, courts will and should strike it down under *Zauderer*. That is not the case here, and the Court should uphold AB 587.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to affirm the district court's decision.

Dated:   March 19, 2024

/s/ *Jake Karr*

<div style="margin-left:auto">

</div>

G.S. Hans
CORNELL LAW SCHOOL
Myron Taylor Hall
Ithaca, NY 14853
(607) 254-5994

Jake Karr
TECHNOLOGY LAW AND POLICY CLINIC
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
(212) 998-6042
jake.karr@nyu.edu

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7). According to the word-processing system used to prepare this brief, it contains 5,959 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman, in 14-point font.

Dated: March 19, 2024

/s/ *Jake Karr*
Jake Karr

*Counsel for* Amici Curiae