### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

X CORP., successor in interest to Twitter, Inc.,

    *Plaintiff-Appellant*

    *v.*

ROBERT BONTA, Attorney General of the State of California,

    *Defendant-Appellee.*

Case No. 24-271

*On Appeal from the U.S. Dist. Ct. for the Eastern District of California*
*Case No. 2:23-cv-1939-WBS-AC*
*The Honorable William B. Shubb*

## BRIEF OF THE INSTITUTE FOR STRATEGIC DIALOGUE AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

*/s/ Jason Harrow*
Jason Harrow
Charles Gerstein
GERSTEIN HARROW LLP
14100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
Telephone: 323-744-5293
jason@gerstein-harrow.com

*Attorneys for Amicus*

March 20, 2024

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amicus is a non-profit, tax-exempt corporation. It has no parent corporation, and no publicly held company has 10% or greater ownership.

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ........................................................iv

INTEREST OF AMICUS CURIAE ...........................................1

INTRODUCTION .......................................................................2

ARGUMENT ...............................................................................4

I. THE COMPLIANCE BURDEN FROM AB 587 IS LIGHT BECUASE X ALREADY MUST COMPLY WITH MATERIALLY IDENTICAL DISCLOSURE LAWS. .......................4

    A. The EU's Digital Services Act Requires Much of What AB 587 Does, and More.............................................5

    B. Texas and Florida Also Have Similar Disclosure Requirements..........................................................................9

    C. Other Jurisdictions Have Passed Or Are Contemplating Social Media Disclosure Laws. ................................13

II. TRANSPARENCY IS A CRITICAL TOOL FOR MAXIMZING FREE SPEECH AND MINIMIZING HARMS FROM VERY LARGE SOCIAL MEDIA PLATFORMS.........................................14

III. GIVEN THE MINIMAL BURDEN, IMPORTANT GOVERNMENT INTEREST, AND NARROW TAILORING, AB 587 CAN WITHSTAND ANY LEVEL OF SCRUTINY.............22

CONCLUSION.................................................................24

CERTIFICATE OF COMPLIANCE ........................................................26

APPENDIX (TWITTER DSA REPORT) ...................................................27

# TABLE OF AUTHORITIES

### Cases

*CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019) ................................................................................4

*Junior Sports Mags. Inc. v. Bonta*, 80 F. 4th 1109 (9th Cir. 2023) ..............................................................................................22

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022) ..............................................................................................11

*NetChoice, LLC v. Moody*, 144 S. Ct. 478 (2023) ..............................11, 12

*NetChoice, LLC v. Moody*, 144 S. Ct. 69 (2023) ........................................11

*NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ........................12

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................19

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ......................................19

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................................................................................4, 22

### Statutes

Fla. Stat. § 106.072(4) ..............................................................................10

Fla. Stat. § 501.2041 *et seq.* ....................................................................10

Tex. Bus. & Com. Code Ann. § 120.051 *et seq.* ......................................11

### Other Authorities

81 Fed. Reg. 33758 (2016) ........................................................................16

HR 7532 (118th Cong. 2024) ....................................................................20

Amicus Brief of New York et al. in *Moody v. NetChoice* (S. Ct. No. 22-277, Brief filed Dec. 2023) ......................................18, 19

Amicus Brief of the Coalition For Independent Technology Research in *Murthy v. Missouri* (S. Ct. No. 23-411, Brief filed Dec. 2023) (describing First Amendment rights of researchers and scholars in context of social media regulation)..............................................................20

Casey Tonkin, Social Media Faces Australian Ban," *Information Age* (Aug. 2, 2023), *available at* https://perma.cc/W6BE-2ENE.........................................................13

David A. Broniatowski, et al., "The efficacy of Facebook's vaccine misinformation policies and architecture during the COVID-19 pandemic," 9 *Science Advances*, Issue 37 (2023), *available at* https://perma.cc/FSW7-7CU7.........................................................17

David Malloy, "Zuckerberg tells Rogan FBI warning prompted Biden laptop story censorship," *BBC News* (Aug. 26, 2022), *available at* https://perma.cc/S53X-QYMJ (explaining Facebook response to *New York Post* story about Hunter Biden) .....................................................17

"Digital Services Act," *Wikipedia* (as of Mar. 13, 2024) ...........................5

European Commission, "Questions and Answers on the Digital Services Act" (updated Feb. 23, 2024), *available at* https://perma.cc/C8PD-2JQX.......................................................6

Henry Tuck, "Policy Approaches to Addressing Data Access Challenges in the Evolving Online Ecosystem," Inst. For Strategic Dialogue (2023), *available at* https://perma.cc/63LV-AEQ7 .......................................................7

K. Hagedorn et al., "The UK's Online Safety Act and EU's Digital Services Act: What Online Service Providers

Should Know," Orrick (Nov. 6, 2023), *available at*
https://perma.cc/4DH7-W93G .......................................................13

Latham & Watkins, "The Digital Services Act: Practical
Implications," (March 2023), *available at*
https://perma.cc/X7D7-57YF .........................................................7

Nat'l Conf. of State Legislatures, *Social Media and
Children 2023 Legislation* (Aug. 10, 2023),
https://perma.cc/T3ES-QJDA........................................................18

Singapore Infocomm Media Development Auth., "IMDA's
Online Safety Code Comes Into Effect" (Aug. 17,
2023), *available at* https://perma.cc/7N53-B7B8............................13

X Corp. California Terms of Service Report (Jan. 1, 2024),
*available at* https://perma.cc/WY34-E59A.......................................8

## INTEREST OF AMICUS CURIAE[1]

Amicus curiae the Institute for Strategic Dialogue (ISD) is an independent, non-profit organization dedicated to safeguarding human rights and reversing the rising tide of polarization, extremism, and disinformation worldwide. Since 2006, ISD has been at the forefront of analyzing and responding to extremism in all its forms. Its global team of researchers, digital analysts, policy experts, frontline practitioners, and technologists have kept ISD's work systematically ahead of the curve on this fast-evolving set of threats. ISD partners with governments, cities, businesses, and communities to deliver concrete solutions at all levels of society.

ISD's team of researchers has deep experience studying social-media's impacts around the world. ISD has accordingly supported measures that increase meaningful transparency of social media companies' systems and the decisions they make about running their

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than amici and their counsel funded its preparation or submission, except that a non-profit initiative, the Tech Justice Law Project, provided some supplemental funding. *See* Fed. R. App. 29(a)(4)(E). All parties have consented to the filing of this brief.

1

platforms. ISD has come to understand that a basic level of transparency, which is becoming the norm worldwide, is essential for public interest researchers like ISD to scrutinize companies' practices and to share findings that can be used to make platforms safer and more transparent spaces.

## INTRODUCTION

The core issue in this case is the balance between the burdens imposed on X Corp. by AB 587 and the benefits of that law to people of the State of California. ISD's position at the forefront of efforts to ensure social-media transparency gives it unique insight into both the burdens and the benefits.

*First*, X tells this Court that the information required to be disclosed under AB 587 is "burdensome to compile," Appellant's Br. 36, but it conspicuously cites no evidence in the record illuminating the magnitude of this burden. The EU's Digital Services Act ("DSA"), as well as provisions of laws enacted by Florida and Texas, contain disclosure requirements nearly identical to those in AB 587, and X is already complying with those other laws. Indeed, in its most recent report under EU law, X writes that it was "founded on a commitment to transparency."

*See* Appendix, First X DSA Transparency Report Covering Aug. 28, 2023 to Oct. 20, 2023, undated and unpaginated, *available at* https://perma.cc/GZD2-Y6W9. And yet X complains that California is requiring it to transparently report its policies. This complaint rings hollow, given that X is already subject to transparency requirements from at least three other jurisdictions, and X cites transparency as a core founding value.

*Second*, social media platform disclosure laws are beneficial for all users and interested citizens, not just in California but around the country and around the world, and regardless of political affiliation or allegiance. As amici's research shows, data from online platforms has become crucial for protecting citizens' rights, ensuring evidence-based policy making, and holding platforms accountable.

Balancing these interests, California's law creates a minimal burden for the entities—who are already providing this data in Europe and elsewhere—and it is necessary to ensure continued transparency and data access for public interest research, which, in turn, will allow researchers, civil society, and advocates to monitor platform adherence both to their own and governmental policies; to identify harms from the

3

use of social media or the failure to adhere to these policies; and inform political, regulatory, and advocacy agendas.

Given the minimal additional compliance burden and the targeted nature of the regulation, the law passes constitutional muster under any level of scrutiny. The district court's decision to deny X's request for a preliminary injunction should be affirmed.

## ARGUMENT

California's law is not unique. Rather, platforms like X are subject to disclosure laws in other states and around the world, and the corresponding information is proving useful to the public. Accordingly, AB 587 can withstand any level of scrutiny.

**I.  THE COMPLIANCE BURDEN FROM AB 587 IS LIGHT BECUASE X ALREADY MUST COMPLY WITH MATERIALLY IDENTICAL DISCLOSURE LAWS.**

Under the relevant First Amendment standard, which comes from *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), AB 587 must be "reasonably related to a substantial governmental interest." *CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019), and must also not be "unduly burdensome" to comply with. *Zauderer*, 471 U.S. at 651. The State gives several reasons why

4

compliance with AB 587 is not "unduly burdensome." Answering Br. 37. Indeed, as the State recognizes, X does not even attempt to point to evidence of its compliance burden. *See* Answering Br. 38. But there is another very important reason that AB 587 is not unduly burdensome: X is already gathering the relevant data to comply with similar transparency laws in both the United States and around the world. The marginal burden from complying with AB 587 is thus necessarily quite minor.

## A. The EU's Digital Services Act Requires Much of What AB 587 Does, and More.

The EU's Digital Services Act was formally adopted by the European Parliament and the EU Council in 2022, and it applies across all twenty-seven member states. *See generally* "Digital Services Act," *Wikipedia* (as of Mar. 13, 2024). Its passage was driven by the recognition that the digital environment has drastically changed since the early 2000s, with online platforms now playing a central role in facilitating public discourse, commerce, and the dissemination of information. The legislation was developed with the dual aim of safeguarding the rights of citizens online and ensuring that the digital market operates fairly, transparently, and is conducive to innovation. *See, e.g.*, European

Commission, "Questions and Answers on the Digital Services Act" (updated Feb. 23, 2024), *available at* https://perma.cc/C8PD-2JQX.

The DSA applies to a broad spectrum of online platforms and digital services, including social media networks, online marketplaces, and content-sharing platforms. It categorizes these platforms based on their functionality, size, and reach, imposing more stringent obligations on very large online platforms and very large online search engines, which are identified based on the number of recipients of the service in the EU. X has been designated as a "very large" online platform because there are 115 million monthly active users in the EU. European Commission, "Supervision of the Designated Very Large Online Platforms and Search Engines Under DSA," (updated Mar. 1, 2024), *available at* https://perma.cc/65Z2-A2B4.

As a designated very large online platform, X is already subject to important disclosure obligations in the EU. As particularly relevant here, it must publish "annual reports on content moderation." These reports "must include information about the moderation initiative, including information relating to illegal content, use of automated tools, training measures, and complaints received under complaints-handling systems."

Latham & Watkins, "The Digital Services Act: Practical Implications," (March 2023), *available at* https://perma.cc/X7D7-57YF. In addition, X is required to provide additional data specifically to researchers "to support the detection, identification, and understanding of the systemic risks" of content that can circulate on these large platforms, such as illegal content, the suppression of fundamental rights, negative impacts on civic discourse, and more. *See* Henry Tuck, "Policy Approaches to Addressing Data Access Challenges in the Evolving Online Ecosystem," Inst. For Strategic Dialogue (2023), *available at* https://perma.cc/63LV-AEQ7. The law is enforced by the European Commission and new compliance entities, the National Digital Services Coordinators, who will oversee enforcement within each member state.

The DSA is quite new—it only fully went into effect for very large platforms in August 2023 and for all services in February of 2024—but it is already having an impact. X has posted a full report under the Act, and it contains detailed descriptions of X's content-moderation policies. *See* Appendix. It lists actions taken in various categories by country, for instance, including listing the actions taken against posts or users for violating provisions relating to "abuse & harassment" or "negative effects

on civic discourse or elections." *See id.* X's first DSA report, then, is quite similar to the first report it submitted under AB 587, except the one prepared for the EU is much more detailed and, presumably, burdensome to compile. In contrast, X's report under AB 587 contains eleven pages of non-public data and a small handful of tables of relatively broad information. X Corp. California Terms of Service Report (Jan. 1, 2024), *available at* https://perma.cc/WY34-E59A. Meanwhile, the EU transparency report is both longer and contains far more detailed tables of information. An example is below:

From X's AB 587 report (at page 6):

(ii) The total number of actioned items of content.

| Policy | Enforcement Action Taken | | |
|---|---|---|---|
| | Restricted Reach of Post(s) | Post Removal* | Labels (Post-Level) |
| Abuse & Harassment | 39,141 | 8,140 | N/A |
| Civic Integrity | 34 | N/A | N/A |
| Synthetic & Manipulated Media | N/A | N/A | 13 |

From the DSA Report (excerpted from a much larger, more detailed table):

**REPORTS RESOLVED BY ACTIONS TAKEN ON ILLEGAL CONTENT**

| Enforcement Process | Action Type | Reason Code | Austria | Belgium | Bulgaria | Cr |
|---|---|---|---|---|---|---|
| **Actions Taken on Illegal Content - Aug 28 to Oct 20** | | | | | | |
| Automated Means | Global content deletion based on a violation of TIUC Terms of Service and Rules | Illegal or Harmful Speech | 1 | 0 | 0 | |
| | | Non-Consensual Behaviour | 0 | 0 | 0 | |
| | | Self-Harm | 0 | 0 | 0 | |
| | | Violence | 0 | 0 | 0 | |
| | Country withheld Content | Data Protection & Privacy Violations | 0 | 0 | 0 | |
| | | Illegal or Harmful Speech | 0 | 0 | 0 | |
| | No Violation Found | Animal Welfare | 0 | 0 | 0 | |
| | | Data Protection & Privacy Violations | 0 | 0 | 0 | |
| | | Illegal or Harmful Speech | 5 | 2 | 0 | |
| | | Non-Consensual Behaviour | 0 | 0 | 1 | |
| | | Pornography or Sexualized Content | 0 | 0 | 0 | |
| | | Protection of Minors | 1 | 0 | 0 | |
| | | Risk for Public Security | 0 | 0 | 0 | |
| | | Scams and Fraud | 8 | 5 | 1 | |
| | | Scope of Platform Service | 0 | 0 | 0 | |
| | | Self-Harm | 0 | 1 | 0 | |
| | | Unsafe and Illegal Products | 0 | 0 | 0 | |
| | | Violence | 0 | 1 | 0 | |

## B. Texas and Florida Also Have Similar Disclosure Requirements.

California is not the only large state to have mandated disclosure requirements on very large online platforms like X. Although state politics look very different in Texas and Florida from the politics of California, legislators there too have imposed general disclosure requirements on X and similar platforms. Those requirements have been upheld by federal courts, and are not at issue in the pending Supreme

9

Court cases about other aspects of the Florida and Texas laws because certiorari was denied as to those questions.

**Florida**. Florida's SB 702 is a comprehensive regulation of social media platforms that contains disclosure requirements similar to those in AB 587. Platforms must publish their "standards" for "determining how to censor, deplatform, and shadow ban" users. Fla. Stat. § 501.2041(2)(a). They must inform users "about any changes to" their "rules, terms, and agreements." *Id.* § 501.2041(2)(c). Upon request, a platform must tell users how many other users viewed their content. *Id.* § 501.2041(2)(e). And if a platform "willfully provides free advertising for a candidate," it "must inform the candidate of such inkind contribution." *Id.* § 106.072(4). Violations of these provisions can be enforced through suits for damages or injunctive relief, and both the State and private individuals or entities have rights of action. *Id.* § 501.2041(5)–(6). Both laws require publication of specific information about content moderation practices, and indeed the information required by Florida and California largely overlaps.

The Eleventh Circuit upheld these provisions against a First Amendment challenge like that here. As that court held, Florida had a

10

"legitimate" interest "in ensuring that users—consumers who engage in commercial transactions with platforms by providing them with a user and data for advertising in exchange for access to a forum—are fully informed about the terms of that transaction and aren't misled about platforms' content-moderation policies." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022). And the court held that the disclosures were not "unduly burdensome." *Id.* The Supreme Court declined to review that aspect of the Eleventh Circuit's decision. *NetChoice, LLC v. Moody*, 144 S. Ct. 69 (2023) (denying petition for certiorari on this issue while also granting, at 144 S. Ct. 478, the State's petition to review certain other aspects of the Eleventh Circuit's decision).

**Texas.** Under Texas H.B. 20, large social media platforms must disclose how they "curate[] and target[] content to users," how they "moderate[] content," and how they use algorithms to prioritize the ranking or frequency with which content appears. Tex. Bus. & Com. Code Ann. § 120.051(a)(1), (3), and (4). They must also "publish an acceptable use policy." *Id.* § 120.052(a). And, as particularly relevant here, they must issue a "biannual transparency report." *Id.* § 120.053. That report is

11

similar to the ones required by AB 587 and the EU's DSA, in that it requires X (and similar platforms) to disclose "the number of instances in which the social media platform took action with respect to illegal content, illegal activity, or potentially policy-violating content known to the platform due to the nature of the content as illegal content, illegal activity, or potentially policy-violating content," among other detailed data. *Id.* at § 120.053(a)(2).

Like the Florida law, the Texas disclosure law was challenged in federal court. And like the Florida law, it was upheld by the Court of Appeals. The Fifth Circuit held that the disclosure and reporting requirements "easily pass[] muster" under the First Amendment. *NetChoice, LLC v. Paxton*, 49 F.4th 439, 487 (5th Cir. 2022). Indeed, the court correctly recognized that preparing a transparency report "imposes little burden because the Platforms already track many of the statistics required by this report," *id.* at 486, and this aspect of the Fifth Circuit's decision is not at issue in the pending Supreme Court case, *see* 144 S. Ct. 478 (limiting questions presented). Tellingly, the broad coalition of tech companies challenging the law there actually "concede[d]" the minimal

12

burden point before the Fifth Circuit. *Id.* Though X has taken a different position here, it has given the Court no evidence of its compliance burden.

### C. Other Jurisdictions Have Passed Or Are Contemplating Social Media Disclosure Laws.

In addition to the EU, California, Texas, and Florida, large social media platforms are now also subject to disclosure laws around the world. The U.K.'s Online Safety Act requires "terms of service and risk reporting." K. Hagedorn et al., "The UK's Online Safety Act and EU's Digital Services Act: What Online Service Providers Should Know," Orrick (Nov. 6, 2023), *available at* https://perma.cc/4DH7-W93G. Singapore has enacted recent legislation that requires that social media platforms be "accountable to Singapore users by providing transparency on their measures and levels of safety in annual online safety reports." Singapore Infocomm Media Development Auth., "IMDA's Online Safety Code Comes Into Effect" (Aug. 17, 2023), *available at* https://perma.cc/7N53-B7B8. Australia is considering banning social media platforms that do not "meet a set of transparency requirements." Casey Tonkin, Social Media Faces Australian Ban," *Information Age* (Aug. 2, 2023), *available at* https://perma.cc/W6BE-2ENE.

This is not surprising. As social media platforms' reach and influence increases, so too does the need for governments to ensure the products these platforms are offering are not causing unnecessary harms. Given the widespread application of these laws, the burden from any additional compliance is relatively minimal, especially for a very large platform like X. Indeed, it would seem unfair to Californian citizens if a series of world-changing companies based in California were subject to transparency requirements in Europe and around the world, but Californians lacked any real insight into how their homegrown companies operated. AB 587 is of a piece with what many others around the country and world are doing, and X and other platforms are validly subject to regulation in California as much as in other jurisdictions.

## II. TRANSPARENCY IS A CRITICAL TOOL FOR MAXIMZING FREE SPEECH AND MINIMIZING HARMS FROM VERY LARGE SOCIAL MEDIA PLATFORMS.

While the marginal burden on very large platforms from complying with AB 587 is not undue, the benefits of the transparency reports and disclosures provided by AB 587 and other provisions is substantial. After all, as X itself professes, it was "founded on a commitment to transparency." *See* X DSA Report. X "want[s] people on X to feel they are

able to freely express themselves, while also ensuring that conversations on X are safe, legal and unregretted." *Id.* And, as X itself recognizes, its "Terms of Service and Rules—which are continually being reviewed, and are informed by feedback from the people who use X—help ensure everyone feels safe expressing themselves." *Id.* In other words, as X itself recognizes, enforcement of the rules of the platform is critical for free expression. Transparency around rules enforcement thus furthers the First Amendment's core principle that creating a vibrant marketplace of ideas is good for democracy and society. Without the information required by AB 587, the marketplace of ideas around social media usage and impact would be noticeably weaker.

The transparency that AB 587 requires plays a crucial role in creating a safe, responsible, and trustworthy digital environment in California and throughout the country. Amici's research points to several concrete benefits that the kinds of disclosures AB 587 requires can have for users. The government has a strong interest in generating these benefits for its citizens. Among them are:

**Helping users make informed choices**. Providing clear, accessible information about how platforms operate and make decisions

15

regarding content gives users a better understanding of the digital environment they are engaging with. This empowers them to make informed decisions about their online behavior and how they interact with content. *See generally* Answering Br. 35–37 (describing state interest).

This interest is similar to the one the government has in requiring accurate labeling of packaged foods. During the most recent rulemaking updating nutrition labeling requirements, the FDA noted that nutrition labels further important government interests by "providing information to consumers to assist them in maintaining healthy dietary practices." 81 Fed. Reg. 33758 (2016). And while the transparency reports required by AB 587 won't necessarily be put in front of consumers every time they use the product, the ability for commentators and researchers to digest the information in the required reports will indeed help consumers understand how to "maintain[] healthy [social media] practices."

For example, users of social media platforms who are interested in discussing, say, the potential dangers of vaccination or materials discovered on Hunter Biden's laptop would benefit from the knowledge that Facebook, run by Meta Platforms Inc. (a company subject to AB 587),

16

may consider certain posts on those topics to be "misinformation" or "election interference" and may take content on those topics down. *See, e.g.*, David A. Broniatowski, et al., "The efficacy of Facebook's vaccine misinformation policies and architecture during the COVID-19 pandemic," 9 *Science Advances*, Issue 37 (2023), *available at* https://perma.cc/FSW7-7CU7 (discussing Facebook policy on vaccine misinformation); David Malloy, "Zuckerberg tells Rogan FBI warning prompted Biden laptop story censorship," *BBC News* (Aug. 26, 2022), *available at* https://perma.cc/S53X-QYMJ (explaining Facebook response to *New York Post* story about Hunter Biden). Similarly, users who are concerned about exposure to racist, antisemitic, and other bigoted content would benefit from being able to reference a platform's terms of service and reliably know that the company consistently adheres to it. As these examples show, these interests run the partisan spectrum—what's good for the goose, after all, is good for the gander, and laws like AB 587 forward the interests of *all* Americans.

**Furthering accountability and regulatory compliance**. When social media platforms are transparent about their operations, external stakeholders, including the public, researchers, and regulators, can hold

them accountable for their actions. Especially in an environment when many believe that social media platforms can sway public opinion on important matters of public concern—from COVID information to political races to foreign policy—this public accountability is essential for ensuring platforms act responsibly and in the best interests of society. Indeed, it is no coincidence that three overlapping disclosure requirements on social media platforms have been passed by legislatures across the country. The states all recognize that transparency requirements are critical to understanding the platforms' roles in impacting matters of public concern. *See, e.g.*, Nat'l Conf. of State Legislatures, *Social Media and Children 2023 Legislation* (Aug. 10, 2023), https://perma.cc/T3ES-QJDA (detailing status of social media legislation in 35 states in the last legislative year); *see also* Amicus Brief of New York et al. in *Moody v. NetChoice* at 5–20 (S. Ct. No. 22-277, Brief filed Dec. 2023) (extensively detailing how "States have worked diligently to protect their citizens from the risks posed by social media platforms"). AB 587 furthers that interest.

Relatedly, transparency helps platforms demonstrate compliance with existing regulations and legal requirements. As digital governance

18

evolves, being able to show that they are adhering to the letter and spirit of the law is crucial for platforms to maintain their operational legitimacy. The State, of course, has general police powers, *see* U.S. Const. amd. X (reserving to the States all unenumerated powers of government), and disclosure requirements further California's general interest in regulating to protect the health and welfare of its citizens. *See, e.g.*, Amicus Brief of New York et al. in *Moody v. NetChoice* at 20–25 (S. Ct. No. 22-277, Brief filed Dec. 2023) (summarizing state power to regulate social media platforms).

**Supporting research and researchers**. The Supreme Court has long held that scholars "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs."). By sharing data and insights about their platforms, social media companies can support academic and policy research that aims to understand and mitigate the negative impacts of social media on

19

society. This research can inform the development of more effective algorithms, tools, and policies for content moderation and user engagement. California has a strong interest in giving researchers, commentators, and all citizens—each of whom has a First Amendment right to listen and to speak on topics of public concern—access to important data about the practices of social media platforms that occupy such an important role in our society and in our public discourse. *See, e.g.*, Amicus Brief of the Coalition For Independent Technology Research in *Murthy v. Missouri* at 5–11 (S. Ct. No. 23-411, Brief filed Dec. 2023) (describing First Amendment rights of researchers and scholars in context of social media regulation).

**Promoting ethical AI use**. As artificial intelligence becomes increasingly integral to platform operations, transparency about the development, deployment, and impacts of AI systems is critical. *See, e.g,* HR 7532 (118th Cong. 2024) (bipartisan introduced bill called the "Federal AI Governance and Transparency Act," which notes that the government should ensure "[t]ransparency in publicly disclosing relevant information regarding the use of artificial intelligence to appropriate stakeholders"). Transparency around the use of this rapidly developing,

critical technology ensures that AI is used ethically and responsibly, with due consideration for potential biases and negative outcomes.

AB 587 and related disclosure requirements further that interest. In its initial report to the California Attorney General, X revealed that certain categories of enforcement were "auto enforced" while others were "manual enforced." Report page 7. The EU's DSA gives even more detail on what actions were taken via "automated means" or "manual review," and it also explains in some detail how problematic content can be "flagged by a combination of technology and other purpose-built internal proprietary tools." DSA report.

\* \* \*

California's interest in requiring these minimally burdensome disclosures of very large social media platforms like X is not merely speculative. Instead, as amici's experience shows with laws worldwide that are like AB 587, it is concrete and important. There is a reason that governments around the country and worldwide are passing laws similar to AB 587: people of all political stripes are requesting them.

### III. GIVEN THE MINIMAL BURDEN, IMPORTANT GOVERNMENT INTEREST, AND NARROW TAILORING, AB 587 CAN WITHSTAND ANY LEVEL OF SCRUTINY.

The State and the District Court have ably explained why AB 587 is subject to so-called *Zauderer* scrutiny and why it passes that test. *See* Answering Br. 34–38. But if the Court does not analyze the law under *Zauderer* (though it should), then it will likely apply intermediate scrutiny, or perhaps even strict scrutiny. The forgoing analysis reveals why the disclosure requirements survive those requirements.

In particular, X claims that the law does not "directly and materially advance[] a substantial government interest" and is "more extensive than . . . necessary to further that interest." *Junior Sports Mags. Inc. v. Bonta*, 80 F. 4th 1109, 1116 (9th Cir. 2023); Appellant's Br. 50. But transparency laws do indeed further at least the four concrete interests described above, and the law here, like similar laws, directly advances those interests. Further, as explained and illustrated earlier, the reports required here are actually less extensive than the one required by the EU's DSA, and are comparable to the disclosures required by Texas, as described above. Some minimum amount of

22

information is required to make the reports broadly useful, and that is what AB 587 captures without going any further.

In addition, X's claim that there are less restrictive alternatives because "the State could have conducted its own review and published its own findings about the content moderation policies and practices of social media companies, which are largely already publicly available," Appellant's Br. 53, is deeply misleading. The information is "already publicly available" precisely because of the government regulations described in this brief. To render disclosure requirements unconstitutional would remove from the public sphere the very data that X asks the government to collect.

Finally, as mentioned, X does not explain with any specificity why the law here burdens it, and that is because there is no meaningful, marginal burden from AB 587. Because there is no actual administrative burden, it primarily focuses on an abstract burden that the "report—and the threat of enforcement, investigation, and corresponding monetary and injunctive penalty—pressures X Corp. to moderate content in a particular way and thereby interferes with its constitutionally protected editorial judgment." Appellant's Br. 54. But it doesn't explain what "this

particular way" is, and *amici* have found no evidence that the transparency reports in other jurisdictions have created any interference with editorial judgments, which are not at issue anyway in these kinds of reports. X ends with a bare assertion that the reports required by AB 587 could "chill the protected speech of X platform users," Appellant's Br. 54, but there is no explanation of how this would be so.

* * *

Understanding how very large social media platforms operate is important. In a generation, they have gone from fun products used by college students to perhaps the primary way the world communicates about everything—from their cats and grandchildren to matters of great public importance. Governments have accordingly responded to this disruption by requiring modest disclosures, so the public, governments, and researchers can at least understand how these influential platforms operate. The California legislation at issue here is a part of that trend. There is nothing novel, dangerous, burdensome, or, as relevant here, unconstitutional about it. The district court's decision should be affirmed.

## CONCLUSION

The district court's decision should be affirmed.

24

Dated: March 20, 2024

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
Charles Gerstein
GERSTEIN HARROW LLP
14100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
Telephone:  323-744-5293
jason@gerstein-harrow.com

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure and Circuit Rule 32 because this brief contains 4,368 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

<u>/s/ Jason Harrow</u>

*Counsel for Amicus Curiae*

March 20, 2024

26

# APPENDIX

- X Corp's Most Recent Transparency Report Pursuant to the EU Digital Services Act

*available at*

https://transparency.twitter.com/dsa-transparency-report.html

*and archived permanently at*

https://perma.cc/GZD2-Y6W9

## Opening Remarks

X was founded on a commitment to transparency. We also want people on X to feel they are able to freely express themselves, while also ensuring that conversations on X are safe, legal and unregretted. When you think about some of the world's most powerful moments, movements, and memes, they prevailed because people had a place to express their ideas, challenge conventional norms, and demand better. That's why free expression matters.

We also believe, and we're proving, that free expression and platform safety can coexist. X is reflective of real conversations happening in the world, and that sometimes includes perspectives that may be offensive, controversial, and/or narrow-minded to others. While we welcome everyone to express themselves on X, we will not tolerate behaviour that harasses, threatens, dehumanises or uses fear to silence the voices of others. Our TIUC Terms of Service and Rules - which are continually being reviewed, and are informed by feedback from the people who use X - help ensure everyone feels safe expressing themselves.

We are committed to fair, informative, responsive, and accountable enforcement. In the past, we too often got caught in a binary paradigm of whether to leave content up, or take it down.
- The risks of getting it wrong at the extremes are great: on one hand, you can leave up content that's really dangerous; on the other, you run the risk of censorship.
- Our point is: if you do either, you need to be right. And we live in a world with many shades of grey.

To be clear, we do continue to remove dangerous and illegal content and accounts. X also responds to reports of illegal content and takes action on content that violates local laws. But what we've learned is that there are other types of content where a range of potential reasonable, proportionate, and effective approaches, that also seek to balance fundamental rights, can be appropriate.

You can think about how we moderate on X in three buckets: content and accounts that remain, are restricted, and are removed.

1. **Remain:** The overwhelming majority of content on X is healthy—meaning it does not violate our TIUC Terms of Service and Rules or our policies such as Hateful Conduct, Abuse & Harassment, and more. Keep in mind: just because a post doesn't violate a policy, doesn't mean everyone will like it.
2. **Restrict:** This is where our new [Freedom of Speech, Not Reach enforcement philosophy](#) is used. For content that may be interpreted as potentially violating our policies—meaning it's awful, but lawful—we restrict the reach of posts by making the content less discoverable, and we're making this action more transparent to everyone. When we decide to restrict a piece of content, a restricted reach label is applied, the ability to engage with the content is taken away, and its reach is restricted to views occurring directly on the author's profile. Restricted reach labels are not in use for all policies; our restricted reach labels were initially only applied to Hateful Conduct, but we have since expanded application to our Abuse & Harassment, Civic Integrity, and Violent Speech Policies. That said, restricting content—or even a whole account—is something we've done for a long time, and we have a range of enforcement options for the variety of use cases that we face every day. For example, we may also place an account in read-only mode, temporarily limiting its ability to post, Repost, or Like.
3. **Remove:** If reported content is illegal, we withhold access to it in the respective jurisdictions. We also know that certain types of content, such as targeted violent threats, targeted harassment, or privacy violations, can be extremely harmful if not removed and we either suspend outright or require that this content be deleted before returning to the platform.

We've made significant progress towards improving the safeguards to protect our users and our platform, but we know that this critical work will never be done. X is committed to ensuring the safety and health of the platform and fulfilment of its DSA Compliance obligations through our continued investment in human and automated protections.

This report covers the content moderation activities of X's international entity Twitter International Unlimited Company (TIUC) under the Digital Services Act (DSA), during the date range August 28, 2023 to October 20, 2023.

We refer to "notices" as defined in the DSA as "user reports" and "reports".

## Description of our Content Moderation Practices

**X's purpose is to serve the public conversation**. Violence, harassment, and other similar types of behaviour discourage people from expressing themselves, and ultimately diminish the value of global public conversation. Our rules are designed to ensure all people can participate in the public conversation freely and safely.

**X has policies protecting user safety as well as platform and account integrity**. The X Rules and Policies are [publicly accessible](#) on our Help Center, and we are making sure that they are written in an easily understandable way. We also keep our Help Center regularly updated anytime we modify our rules.

**Additionally, you will find explanations in our Help Center on our policy development process and rules enforcement philosophy.** Creating a new policy or making a policy change requires in-depth research around trends in online behaviour, developing clear external language that sets expectations around what's allowed, and creating enforcement guidance for reviewers that can be scaled across millions of pieces of content and accounts. Our policies are dynamic, and we continually review them to ensure that they are up-to-date, necessary, and proportional.

**We consider diverse perspectives around the changing nature of online speech, including how our Rules are applied and interpreted in different cultural and social contexts.** We then test the proposed rule with samples of potentially violative content to measure the policy effectiveness, and once we determine it meets our expectations, we build and operationalise product changes to support the update. Finally, we train our global review teams, update the X Rules, and start enforcing the relevant policy.

**While we aim to enable open discussion of differing opinions and viewpoints, we are committed to the objective, timely, and consistent enforcement of our rules.** This approach allows many forms of speech to exist on our platform and, in particular, promotes counterspeech: speech that presents facts to correct misstatements or misperceptions, points out hypocrisy or contradictions, warns of offline or online consequences, denounces hateful or dangerous speech, or helps change minds and disarm.

Thus, context matters. When determining whether to take enforcement action, we may consider a number of factors, including (but not limited to) whether:
- The behaviour is directed at an individual, group, or protected category of people;
- The report has been filed by the target of the abuse or a bystander;
- The user has a history of violating our policies;
- The severity of the violation;
- The content may be a topic of legitimate public interest.

**When we take enforcement actions, we may do so either on a specific piece of content (e.g., an individual post or Direct Message) or on an account.** We may employ a combination of these options. In most cases, this is because the behaviour violates the X Rules.

**X strives to provide an environment where people can feel free to express themselves. If abusive behaviour happens, we want to make it easy for people to report it to us.** EU users can also report any violation of our rules or their local laws, no matter where such violations appear, and we've recently improved our reporting flow to make it easier to use in several key ways. It now takes less steps to report most content, with extra steps only when it helps us take the right action. We now have clearer choices that match directly to our policies and how they're communicated externally. We've also included new options that were previously only available at help.x.com.

## EXERCISE OF MODERATION

**To enforce our rules, we are using a combination of machine learning and human review.** Our systems are able to surface content to human moderators who use important context to make decisions about potential rule violations. This work is led by an international, cross-functional team with 24-hour coverage and the ability to cover multiple languages. We also have a complaints process for any potential errors that may occur.

Examples of actions we may take:
- *Placing a post behind a notice*: We may place some forms of sensitive media like adult content or graphic violence behind an interstitial advising viewers to be aware that they will see sensitive media if they click through. We also give users the option to control whether they see sensitive media.
- *Withholding a post based on age*: We restrict views of specific forms of sensitive media such as adult content for viewers who are under 18, or who do not include a birth date on their profile, with interstitials.
- *Withholding a post or account in a country*: We may withhold access to certain content in a particular country if we receive a valid and properly scoped request from an authorised entity in that country. Read more about country withheld content.

**To ensure that our human reviewers are prepared to perform their duties we provide them with a robust support system.** Each human reviewer goes through extensive training and refreshers, they are provided with a suite of tools that enable them to do their jobs effectively, and they have a suite of wellness initiatives available to them. For further information on our human review resources, see the section titled "Human resources dedicated to Content Moderation".

**We always aim to exercise moderation with transparency.** Where our systems or teams take action against content or an account as a result of violating our rules or in response to a valid and properly scoped request from an authorised entity in a given country, we strive to provide context to users. Our Help Center article explains notices that users may encounter following actions taken. We will also promptly notify affected users about legal requests to withhold content, including a copy of the original request, unless we are legally prohibited from doing so.

## COOPERATION WITH PUBLIC AUTHORITIES

**Cooperation with law enforcement authorities within the EU is crucial to X.** We work closely with law enforcement, and we do our best to assist them in identifying users whose content may be in violation of local laws. Any law enforcement authority or agency can find guidelines on our Help Center specifically for law enforcement and can reach out to X using a dedicated form.

**TIUC is headquartered in Dublin, Ireland, and processes law enforcement requests relating to users who live in the EU.** We receive and respond to requests related to user data from EU law enforcement agencies and judicial authorities wherever there is a valid legal

process. We have existing processes in place, including a dedicated online portal for law enforcement, and expert teams with global coverage across all timezones that review and respond to reports in diverse languages.

Law enforcement can use our dedicated portal to submit their legal demands and can request the following information:

- **Information requests:** Requests/orders for user personal and private information (e.g Basic Subscriber Information).
- **Content removal requests:** Requests/orders to remove content based on TIUC Terms of Service and Rules or EU local laws.
- **Preservation requests:** Requests to preserve data for the purposes of an investigation.
- **Emergency requests:** Process through which, when there is an imminent threat to life or serious bodily harm, X may disclose user information to law enforcement without receiving formal legal process.

## Our Own Initiative Content Moderation Activities

**AUTOMATED CONTENT MODERATION**

X employs a combination of heuristics and machine learning algorithms to automatically detect content that violates the X Rules and policies enforced on our platform.

**MACHINE LEARNING MODELS**

We use combinations of natural language processing models, image processing models and other sophisticated machine learning methods to detect potentially violative content.
These models vary in complexity and in the outputs they produce. For example, the model used to detect abuse on the platform is trained on abuse violations detected in the past. Content flagged by these machine learning models are either reviewed by human content reviewers before an action is taken or, in some cases, automatically actioned based on model output.

**HEURISTIC MODELS**

Heuristics are typically utilised to enable X to react quickly to new forms of violations that emerge on the platform. Heuristics are common patterns of text or keywords that may be typical of a certain category of violations. Pieces of content detected by heuristics may also get reviewed by human content reviewers before an action is taken on the content. These heuristics are used to flag content for review by human agents and prioritise the order such content is reviewed.

**TESTING, EVALUATION, AND ITERATION**

Automated enforcements under the X Rules and policies undergo rigorous testing before being applied to the live product. Both machine learning and heuristic models are trained and/or validated on thousands of data points and labels (e.g., violative or non-violative) that are generated by trained human content reviewers. For example, inputs to content-related models can include the text within the post itself, the images attached to the post, and other characteristics. Training data for the models comes from both the cases reviewed by our content moderators, random samples, and various other samples of pieces of content from the platform.

Once reviewers have confirmed that the detection meets an acceptable standard of accuracy, we consider the automation to be ready for launch. Once launched, automations are monitored dynamically for ongoing performance and health. If we detect anomalies in performance (for instance, significant spikes or dips against the volume we established during sizing, or significant changes in user complaint/overturn rates), our Engineering (including Data Science) and Policy teams revisit the automation to diagnose any potential problems and adjust the automations as appropriate.

**USE OF HUMAN MODERATION**

Before any given algorithm is launched to the platform, we verify its detection of policy violating content or behaviour by drawing a statistically significant test sample and performing item-by-item human review. Reviewers have expertise in the applicable policies and are trained by our Policy teams to ensure the reliability of their decisions. During this testing phase, we also calculate the expected volume of moderation actions a given automation is likely to perform in order to set a baseline against which we can monitor for anomalies in the future (called "sizing"). Human review helps us to confirm that these automations achieve a level of precision, and sizing helps us understand what to expect once the automations are launched.

In addition, humans proactively conduct manual content reviews for potential policy violations. We conduct proactive sweeps for certain high-priority categories of potentially violative content both periodically and during major events, such as elections. Agents also proactively review content flagged by heuristic and machine learning models for potential violations of other policies, including our sensitive media, child sexual exploitation (CSE) and violent and hateful entities policies.

**AUTOMATED MODERATION ACTIVITY EXAMPLES**

A vast majority of all accounts that are suspended for the promotion of terrorism and CSE are proactively flagged by a combination of technology and other purpose-built internal proprietary tools.

When we remove CSE content, we immediately report it to the National Center for Missing and Exploited Children (NCMEC). NCMEC makes reports available to the appropriate law enforcement agencies around the world to facilitate investigations and prosecutions.

Our current methods for surfacing potentially violative terrorist content for review include leveraging the shared industry hash database, e.g., supported by the Global Internet Forum to Counter Terrorism (GIFCT), and deploying a range of internal tools and/or utilising the industry hash sharing (e.g., PhotoDNA) prior to any reports filed. We commit to continuing to invest in technology that improves our capability to detect and remove, for instance, terrorist and violent extremist content online, including the extension or development of digital fingerprinting and AI-based technology solutions. Our participation in multi-stakeholder communities, such as the Christchurch Call to Action, Global Internet Forum to Counter Terrorism and EU Internet Forum (EUIF), helps to identify emerging trends in how terrorists and violent extremists are using the Internet to promote their content and exploit online platforms.

You can learn more about our commitment to eradicating CSE and terrorist content, and the actions we've taken here. Our continued investment in proprietary technology is steadily reducing the burden on people to report this content to us.

### SCALED INVESTIGATIONS

These moderation activities are supplemented by scaled human investigations into the tactics, techniques and procedures that bad actors use to circumvent our rules and policies. These investigations may leverage signals and behaviours identifiable on our platform, as well as off-platform information, to identify large-scale and/or technically sophisticated evasions of our detection and enforcement activities. For example, through these investigations, we are able to detect coordinated activity intended to manipulate our platform and artificially amplify the reach of certain accounts or their content.

### CLOSING STATEMENT ON CONTENT MODERATION ACTIVITIES

Our content moderation systems are designed and tailored to mitigate systematic risks without unnecessarily restricting the use of our service and fundamental rights, especially freedom of expression. Content moderation activities are implemented and anchored on principled policies and leverage a diverse set of interventions to ensure that our actions are reasonable, proportionate and effective. Our content moderation systems blend automated and human review paired with a robust appeals system that enables our users to quickly raise potential moderation anomalies or mistakes.

## Enforcement Activity Summary Data

### RESTRICTED REACH LABELS DATA: FREEDOM OF SPEECH, NOT REACH

Our mission at X is to promote and protect the public conversation. We believe X users have the right to express their opinion and ideas without fear of censorship. We also believe it is our responsibility to keep users on our platform safe from content that violates our rules.

These beliefs are the foundation of Freedom of Speech, Not Reach - our freedom of expression based enforcement philosophy which means, where appropriate, restricting the reach of posts that are classified as potentially meeting our threshold for enforcement under our Hateful Conduct, Abuse & Harassment, Civic Integrity, and Violent Speech policies. Please note these policies have a range of enforcement actions, such as removal, suspension, and restricted reach.

Restricting the reach of posts, also known as visibility filtering, is one of our existing enforcement actions that allows us to move beyond the binary "leave up versus take down" approach to content moderation. Posts with these labels will be made less discoverable on the platform. This can include:
- Excluding the post from search results, trends, and recommended notifications;
- Removing the post from the For you and Following timelines;
- Restricting the post's discoverability to the author's profile;
- Downranking the post in replies;
- Restricting Likes, replies, Reposts, Quote posts, bookmarks, share, pin to profile, or Edit post.

Additionally, these labels bring transparency to this enforcement action by displaying which policy the post potentially violates to both the author and other users on X, and communicating that the post's visibility is limited. Authors can submit a complaint on the label if they think we incorrectly limited their post's visibility.

### RESTRICTED REACH LABELS DATA

**Restricted Reach Labels - Aug 28 to Oct 20**

| Detection | Enforcement | Policy | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ire |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Own Initiative | Automated Means | Hateful Conduct | 1,118 | 2,137 | 653 | 759 | 251 | 1,333 | 1,311 | 281 | 1,389 | 11,279 | 9,913 | 1,015 | 707 | 3 |
| | Manual Review | Abuse & Harassment | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 10 | 0 | 0 | |
| | | Hateful Conduct | 31 | 10 | 11 | 17 | 14 | 15 | 61 | 1 | 22 | 56 | 127 | 14 | 4 | |
| | | Violent Speech | | | | 1 | | | | | | 1 | 2 | | 1 | |
| User Report | Manual Review | Abuse & Harassment | 87 | 244 | 73 | 42 | 24 | 159 | 99 | 38 | 75 | 2,093 | 1,069 | 194 | 87 | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hateful Conduct | 95 | 251 | 52 | 65 | 28 | 144 | 90 | 17 | 139 | 2,313 | 1,046 | 97 | 115 |
| Violent Speech | 13 | 35 | 12 | 9 | 6 | 22 | 23 | | 19 | 321 | 261 | 22 | 8 |
| Grand Total | 1,345 | 2,678 | 802 | 893 | 323 | 1,673 | 1,584 | 337 | 1,644 | 16,064 | 12,428 | 1,342 | 922 |

Important Note: The table lists actions of visibility filtering on content potentially violative of our rules in accordance with our Freedom of Speech, Not Reach enforcement philosophy. We did not apply any visibility filtering based on illegal content.

**ACTIONS TAKEN ON CONTENT FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS**

**TIUC Terms of Service and Rules Content Removal Actions - Aug 28 to Oct 20***

| Detection Method | Enforcement Process | Policy | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ire |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| User Report | Manual Review | Abuse & Harassment | 78 | 197 | 83 | 54 | 27 | 123 | 72 | 17 | 85 | 4,291 | 1,088 | 142 | 49 | |
| | | Child Sexual Exploitation | 1 | 3 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 10 | 16 | 0 | 0 | |
| | | Counterfeit | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 15 | 1 | 0 | 0 | |
| | | Deceased Individuals | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 9 | 1 | 0 | |
| | | Hateful Conduct | 3 | 15 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 130 | 34 | 5 | 2 | |
| | | Illegal or Certain Regulated Goods and Services | 2 | 6 | 50 | 22 | 1 | 20 | 1 | 2 | 17 | 1,420 | 225 | 13 | 3 | |
| | | Misleading & Deceptive Identities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Non-Consensual Nudity | 0 | 16 | 31 | 1 | 0 | 10 | 2 | 2 | 5 | 132 | 134 | 49 | 7 | |
| | | Perpetrators of Violent Attacks | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | |
| | | Private Information & Media | 2 | 6 | 1 | 0 | 0 | 3 | 1 | 0 | 1 | 90 | 39 | 0 | 0 | |
| | | Sensitive Media | 26 | 44 | 7 | 5 | 5 | 19 | 6 | 7 | 18 | 360 | 301 | 23 | 16 | |
| | | Suicide & Self Harm | 12 | 28 | 8 | 5 | 2 | 12 | 22 | 4 | 17 | 177 | 189 | 20 | 10 | |
| | | Synthetic & Manipulated Media | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Violent Speech | 73 | 170 | 25 | 31 | 11 | 72 | 70 | 9 | 51 | 1,669 | 1,143 | 65 | 55 | |
| Own Initiative | Automated Means | Abuse & Harassment | 3 | 5 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 19 | 47 | 1 | 1 | |
| | | Hateful Conduct | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Non-Consensual Nudity | 2 | 1 | 0 | 0 | 0 | 108 | 19 | 0 | 2 | 201 | 26 | 0 | 44 | |
| | | Other | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | |
| | | Perpetrators of Violent Attacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | |
| | | Private Information & Media | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | |
| | | Sensitive Media | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Violent Speech | 224 | 564 | 167 | 109 | 44 | 202 | 260 | 51 | 204 | 6,041 | 1,986 | 216 | 155 | |
| | Manual Review | Abuse & Harassment | 3 | 2 | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 3 | 7 | 1 | 0 | |
| | | Hateful Conduct | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | |
| | | Illegal or Certain | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

| Policy | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Regulated Goods and Services | | | | | | | | | | | | |
| Non-Consensual Nudity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Private Information & Media | 3 | 1 | 0 | 2 | 0 | 4 | 8 | 0 | 0 | 9 | 14 | 0 | 6 |
| Sensitive Media | 140 | 336 | 42 | 41 | 41 | 182 | 106 | 13 | 112 | 1,683 | 1,866 | 63 | 24 |
| Suicide & Self Harm | 5 | 0 | 0 | 1 | 0 | 4 | 2 | 0 | 3 | 8 | 18 | 0 | 1 |
| Violent Speech | 3 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 7 | 11 | 1 | 1 |
| Grand Total | 583 | 1403 | 420 | 274 | 133 | 762 | 576 | 106 | 521 | 16,288 | 7160 | 601 | 374 |

## ACTIONS TAKEN ON ACCOUNTS FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS

### TIUC Terms of Service and Rules Account Suspensions - Aug 28 to Oct 20

| Detection Method | Enforcement Process | Policy | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| User Report | Manual Review | Abuse & Harassment | 86 | 70 | 47 | 15 | 32 | 73 | 81 | 8 | 36 | 2,475 | 726 | 38 | 27 |
| | | Ban Evasion | 1 | 0 | 1 | 0 | 0 | 1 | 2 | 0 | 12 | 26 | 14 | 2 | 0 |
| | | Child Sexual Exploitation | 194 | 237 | 372 | 122 | 55 | 661 | 138 | 36 | 121 | 4,157 | 2,150 | 164 | 270 |
| | | Copyright Repeated Infringer | 2 | 7 | 2 | 1 | 1 | 6 | 5 | 0 | 4 | 116 | 50 | 3 | 2 |
| | | Counterfeit | 4 | 1 | 3 | 0 | 0 | 5 | 1 | 0 | 3 | 60 | 21 | 1 | 0 |
| | | Deceased Individuals | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Distribution of Hacked Materials | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Financial Scam | 3 | 0 | 7 | 1 | 2 | 2 | 0 | 0 | 2 | 48 | 24 | 3 | 0 |
| | | Hateful Conduct | 1 | 12 | 1 | 4 | 0 | 5 | 4 | 2 | 7 | 79 | 59 | 4 | 3 |
| | | Illegal or Certain Regulated Goods and Services | 27 | 24 | 54 | 21 | 9 | 56 | 34 | 7 | 24 | 1,241 | 416 | 27 | 26 |
| | | Misleading & Deceptive Identities | 13 | 29 | 24 | 11 | 9 | 38 | 14 | 4 | 7 | 274 | 213 | 28 | 16 |
| | | Non-Consensual Nudity | 5 | 13 | 9 | 7 | 2 | 8 | 5 | 1 | 4 | 73 | 108 | 16 | 8 |
| | | Other | 30 | 27 | 12 | 5 | 5 | 29 | 20 | 2 | 8 | 4,744 | 634 | 14 | 17 |
| | | Perpetrators of Violent Attacks | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 3 | 6 | 13 | 12 | 2 | 1 |
| | | Platform Manipulation & Spam | 1,861 | 2,299 | 2,423 | 1,216 | 430 | 3,623 | 1,233 | 194 | 729 | 139,102 | 28,537 | 1,806 | 2,671 |
| | | Private Information & Media | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 3 | 7 | 1 | 0 |
| | | Sensitive Media | 2 | 0 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 15 | 27 | 2 | 3 |
| | | Suicide & Self Harm | 2 | 4 | 0 | 0 | 0 | 2 | 5 | 0 | 4 | 18 | 17 | 2 | 1 |
| | | Trademark | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 | 4 | 1 | 1 |
| | | Username Squatting | 0 | 1 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 5 | 4 | 1 | 1 |
| | | Violent & Hateful Entities | 29 | 38 | 8 | 3 | 18 | 17 | 39 | 4 | 38 | 350 | 537 | 108 | 12 |
| | | Violent Speech | 228 | 441 | 104 | 100 | 23 | 222 | 312 | 36 | 204 | 4,375 | 2,859 | 192 | 151 |

| Own Initiative | Automated Means | Child Sexual Exploitation | 351 | 559 | 372 | 135 | 140 | 698 | 253 | 58 | 265 | 5,708 | 8,985 | 205 | 432 |
| | | Financial Scam | 1 | 3 | 7 | 1 | 0 | 6 | 1 | 0 | 0 | 41 | 31 | 0 | 2 |
| | | Illegal or Certain Regulated Goods and Services | 0 | 2 | 1 | 0 | 1 | 3 | 4 | 0 | 0 | 53 | 30 | 0 | 0 |
| | | Other | 3 | 7 | 6 | 4 | 0 | 3 | 1 | 0 | 1 | 51 | 26 | 2 | 6 |
| | | Perpetrators of Violent Attacks | 0 | 0 | 0 | 1 | 0 | 1 | 6 | 0 | 4 | 8 | 5 | 0 | 0 |
| | | Platform Manipulation & Spam | 11,954 | 26,623 | 39,771 | 15,529 | 2,465 | 33,141 | 33,991 | 3,790 | 11,395 | 261,976 | 186,543 | 24,423 | 34,708 |
| | | Violent & Hateful Entities | 8 | 9 | 1 | 1 | 0 | 3 | 5 | 0 | 5 | 73 | 96 | 2 | 1 |
| | Manual Review | Abuse & Harassment | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 17 | 9 | 2 | 0 |
| Grand Total | | | 14,806 | 30,407 | 43,228 | 17,180 | 3,193 | 38,612 | 36,159 | 4,146 | 12,879 | 425,104 | 232,144 | 27,049 | 38,359 |

Important Notes about Action based on TIUC Terms of Service and Rules Violations:
1. The categories "Other" refer to cases of workflow exceptions and tooling inconsistencies which prevent a further clarification on the violated policy of TIUC Terms of Service and Rules.
2. User reports of illegal content which have been actioned under TIUC Terms of Service and Rules are displayed in the table "Actions Taken on Illegal Content".

*A data extraction limitation is impacting the availability of data ranging from Aug 28 to Sept 23. See the table "TIUC Terms of Service and Rules Content Removal Actions - Sep 5 to Sep 23" in the Appendix.

## Orders received from Member States' authorities including orders issued in accordance with Articles 9 (Removal Orders) and 10 (Information Requests)

**REMOVAL ORDERS, Art. 9 DSA**

| Removal Orders Received - Aug 28 to Oct 20 | | | | |
| --- | --- | --- | --- | --- |
| Illegal Content Category | France | Italy | Spain | Grand Total |
| Unsafe and/or Illegal Products | 1 | | | 1 |
| Illegal or Harmful Speech | | 4 | 1 | 5 |
| Grand Total | 1 | 4 | 1 | 6 |

| Removal Orders Median Handle Time (Hours) - Aug 28 to Oct 20 | | | |
| --- | --- | --- | --- |
| Illegal Content Category | France | Italy | Spain |
| Unsafe and/or Illegal Products | 32 | | 124 |
| Illegal or Harmful Speech | | 73 | |

| Removal Orders Median Time to Acknowledge Receipt - Aug 28 to Oct 20 |
| --- |
| X provides an automated acknowledgement of receipt of removal orders submitted by law enforcement through our Legal Request submission portal. As a consequence of this immediate acknowledgement of receipt, the median time is zero. |

Important Notes about Removal Orders:
1. To improve clarity, we've omitted countries and violation types with no legal requests from the tables above.
2. The table "Removal Orders Median Handle Time" shows the category which we considered to fit best and under which we handled the order. This category might deviate from the information provided by the authority when submitting the order via the X online submission platform.
3. In the cases from France and Spain, we asked the submitting authority to fulfil Article 9 information requirements but did not receive responses in the reporting period.

**INFORMATION REQUESTS, Art. 10 DSA**

| Information Requests Received - Aug 28 to Oct 20 | | | | | | | | | | | | | | | Grand Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Content Category | Austria | Belgium | Finland | France | Germany | Greece | Hungary | Ireland | Italy | Malta | Netherlands | Poland | Portugal | Spain | |
| Data Protection and Privacy Violations | | | | | 2 | 1 | | | 1 | | | | | 1 | 5 |

| Content Category | Austria | Belgium | Finland | France | Germany | Greece | Hungary | Ireland | Italy | Malta | Netherlands | Poland | Portugal | Spain | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illegal or Harmful Speech | 4 | 3 | 1 | 43 | 623 | 4 | | 1 | 6 | | | 9 | | 6 | 700 |
| Intellectual Property Infringements | | | | | 2 | | | | | | | | | 1 | 3 |
| Negative Effects on Civic Discourse or Elections | | | | | 2 | | | | | | | 1 | | | 3 |
| Non-Consensual Behaviour | | | | 3 | 23 | 1 | | | | | | | | 1 | 28 |
| Not Specified | 1 | | | 4 | 7 | | 1 | | | | | 3 | | 4 | 20 |
| Other | | 2 | | 8 | 4 | | | | | | | 1 | 1 | | 16 |
| Pornography or Sexualized Content | | | | | 13 | | | | | | | | | | 13 |
| Protection of Minors | | 7 | | 1 | 31 | | | | 2 | | | 1 | 1 | | 43 |
| Risk for Public Security | | 19 | | 654 | 16 | 1 | | | 17 | 1 | 1 | | | 7 | 716 |
| Scams and/or Fraud | 1 | | 1 | 2 | 7 | 1 | | 1 | 1 | | | | | 1 | 15 |
| Self-Harm | | | | 1 | | | | | | | | | | | 1 |
| Unsafe and/or Illegal Products | | | | | 4 | | | | | | | | | 2 | 6 |
| Violence | | 1 | | 71 | 61 | 1 | | 2 | 6 | | 8 | 7 | 1 | 1 | 159 |
| Grand Total | 6 | 32 | 2 | 787 | 795 | 9 | 1 | 4 | 33 | 1 | 9 | 22 | 3 | 24 | 1,728 |

| Information Request Median Time to Acknowledge Receipt - Aug 28 to Oct 20 |
|---|
| X provides an automated acknowledgement of receipt of information requests submitted by law enforcement through our Legal Request submission portal. As a consequence of this immediate acknowledgement of receipt, the median time is zero. |

| Information Request Median Handle Time (Hours) - Aug 28 to Oct 20 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Content Category | Austria | Belgium | Finland | France | Germany | Greece | Hungary | Ireland | Italy | Malta | Netherlands | Poland | Portugal | Spain |
| Data Protection and Privacy Violations | | | | | 152 | 141 | | | 146 | | | | | 173 |
| Illegal or Harmful Speech | 146 | 42 | 146 | 138 | 127 | 64 | | 73 | 164 | | | 78 | | 129 |
| Intellectual Property Infringements | | | | | 114 | | | | | | | | | 175 |
| Negative Effects on Civic Discourse or Elections | | | | | 183 | | | | | | | 20 | | |
| Non-Consensual Behaviour | | | | 21 | 117 | 124 | | | | | | | | 170 |
| Not Specified | 219 | | | 35 | 24 | | 5 | | | | | 1 | | 2 |
| Other | | 170 | | 152 | 149 | | | | | | | 2 | 165 | |
| Pornography or Sexualized Content | | | | | 56 | | | | | | | | | |
| Protection of Minors | | 2 | | 49 | 4 | | | | 2 | | | 26 | 209 | |
| Risk for Public Security | | 5 | | 8 | 47 | 18 | | | 149 | 43 | 126 | | | 74 |
| Scams and/or Fraud | 30 | | 172 | 169 | 120 | 120 | | 20 | 124 | | | | | 73 |
| Self-Harm | | | | 194 | | | | | | | | | | |
| Unsafe and/or Illegal Products | | | | | 146 | | | | | | | | | 126 |

| Violence | | 154 | | 132 | 119 | 51 | | 19 | 147 | | | 19 | 48 | 241 | 190 |

Important Notes about Information Requests:
1. The content category for each request is determined by the information law enforcement provides while submitting such requests through the X online submission platform.
2. The median handling time is the time between receiving the order and either: 1) disclosing information to law enforcement if the order is valid; or 2) pushing back due to legal issues. The median handling time does not include extra time where X pushes back due to legal issues, receives a valid order later, and disclosure is eventually made.
3. To improve clarity, we've omitted countries and violation types with zero legal requests from the tables above.
4. The "Not Specified" category shows cases where the illegal content category could not be determined based on the information law enforcement provided during the submission process.
5. The "Other" category here shows cases where law enforcement selects "Cybercrime" as the content category during the case submission process without providing more details to determine a more specific content category.

## Reports submitted in accordance with Article 16 (Illegal Content)

**ACTIONS TAKEN ON ILLEGAL CONTENT:**

- During the reporting period, we took action on 12,099 items of content following reports of illegality (excluding intellectual property infringements). We globally deleted 99 items of content and withheld access to 11,998 items of content in EU Member States.

- In respect of intellectual property infringements, we globally withheld content in response to 1,829 reports.

- We also proactively withheld access to 319 posts in one Member State.

**ACTIONS TAKEN ON ACCOUNTS FOR POSTING ILLEGAL CONTENT:** We suspended accounts in response to 855 reports of Intellectual Property Infringements. This was the only type of violation of local law that resulted in account suspension as many types of illegal behaviour are addressed in our policies, such as account suspensions for posting CSE. On our own initiative, we withheld 1 account for breaching local laws connected to unsafe and/or illegal products.

Also, we withheld 15 accounts in one Member State each for provision of illegal content.

**REPORTS OF ILLEGAL CONTENT**

Illegal Content Reports Received - Aug 28 to Oct 20

| Content Category | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Greece | Hungary | Ireland | Italy | La |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Animal Welfare | 14 | 4 | 1 | 2 | 4 | 2 | 4 | 1 | 88 | 4 | 96 | 58 | 3 | 1 | 11 | 10 | |
| Data Protection & Privacy Violations | 18 | 50 | 7 | 5 | 6 | 16 | 21 | 6 | 500 | 13 | 727 | 592 | 45 | 9 | 90 | 98 | |
| Illegal or Harmful Speech | 397 | 448 | 46 | 34 | 32 | 205 | 175 | 46 | 5,258 | 133 | 9,499 | 11,265 | 198 | 32 | 335 | 1203 | |
| Intellectual Property Infringements | 16 | 19 | 4 | 14 | 17 | 8 | 14 | 2 | 0 | 35 | 737 | 872 | 19 | 7 | 64 | 185 | |
| Negative Effects on Civic Discourse or Elections | 27 | 33 | 6 | 1 | 3 | 25 | 12 | 7 | 475 | 14 | 314 | 934 | 15 | 7 | 26 | 132 | |
| Non-Consensual Behaviour | 15 | 16 | 2 | 4 | 4 | 2 | 11 | 4 | 179 | 9 | 196 | 143 | 7 | 15 | 35 | 36 | |
| Pornography or Sexualized Content | 38 | 50 | 9 | 3 | 4 | 25 | 23 | 1 | 468 | 10 | 865 | 641 | 44 | 109 | 55 | 145 | |
| Protection of Minors | 43 | 49 | 11 | 7 | 3 | 20 | 24 | 3 | 462 | 22 | 672 | 564 | 24 | 7 | 65 | 57 | |
| Risk for Public Security | 39 | 105 | 8 | 4 | 4 | 46 | 13 | 8 | 414 | 24 | 981 | 950 | 17 | 8 | 22 | 59 | |
| Scams and/or Fraud | 96 | 140 | 12 | 23 | 33 | 83 | 90 | 20 | 833 | 48 | 1292 | 749 | 46 | 42 | 233 | 356 | |
| Scope of Platform Service | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 53 | 1 | 31 | 35 | 0 | 0 | 3 | 9 | |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Self-Harm | 1 | 4 | 0 | 1 | 2 | 4 | 5 | 0 | 74 | 2 | 41 | 72 | 0 | 0 | 4 | 8 |
| Unsafe and Illegal Products | 5 | 20 | 0 | 0 | 2 | 6 | 2 | 2 | 126 | 5 | 600 | 179 | 4 | 0 | 21 | 18 |
| Violence | 57 | 177 | 12 | 4 | 4 | 45 | 41 | 7 | 1095 | 47 | 2274 | 1448 | 37 | 10 | 78 | 219 |
| Grand Total | 769 | 1117 | 119 | 102 | 118 | 487 | 435 | 107 | 10,025 | 367 | 18,325 | 18,502 | 459 | 247 | 1042 | 2,536 |

**REPORTS RESOLVED BY ACTIONS TAKEN ON ILLEGAL CONTENT**

### Actions Taken on Illegal Content - Aug 28 to Oct 20

| Enforcement Process | Action Type | Reason Code | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Gree |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Global content deletion based on a violation of TIUC Terms of Service and Rules | Illegal or Harmful Speech | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | |
| | | Non-Consensual Behaviour | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Self-Harm | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Violence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | Country withheld Content | Data Protection & Privacy Violations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | Illegal or Harmful Speech | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | No Violation Found | Animal Welfare | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | |
| | | Data Protection & Privacy Violations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Illegal or Harmful Speech | 5 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 202 | 0 | 0 | 0 | |
| | | Non-Consensual Behaviour | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Pornography or Sexualized Content | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | |
| | | Protection of Minors | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | |
| | | Risk for Public Security | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | |
| | | Scams and Fraud | 8 | 5 | 1 | 0 | 2 | 0 | 4 | 1 | 33 | 3 | 0 | 0 | |
| | | Scope of Platform Service | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 | |
| | | Self-Harm | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Unsafe and Illegal Products | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| | | Violence | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 9 | 0 | 0 | 0 | |
| Manual Closure | Global content deletion based on TIUC Terms of Service and Rules | Animal Welfare | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 0 | 11 | 8 | |
| | | Data Protection & Privacy Violations | 1 | 2 | 0 | 0 | 0 | 3 | 3 | 0 | 15 | 1 | 15 | 33 | |
| | | Illegal or Harmful Speech | 26 | 14 | 2 | 4 | 3 | 10 | 5 | 1 | 231 | 7 | 440 | 1,270 | |
| | | Negative Effects on Civic Discourse or Elections | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 3 | 8 | |
| | | Non-Consensual Behaviour | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 0 | 13 | 14 | |

| Category | Subcategory | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pornography or Sexualized Content | 16 | 1 | 0 | 1 | 0 | 3 | 8 | 1 | 80 | 4 | 55 | 108 |
| | Protection of Minors | 5 | 8 | 3 | 1 | 0 | 3 | 5 | 1 | 211 | 12 | 152 | 308 |
| | Risk for Public Security | 0 | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 28 | 0 | 56 | 87 |
| | Scams and Fraud | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 12 | 0 | 3 | 1 |
| | Scope of Platform Service | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| | Self-Harm | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 8 | 0 | 2 | 5 |
| | Unsafe and Illegal Products | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 1 | 69 | 19 |
| | Violence | 11 | 7 | 0 | 0 | 1 | 4 | 3 | 0 | 120 | 9 | 215 | 192 |
| Temporary suspension and global content deletion based on TIUC Terms of Service and Rules | Data Protection & Privacy Violations | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | Illegal or Harmful Speech | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 2 |
| | Pornography or Sexualized Content | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| | Protection of Minors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | Risk for Public Security | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | Scams and Fraud | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| | Violence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 1 |
| [Offer of help in case of self-harm and suicide concern](#) based on TIUC Terms of Service and Rules | Protection of minors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Self-Harm | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 1 | 3 |
| Content removed globally | Animal Welfare | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Data Protection & Privacy Violations | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Illegal or Harmful Speech | 0 | 2 | 0 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 1 | 5 |
| | Non-Consensual Behaviour | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pornography or Sexualized Content | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 5 | 3 |
| | Protection of Minors | 0 | 5 | 0 | 0 | 0 | 2 | 0 | 0 | 7 | 0 | 0 | 8 |
| | Risk for Public Security | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 3 | 0 |
| | Scams and Fraud | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 7 | 0 |
| | Self-Harm | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | Unsafe and Illegal Products | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Country withheld Account | Illegal or Harmful Speech | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Pornography or Sexualized | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |

| Category | Subcategory | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Content | | | | | | | | | | | | |
| | Scams and fraud | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | Violence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| Country withheld Content | Animal Welfare | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 2 | 6 |
| | Data Protection & Privacy Violations | 0 | 3 | 1 | 0 | 1 | 3 | 2 | 0 | 30 | 1 | 61 | 91 |
| | Illegal or Harmful Speech | 84 | 92 | 2 | 9 | 2 | 39 | 32 | 4 | 1,131 | 21 | 2,433 | 2,962 |
| | Negative Effects on Civic Discourse or Elections | 5 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 26 | 0 | 8 | 88 |
| | Non-Consensual Behaviour | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 36 | 1 | 29 | 32 |
| | Pornography or Sexualized Content | 6 | 9 | 6 | 2 | 1 | 3 | 4 | 0 | 104 | 3 | 116 | 230 |
| | Protection of Minors | 1 | 6 | 0 | 2 | 0 | 1 | 2 | 0 | 19 | 2 | 21 | 50 |
| | Risk for Public Security | 2 | 8 | 0 | 0 | 1 | 2 | 0 | 0 | 19 | 0 | 46 | 89 |
| | Scams and Fraud | 6 | 2 | 0 | 0 | 0 | 6 | 5 | 1 | 29 | 2 | 34 | 54 |
| | Scope of Platform Service | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| | Self-Harm | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 6 | 0 | 5 | 2 |
| | Unsafe and Illegal Products | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 0 | 16 | 1 | 277 | 33 |
| | Violence | 5 | 6 | 3 | 0 | 0 | 8 | 8 | 0 | 81 | 15 | 518 | 212 |
| Globally withheld content | Intellectual Property Infringements | 4 | 10 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 31 | 561 | 167 |
| Account Suspension | Intellectual Property Infringements | 1 | 1 | 0 | 6 | 5 | 0 | 1 | 0 | 0 | 1 | 28 | 498 |
| No Violation Found | Animal Welfare | 13 | 3 | 1 | 2 | 4 | 2 | 4 | 1 | 61 | 4 | 56 | 45 |
| | Data Protection & Privacy Violations | 17 | 47 | 5 | 5 | 4 | 10 | 15 | 6 | 452 | 11 | 470 | 443 |
| | Illegal or Harmful Speech | 280 | 340 | 44 | 20 | 25 | 165 | 133 | 40 | 3,729 | 109 | 5,460 | 6,887 |
| | Negative Effects on Civic Discourse or Elections | 21 | 30 | 8 | 1 | 3 | 25 | 13 | 7 | 462 | 15 | 259 | 833 |
| | Non-Consensual Behaviour | 13 | 10 | 1 | 5 | 2 | 2 | 12 | 2 | 94 | 8 | 102 | 87 |
| | Pornography or Sexualized Content | 16 | 40 | 3 | 0 | 3 | 19 | 10 | 0 | 283 | 3 | 321 | 293 |
| | Protection of Minors | 36 | 25 | 8 | 4 | 3 | 15 | 17 | 2 | 229 | 9 | 293 | 198 |
| | Risk for Public Security | 37 | 90 | 8 | 3 | 3 | 42 | 14 | 9 | 363 | 24 | 729 | 756 |
| | Scams and Fraud | 65 | 130 | 11 | 19 | 31 | 76 | 79 | 19 | 730 | 42 | 488 | 646 |
| | Scope of Platform Service | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 38 | 1 | 9 | 30 |
| | Self-Harm | 1 | 3 | 0 | 1 | 1 | 4 | 4 | 0 | 57 | 2 | 28 | 61 |

|  | | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Unsafe and Illegal Products | 3 | 16 | 0 | 0 | 1 | 3 | 1 | 2 | 106 | 4 | 179 | 126 |
|  | Violence | 39 | 156 | 7 | 4 | 3 | 33 | 27 | 7 | 901 | 25 | 1,225 | 1,034 |
| **Grand Total** | | **737** | **1,095** | **117** | **90** | **105** | **495** | **424** | **106** | **10,066** | **372** | **14,866** | **18,043** |

## REPORTS OF ILLEGAL CONTENT MEDIAN HANDLE TIME

| Reports of Illegal Content Median Handle Time (Hours) - Aug 28 to Oct 20 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enforcement Process | Action Type | Reason Code | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Greece |
| Automated Means | Global content deletion based on TIUC Terms of Service and Rules | Illegal or Harmful Speech | 34.3 | | | | | | | | 29.5 | | | | |
| | | Non-Consensual Behaviour | | | | | | | | | | | | | |
| | | Self-Harm | | | | | | | | | | | | | |
| | | Violence | | | | | | | | | 21.4 | | | | |
| | Country withheld Content | Data Protection & Privacy Violations | | | | | | | | | | | | | |
| | | Illegal or Harmful Speech | | | | | | | | | | | | | |
| | No violation found | Animal Welfare | | | | | | | | | 45.7 | | | | |
| | | Data Protection & Privacy Violations | | | | | | | | | 30.1 | | | | |
| | | Illegal or Harmful Speech | 34.4 | 33.1 | | | | | | | 36.6 | | | | |
| | | Non-Consensual Behaviour | | | 44.5 | | | | | | 29.5 | | | | |
| | | Pornography or Sexualized Content | | | | | | | 25.7 | | 22.6 | | | | 69.5 |
| | | Protection of Minors | 22.1 | | | | | | | | 27.0 | | | | |
| | | Risk for Public Security | | | | | | | | | 96.1 | | | | |
| | | Scams and Fraud | 75.6 | 73.5 | 102.2 | | 202.8 | | 26.1 | 91.4 | 44.3 | 28.7 | | | |
| | | Scope of Platform Service | | | | | | | | | 42.5 | | | | |
| | | Self-Harm | | 52.2 | | | | | | | 21.3 | | | | |
| | | Unsafe and Illegal Products | | | | | 35.4 | | | | 40.8 | | | | |
| | | Violence | | 70.6 | | | | | 31.0 | | 115.2 | | | | |
| Manual Closure | Global content deletion based on TIUC Terms of Service and Rules | Animal Welfare | | | | | | | | | 3.0 | | 8.6 | 8.4 | |
| | | Data Protection & Privacy Violations | 10.7 | 0.5 | | | | 17.2 | 13.7 | | 12.3 | 37.7 | 6.4 | 3.2 | 42.3 |
| | | Illegal or Harmful Speech | 13.3 | 10.5 | 7.6 | 15.2 | 12.6 | 2.1 | 2.7 | 0.2 | 8.0 | 9.6 | 4.8 | 3.1 | 11.2 |
| | | Negative Effects on Civic Discourse or Elections | | 37.3 | | | | | | | 178.3 | | 13.0 | 6.3 | |
| | | Non-Consensual Behaviour | 3.1 | 53.4 | | | 33.2 | | | | 12.0 | | 4.1 | 10.6 | 26.9 |
| | | Pornography or Sexualized | 10.8 | 10.4 | | 11.2 | | 15.3 | 9.6 | 3.0 | 10.8 | 3.3 | 7.9 | 5.1 | 8.3 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Content | | | | | | | | | | | | | | |
| | Protection of Minors | 9.6 | 12.4 | 15.9 | 75.5 | | 13.8 | 15.4 | 20.5 | 7.7 | 4.8 | 3.9 | 3.8 | 3.3 |
| | Risk for Public Security | | 5.6 | | 2.3 | | 0.8 | | | 11.8 | | 4.1 | 1.5 | 14.5 |
| | Scams and Fraud | 2.8 | | | | | 1.2 | | | 62.2 | | 1.3 | 1.4 | |
| | Scope of Platform Service | | | | | | | | | 62.4 | | | | |
| | Self-Harm | | | | | | | 1.5 | | 3.0 | | 13.5 | 8.9 | |
| | Unsafe and Illegal Products | 1.2 | | | | | | 21.5 | | 13.1 | 5.2 | 4.1 | 1.3 | |
| | Violence | 11.7 | 6.3 | 0.0 | | 22.8 | 0.5 | 5.2 | | 12.3 | 4.3 | 3.1 | 2.8 | 6.8 |
| Temporary suspension and global content deletion based on TIUC Terms of Service and Rules | Data Protection & Privacy Violations | | | | | | | 4.5 | | | | | 1.1 | |
| | Illegal or Harmful Speech | | | | | | | | | | | 1.4 | 2.7 | |
| | Pornography or Sexualized Content | | | | | | | | | | | 4.6 | | |
| | Protection of Minors | | | | | | | | | | | 14.4 | 17.1 | |
| | Risk for Public Security | | | | | | | | | | | 26.5 | | |
| | Scams and Fraud | | | | | | | | | | | 14.1 | | |
| | Violence | | | | | | | | | | | 4.5 | 1.3 | |
| [Offer of help in case of self-harm and suicide concern](#) based on TIUC Terms of Service and Rules | Protection of minors | | | | | | | | | | | | | |
| | Self-harm | | | | | | | | | 12.9 | | 4.5 | 3.9 | |
| Content removed globally | Animal Welfare | | | | | | | | | | | | | |
| | Data Protection & Privacy Violations | | | | | 0.0 | | | | | | | | |
| | Illegal or Harmful Speech | | 74.8 | | | 0.4 | | 11.7 | | | | 34.0 | 0.1 | 0.0 |
| | Non-Consensual Behaviour | | 102.9 | | | | | | | | | | | |
| | Pornography or Sexualized Content | | 52.2 | | | | | | | 88.1 | | 4.0 | 16.2 | |
| | Protection of Minors | | 2.0 | | | | 8.9 | | | 23.9 | | | 17.2 | |
| | Risk for Public Security | | | | | | | | | 32.1 | | 26.5 | | |
| | Scams and Fraud | | | | | | | | | 502.2 | | 19.6 | | |
| | Self-Harm | | | | | | | | | | | | 1.2 | |
| | Unsafe and Illegal Products | | | | | | | | | | | | | |
| Country withheld Account | Illegal or Harmful Speech | | | | | | | | | | | | | |
| | Pornography or Sexualized Content | | | | | | | | | | | | 31.0 | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Scams and Fraud | | | | | | | | | | | 33.0 | | |
| | Violence | | | | | | | | | | | 6.9 | | |
| Country withheld Content | Animal Welfare | 0.0 | 10.1 | | | | | | | 18.7 | | 13.0 | 9.1 | |
| | Data Protection & Privacy Violations | | 17.2 | 157.6 | | 0.4 | 139.4 | 0.3 | | 90.6 | 53.3 | 6.6 | 2.2 | 104.2 |
| | Illegal or Harmful Speech | 12.9 | 3.6 | 4.1 | 12.4 | 22.9 | 14.3 | 10.3 | 72.7 | 126.2 | 13.3 | 8.2 | 3.0 | 2.7 |
| | Negative Effects on Civic Discourse or Elections | 8.4 | 17.1 | | | | 1.8 | | | 157.0 | | 15.1 | 2.8 | 1.8 |
| | Non-Consensual Behaviour | | 12.7 | | | | | | 110.7 | 128.0 | 5.0 | 10.9 | 3.0 | 134.9 |
| | Pornography or Sexualized Content | 12.3 | 17.0 | 18.8 | 9.9 | 47.3 | 1.8 | 35.2 | | 88.0 | 3.8 | 12.4 | 5.2 | 7.9 |
| | Protection of Minors | 8.1 | 12.1 | | 0.6 | | 162.2 | 28.9 | | 44.2 | 138.5 | 12.1 | 10.2 | 4.8 |
| | Risk for Public Security | 96.3 | 2.8 | | | 167.6 | 73.5 | | | 141.0 | | 3.1 | 6.8 | 2.1 |
| | Scams and Fraud | 109.1 | 124.0 | | | | 161.3 | 72.8 | 137.1 | 141.1 | 37.3 | 11.3 | 128.6 | 6.0 |
| | Scope of Platform Service | 6.3 | | | | | | | | | | | 0.9 | |
| | Self-Harm | | | | | 1.8 | | | | 67.2 | | 9.6 | 0.3 | |
| | Unsafe and Illegal Products | | 165.7 | | | | 49.0 | | | 111.2 | | 2.0 | 12.4 | |
| | Violence | 59.1 | 1.2 | 13.3 | | | 12.0 | 51.1 | | 122.0 | 4.9 | 2.4 | 4.7 | 3.0 |
| Globally withheld Content | Intellectual Property Infringements | 5.6 | 3.1 | | | | 5.6 | 6.3 | | | 2.8 | 0.6 | 2.6 | 3.6 |
| Account Suspension | Intellectual Property Infringements | 81.2 | 14.7 | | 31.8 | 58.8 | | 77.7 | | | 63.3 | 81.7 | 50.7 | |
| No violation found | Animal Welfare | 53.6 | 16.2 | 20.5 | 14.4 | 18.6 | 10.3 | 9.3 | 20.5 | 18.3 | 16.3 | 17.2 | 1.0 | 40.3 |
| | Data Protection & Privacy Violations | 3.1 | 11.1 | 73.6 | 8.7 | 3.3 | 5.1 | 24.2 | 7.6 | 13.0 | 9.7 | 13.5 | 2.4 | 1.9 |
| | Illegal or Harmful Speech | 9.6 | 7.6 | 13.1 | 12.2 | 16.7 | 9.2 | 4.4 | 12.8 | 11.1 | 14.3 | 11.0 | 2.7 | 8.4 |
| | Intellectual property infringements | 28.7 | 4.5 | 2.1 | 31.7 | 101.8 | 47.2 | 52.8 | 6.1 | | 4.5 | 37.2 | 33.9 | 1.1 |
| | Negative Effects on Civic Discourse or Elections | 9.2 | 8.8 | 14.4 | 4.4 | 0.2 | 2.2 | 2.0 | 10.1 | 7.7 | 14.3 | 19.2 | 2.1 | 4.3 |
| | Non-Consensual Behaviour | 4.7 | 8.1 | 16.9 | 63.0 | 6.5 | 5.7 | 17.1 | 5.9 | 16.0 | 45.5 | 11.8 | 4.9 | 12.3 |
| | Pornography or Sexualized Content | 5.4 | 13.3 | 13.8 | | 68.7 | 15.0 | 4.4 | | 12.9 | 4.1 | 11.0 | 10.6 | 21.7 |
| | Protection of Minors | 11.2 | 8.6 | 8.6 | 14.6 | 8.6 | 9.0 | 13.5 | 8.8 | 13.7 | 6.3 | 12.5 | 3.7 | 6.6 |
| | Risk for Public Security | 5.0 | 9.0 | 1.5 | 15.4 | 3.6 | 3.1 | 2.3 | 8.2 | 8.7 | 3.5 | 10.9 | 4.2 | 16.0 |
| | Scams and Fraud | 17.5 | 18.7 | 3.6 | 3.4 | 12.3 | 12.6 | 14.8 | 1.5 | 18.7 | 88.6 | 16.0 | 5.4 | 20.6 |
| | Scope of Platform | 114.5 | 73.2 | 7.5 | | | | | | 9.4 | 4.6 | 5.9 | 7.3 | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Service | | | | | | | | | | | | | | | |
| Self-Harm | 2.1 | 13.6 | | | 0.4 | 1.0 | 41.4 | 47.4 | | 11.2 | 1.5 | 11.6 | 9.5 | |
| Unsafe and Illegal Products | 12.5 | 13.4 | | | 77.1 | 10.7 | 7.8 | 6.8 | 13.4 | 12.6 | 18.7 | 7.4 | 15.5 |
| Violence | 11.9 | 9.8 | 13.1 | 32.8 | 89.8 | 10.3 | 49.9 | 83.4 | 10.8 | 8.5 | 10.4 | 3.7 | 13.2 |

Important Notes about Actions taken on illegal content:
1. Disparity between reports received and reports handled is caused by the pending cases at the end of the reporting period.
2. We only use automated means to close user reports of illegal content where: (i) reported content is no longer accessible to the reporter following other means/workflows; or (ii) reporter displays bad actor patterns.
3. The numbers of "Intellectual property infringements" reflect reports instead of individual items of content and accounts. Actions taken against intellectual property infringements are made globally meaning that media that infringes copyright and accounts that infringe trademarks will be disabled globally.
4. Action Types: actions that do not reference TIUC Terms of Service and Rules have been taken based on illegality.
5. To improve clarity, we've omitted countries and violation types with zero reports from the tables above.
6. The tables REPORTS RESOLVED BY ACTIONS TAKEN ON ILLEGAL CONTENT and REPORTS OF ILLEGAL CONTENT MEDIAN HANDLE TIME were updated on 13 November 2023 to replace an undefined description "reported content" with the relevant enforcement method "manual closure".

## Complaints received through our internal complaint-handling system.

### COMPLAINTS OF ACTIONS TAKEN FOR ILLEGAL CONTENT RECEIVED

| Illegal Content Complaints Received - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Greece | Ireland | Italy | Latvia | Luxembourg |
| Complaints | 3 | 8 | 1 | 1 | 1 | 1 | 5 | 3 | 33 | 1 | 52 | 33 | 1 | 10 | 15 | 2 | 5 |

### COMPLAINTS OF ACTIONS TAKEN FOR ILLEGAL CONTENT DECISIONS

| Illegal Content Complaints Actioned - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Greece | Ireland | Italy | Latvia | Luxembourg |
| Overturned Appeal | 1 | 3 | | | | | | | 2 | | 3 | 13 | | 1 | | 1 | 2 |
| Rejected Appeal | 2 | 5 | 1 | 1 | 1 | 1 | 5 | 3 | 31 | 1 | 49 | 20 | 1 | 9 | 15 | 1 | 3 |

### COMPLAINTS OF ACTIONS TAKEN FOR ILLEGAL CONTENT MEDIAN HANDLE TIME

| Illegal Content Complaints Median Handle Time (Hours) - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | EU | Finland | France | Germany | Greece | Ireland | Italy | Latvia | Luxembourg |
| Complaints | 3.8 | 15.4 | 329 | 0.9 | 0 | 131.6 | 1.7 | 168.4 | 13.2 | 68 | 4.7 | 2 | 24.1 | 3.4 | 16 | 71.1 | 0 |

### COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS RECEIVED

| TIUC Terms of Service and Rules Action Complaints - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Category | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ireland | Italy | Latvia | Lithua |
| Account Suspension Complaints | 1,006 | 1,758 | 741 | 407 | 242 | 952 | 1,010 | 321 | 1,101 | 16,340 | 24,594 | 1,067 | 874 | 1,456 | 5,837 | 318 | |
| Content Action Complaints | 70 | 149 | 16 | 19 | 15 | 70 | 54 | 10 | 45 | 1,296 | 960 | 50 | 27 | 176 | 177 | 10 | |
| Live Feature Action Complaints | 1 | 4 | 1 | 2 | | | 1 | | | 45 | 32 | 1 | 1 | 2 | 10 | 1 | |
| Restricted Reach Complaints | 48 | 86 | 21 | 35 | 10 | 57 | 50 | 14 | 66 | 371 | 470 | 41 | 17 | 195 | 145 | 10 | |
| Sensitive Media Action Complaints | 5 | 11 | 1 | 4 | 3 | 12 | 4 | 3 | 7 | 49 | 129 | 4 | 3 | 15 | 22 | | |
| Grand Total | 1,130 | 2,008 | 780 | 467 | 270 | 1,091 | 1,119 | 348 | 1,219 | 18,101 | 26,185 | 1,163 | 922 | 1,844 | 6,191 | 339 | |

**COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS DECISIONS**

| Decisions | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Category | Overturned | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ireland | Italy |
| Account Suspension Complaints | No | 928 | 1,607 | 699 | 367 | 222 | 847 | 938 | 306 | 1,013 | 15,047 | 23,503 | 969 | 817 | 1,333 | 5,382 |
| | Yes | 74 | 130 | 37 | 35 | 18 | 92 | 62 | 14 | 74 | 1,114 | 948 | 84 | 51 | 97 | 368 |
| Content Action Complaints | No | 60 | 122 | 15 | 14 | 11 | 58 | 38 | 8 | 36 | 968 | 782 | 43 | 16 | 133 | 136 |
| | Yes | 8 | 26 | 1 | 4 | 4 | 11 | 16 | 2 | 8 | 287 | 162 | 6 | 10 | 42 | 40 |
| Live Feature Action Complaints | No | 1 | 4 | 1 | 2 | | | 1 | | | 44 | 30 | 1 | 1 | 2 | 10 |
| | Yes | | | | | | | | | | 1 | 1 | | | | |
| Restricted Reach Complaints | No | 24 | 38 | 12 | 23 | 5 | 20 | 29 | 5 | 25 | 203 | 232 | 18 | 9 | 96 | 82 |
| | Yes | 24 | 48 | 9 | 12 | 4 | 37 | 21 | 9 | 40 | 168 | 235 | 23 | 8 | 99 | 63 |
| Sensitive Media Action Complaints | No | 2 | 5 | | 2 | 3 | 12 | 4 | 3 | 3 | 32 | 72 | 3 | 3 | 11 | 9 |
| | Yes | 3 | 6 | 1 | 2 | | | | | 4 | 13 | 50 | 1 | | 3 | 13 |
| Grand Total | Total | 1,124 | 1,986 | 775 | 461 | 267 | 1,077 | 1,109 | 347 | 1,203 | 17,877 | 26,015 | 1,148 | 915 | 1,816 | 6,103 |

**COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS MEDIAN HANDLE TIME**

| TIUC Terms of Service and Rules Complaints Median Handle Time (Hours) | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Category | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ireland | Italy | Latvia | Lithuan |
| Account Suspension Complaints | 0.14 | 0.07 | 0.00 | 0.17 | 0.16 | 0.12 | 0.12 | 0.47 | 0.18 | 0.07 | 0.00 | 0.12 | 0.08 | 0.08 | 0.10 | 0.23 | 0. |
| Content Action Complaints | 0.25 | 0.33 | 0.90 | 0.16 | 0.48 | 0.07 | 0.05 | 0.28 | 0.46 | 0.55 | 1.04 | 0.77 | 0.48 | 0.15 | 0.35 | 0.13 | 0. |
| Live Feature Action Complaints | 1.21 | 9.11 | 4.76 | 3.71 | | | 12.87 | | | 5.51 | 6.40 | 0.07 | 4.51 | 4.30 | 7.98 | 8.86 | 3. |
| Restricted Reach Complaints | 0.08 | 0.05 | 0.10 | 0.17 | 0.04 | 0.08 | 0.03 | 0.05 | 0.07 | 0.08 | 0.08 | 0.05 | 0.05 | 0.07 | 0.08 | 0.05 | 0. |
| Sensitive Media Action Complaints | 5.82 | 0.13 | 11.75 | 0.27 | 2.78 | 0.22 | 4.80 | 2.18 | 1.13 | 0.93 | 1.88 | 1.65 | 3.70 | 1.17 | 0.45 | | |

Important Notes about Complaints:
1. Information on the basis of complaints is not provided due to the wide variety of underlying reasoning contained in the open text field in the complaint form.
2. To improve clarity, we've omitted countries and violation types with zero complaints from the tables above.
3. The COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS RECEIVED/DECISIONS tables were updated on 1 November 2023 to show additional data regarding complaints of actions taken based on the CSE policy that were not shown in the original version. The table COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS MEDIAN HANDLE TIME has been updated following updates to the tables COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS RECEIVED/DECISIONS.

# INDICATORS OF ACCURACY FOR CONTENT MODERATION

The possible rate of error of the automated means used in fulfilling those purposes, and any safeguards applied

**VISIBILITY FILTERING INDICATORS**

| TIUC Terms of Service and Rules Visibility Filtering Complaints Received - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian | M |
| Automated | Hateful | 1 | 6 | 21 | 11 | 84 | 1,098 | 18 | 240 | 151 | 4 | 2 | 0 | 56 | 1 | | |

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Means | Conduct | | | | | | | | | | | | | | | |
| Manual Closure | Abuse & Harassment | 0 | 0 | 3 | 0 | 1 | 44 | 0 | 13 | 21 | 0 | 1 | | 10 | | 0 |
| | Hateful Conduct | 0 | 0 | 0 | 1 | 7 | 64 | 1 | 17 | 18 | 1 | 0 | | 7 | 0 | |
| | Violent Speech | 0 | 0 | 0 | 0 | 1 | 4 | 0 | 0 | 3 | 1 | 0 | | 1 | | |

**TIUC Terms of Service and Rules Visibility Filtering Complaint Overturns - Aug 28 to Oct 20**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Hateful Conduct | 1 | 4 | 15 | 3 | 45 | 527 | 13 | 147 | 76 | 2 | 1 | 0 | 20 | 0 | |
| Manual Closure | Abuse & Harassment | 0 | 0 | 3 | 0 | 1 | 25 | 0 | 11 | 15 | 0 | 1 | | 5 | | 0 |
| | Hateful Conduct | 0 | 0 | 0 | 0 | 3 | 31 | 1 | 7 | 5 | 1 | | | 3 | 0 | |
| | Violent Speech | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 1 | | | 0 | | |

**TIUC Terms of Service and Rules Visibility Filtering Complaint Rate - Aug 28 to Oct 20**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Hateful Conduct | 1% | 4% | 5% | 4% | 5% | 3% | 4% | 4% | 5% | 2% | 1% | 0% | 6% | 3% | |
| Manual Closure | Abuse & Harassment | 0% | 0% | 4% | 0% | 1% | 1% | 0% | 1% | 6% | 0% | 3% | | 2% | | 0% |
| | Hateful Conduct | 0% | 0% | 0% | 3% | 4% | 1% | 2% | 1% | 6% | 2% | 0% | | 2% | 0% | |
| | Violent Speech | 0% | 0% | 0% | 0% | 1% | 1% | 0% | 0% | 2% | 11% | 0% | | 2% | | |

**TIUC Terms of Service and Rules Visibility Filtering Complaint Overturn Rate - Aug 28 to Oct 20**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Hateful Conduct | 100% | 67% | 71% | 27% | 54% | 48% | 72% | 61% | 50% | 50% | 50% | | 36% | 0% | |
| Manual Closure | Abuse & Harassment | | | 100% | | 100% | 57% | | 85% | 71% | | 100% | | 50% | | |
| | Hateful Conduct | | | | 0% | 43% | 48% | 100% | 41% | 28% | 100% | | | 43% | | |
| | Violent Speech | | | | | 0% | 25% | | | 100% | 100% | | | 0% | | |

Important Notes:

1. The tables in the section VISIBILITY FILTERING INDICATORS were updated on 13 November 2023 to replace an undefined description "reported content" with the relevant enforcement method "manual closure".

## INDICATORS OF ACCURACY FOR CONTENT REMOVAL

**TIUC Terms of Service and Rules Content Removal Complaints Received**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Abuse & harassment | 0 | 0 | 0 | 1 | 0 | 14 | 0 | 2 | 0 | 0 | 0 | | 0 | 0 | |
| | Counterfeit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Hateful Conduct | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Illegal or certain regulated goods and services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Non-Consensual Nudity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Perpetrators of Violent Attacks | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | | 0 | 0 | |
| | Private information & media | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Sensitive Media | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Suicide & Self Harm | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |

| Enforcement | Policy | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Violent Speech | 1 | 3 | 7 | 4 | 10 | 655 | 3 | 257 | 44 | 0 | 2 | | 5 | 1 | |
| Manual Closure | Abuse & harassment | 0 | 0 | 1 | 1 | 8 | 236 | 0 | 65 | 31 | 3 | 0 | | 17 | 0 | |
| | Child Sexual Exploitation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Counterfeit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Deceased Individuals | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Hateful Conduct | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 15 | 3 | 0 | 0 | | 0 | 0 | |
| | Illegal or certain regulated goods and services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Misleading & deceptive identities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Non-Consensual Nudity | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 2 | 2 | 0 | 0 | | 10 | 0 | |
| | Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Perpetrators of Violent Attacks | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | | 0 | 0 | |
| | Private information & media | 0 | 0 | 0 | 0 | 3 | 13 | 0 | 4 | 5 | 0 | 1 | | 2 | 0 | |
| | Restricted Reach Labels | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Sensitive Media | 0 | 0 | 0 | 3 | 13 | 297 | 0 | 79 | 38 | 0 | 0 | | 6 | 0 | |
| | Suicide & Self Harm | 0 | 0 | 0 | 0 | 0 | 51 | 2 | 17 | 6 | 0 | 0 | | 4 | 0 | |
| | Synthetic & Manipulated Media | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Violent & Hateful Entities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Violent Speech | 2 | 2 | 8 | 5 | 29 | 840 | 4 | 310 | 115 | 1 | 1 | | 14 | 0 | |

**TIUC Terms of Service and Rules Content Removal Complaint Overturns**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Abuse & harassment | | | | | | | | | | | | | | | | |
| | Counterfeit | | | | | | | | | | | | | | | | |
| | Hateful Conduct | | | | | | | | | | | | | | | | |
| | Illegal or certain regulated goods and services | | | | | | | | | | | | | | | | |
| | Non-Consensual Nudity | | | | | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | | | | | |
| | Perpetrators of Violent Attacks | | | | | | 1 | | | | | | | | | | |
| | Private information & media | | | | | | 1 | | | | | | | | | | |
| | Sensitive Media | | | | | | | | | | | | | | | | |
| | Suicide & Self Harm | | | | | | | | | | | | | | | | |
| | Violent Speech | | | | 1 | | 64 | | 19 | 4 | | | | | | | |
| Manual Closure | Abuse & harassment | | | | | | 8 | | 4 | | | | | | | | |
| | Child Sexual | | | | | | | | | | | | | | | | |

| | Danish | English | French | German |
|---|---|---|---|---|
| Exploitation | | | | |
| Counterfeit | | | | |
| Deceased Individuals | | | | |
| Hateful Conduct | | 1 | 1 | 1 |
| Illegal or certain regulated goods and services | | | | |
| Misleading & deceptive identities | | | | |
| Non-Consensual Nudity | | | 1 | |
| Other | | | | |
| Perpetrators of Violent Attacks | | 1 | | |
| Private information & media | | 3 | | |
| Restricted Reach Labels | | | | |
| Sensitive Media | | 14 | 4 | 2 |
| Suicide & Self Harm | | 3 | 1 | |
| Synthetic & Manipulated Media | | | | |
| Violent & Hateful Entities | | | | |
| Violent Speech | 1 | 75 | 25 | 10 |

**TIUC Terms of Service and Rules Content Removal Complaint Rate**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian | M… |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Abuse & harassment | | | 0% | 100% | 0% | 24% | | 13% | 0% | 0% | | | 0% | | | |
| | Counterfeit | | | | | | | | | | | | | | | | |
| | Hateful Conduct | | | | | | 0% | | | | | | | | | | |
| | Illegal or certain regulated goods and services | | | | | | | 0% | 0% | 0% | | 0% | | | | | |
| | Non-Consensual Nudity | | | | | | 0% | | | | | | | | | | |
| | Other | | | | | | 0% | | 0% | | | | | | | | |
| | Perpetrators of Violent Attacks | | | | | | 50% | | | 100% | | | | 0% | | | |
| | Private information & media | | | 0% | | | 50% | | | | | | | 0% | | | |
| | Sensitive Media | | | | | | 0% | | 0% | | | | | | | | |
| | Suicide & Self Harm | | | | | | 0% | | | | | | | | | | |
| | Violent Speech | 7% | 8% | 9% | 5% | 3% | 5% | 4% | 6% | 6% | 0% | 4% | | 2% | 17% | | |
| Manual Closure | Abuse & harassment | 0% | 0% | 2% | 7% | 7% | 2% | 0% | 6% | 11% | 4% | 0% | | 5% | | | |
| | Child Sexual Exploitation | | | | | 0% | 0% | | 0% | 0% | | | | 0% | | | |
| | Counterfeit | | | | | | 0% | | 0% | | | | | | | | |

| Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deceased Individuals | | | | | | 3% | | 0% | 0% | | | | 0% | | |
| Hateful Conduct | | | | | 0% | 5% | 0% | 13% | 20% | | | 0% | 0% | | |
| Illegal or certain regulated goods and services | | | 0% | | 0% | 0% | | 0% | 0% | | | | 0% | | |
| Misleading & deceptive identities | | | | | | | | | | | | | | | |
| Non-Consensual Nudity | 0% | | 0% | | 0% | 2% | | 4% | 7% | 0% | | 0% | 29% | | |
| Other | | | | | | 0% | | 0% | | | | | | | |
| Perpetrators of Violent Attacks | | | | | 0% | 20% | | 0% | 100% | | | | 0% | | |
| Private information & media | | 0% | 0% | 0% | 33% | 6% | | 5% | 15% | | | 100% | 18% | | |
| Restricted Reach Labels | | | | | | 0% | | | | | | | | | |
| Sensitive Media | 0% | 0% | 0% | 6% | 3% | 5% | 0% | 6% | 5% | 0% | | 0% | 2% | | |
| Suicide & Self Harm | 0% | 0% | 0% | 0% | 0% | 5% | 15% | 12% | 6% | 0% | | 0% | 4% | | |
| Synthetic & Manipulated Media | | | | | | 0% | | | | | | | | | |
| Violent & Hateful Entities | | | | | | | | | 0% | | | | | | |
| Violent Speech | 13% | 5% | 7% | 5% | 5% | 6% | 5% | 6% | 9% | 1% | | 1% | 2% | 0% | |

**TIUC Terms of Service and Rules Content Removal Complaint Overturn Rate**

| Enforcement | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian | Ma… |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automated Means | Abuse & harassment | | | | 0% | | 0% | | 0% | | | | | | | | |
| | Counterfeit | | | | | | | | | | | | | | | | |
| | Hateful Conduct | | | | | | | | | | | | | | | | |
| | Illegal or certain regulated goods and services | | | | | | | | | | | | | | | | |
| | Non-Consensual Nudity | | | | | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | | | | | |
| | Perpetrators of Violent Attacks | | | | | | 50% | | | 0% | | | | | | | |
| | Private information & media | | | | | | 50% | | | | | | | | | | |
| | Sensitive Media | | | | | | | | | | | | | | | | |
| | Suicide & Self Harm | | | | | | | | | | | | | | | | |
| | Violent Speech | 0% | 0% | 0% | 25% | 0% | 10% | 0% | 7% | 9% | | | 0% | 0% | | 0% | |
| Manual Closure | Abuse & harassment | | | 0% | 0% | 0% | 3% | | 6% | 0% | 0% | | | 0% | | | |
| | Child Sexual Exploitation | | | | | | | | | | | | | | | | |
| | Counterfeit | | | | | | | | | | | | | | | | |
| | Deceased Individuals | | | | | | 0% | | | | | | | | | | |
| | Hateful Conduct | | | | | | 13% | | 7% | 33% | | | | | | | |

| Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illegal or certain regulated goods and services | | | | | | | | | | | | | | | |
| Misleading & deceptive identities | | | | | | | | | | | | | | | |
| Non-Consensual Nudity | | | | | | 0% | | 50% | 0% | | | | 0% | | |
| Other | | | | | | | | | | | | | | | |
| Perpetrators of Violent Attacks | | | | | | 50% | | | 0% | | | | | | |
| Private information & media | | | | | 0% | 23% | | 0% | 0% | | 0% | | 0% | | |
| Restricted Reach Labels | | | | | | | | | | | | | | | |
| Sensitive Media | | | | 0% | 0% | 5% | | 5% | 5% | | | | 0% | | |
| Suicide & Self Harm | | | | | | 6% | 0% | 6% | 0% | | | | 0% | | |
| Synthetic & Manipulated Media | | | | | | | | | | | | | | | |
| Violent & Hateful Entities | | | | | | | | | | | | | | | |
| Violent Speech | 0% | 0% | 0% | 20% | 0% | 9% | 0% | 8% | 9% | 0% | 0% | | 0% | | |

Important Notes:

1. The tables in the section INDICATORS OF ACCURACY FOR CONTENT REMOVAL were updated on 13 November 2023 to replace an undefined description "reported content" with the relevant enforcement method "manual closure".

**INDICATORS OF ACCURACY FOR SUSPENSIONS**

| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TIUC Terms of Service and Rules Suspension Complaints Received - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
| Own Initiative - Automated Means | Child Sexual Exploitation | 7 | 7 | 31 | 8 | 39 | 1,933 | 4 | 316 | 218 | 12 | 36 | | 106 | 2 | |
| | Financial Scam | | | | | | 0 | | 0 | 0 | | | | | | |
| | Help with My Compromised Account | | 0 | 3 | 0 | 10 | 82 | 1 | 32 | 12 | 2 | 1 | | 14 | 1 | |
| | Illegal or Certain Regulated Goods and Services | | | | | | 0 | | | 0 | | | | | | |
| | Other | | | | | | 0 | | | 0 | | | | 2 | | |
| | Perpetrators of Violent Attacks | | | | | | 8 | | | | | | | | | |
| | Platform Manipulation & Spam | 9 | 10 | 45 | 21 | 73 | 2,755 | 12 | 878 | 367 | 32 | 54 | | 253 | 4 | 0 |
| | Violent & Hateful Entities | | | | | 0 | 8 | | 8 | 0 | | | | 0 | | |
| User Report - Manual Review | Abuse & Harassment | 1 | 3 | 3 | | 9 | 149 | 0 | 41 | 21 | 3 | 2 | | 23 | | |
| | Ban Evasion | | | | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| | Child Sexual Exploitation | 0 | 0 | 4 | 4 | 14 | 531 | 2 | 89 | 69 | 5 | 5 | | 30 | | |
| | Copyright | | | 0 | | 2 | 58 | 1 | 29 | 6 | 2 | | | 13 | | |
| | Counterfeit | | | | | | 3 | | 4 | | | | | 0 | | |
| | Deceased Individuals | | | | 0 | | 0 | | | | | | | | | |
| | Distribution of Hacked Materials | | | | | | 0 | | | | | | | | | |
| | Financial Scam | 0 | | | | 0 | 1 | | 1 | 0 | 0 | | | 0 | | |

| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hateful Conduct | | | | | | 3 | | 7 | 1 | | | | 1 | | |
| | Illegal or Certain Regulated Goods and Services | | | 0 | | 0 | 1 | 0 | 1 | 0 | 0 | | | 1 | | |
| | Misleading & Deceptive Identities | 1 | 1 | 0 | | 1 | 51 | 0 | 7 | 3 | 0 | 0 | | 2 | | |
| | Non-Consensual Nudity | 2 | 0 | 2 | | 4 | 45 | 0 | 13 | 8 | 6 | 1 | | 6 | | |
| | Other | | 0 | 2 | 0 | 0 | 10 | 0 | 3 | 2 | | 0 | | 0 | 0 | |
| | Perpetrators of Violent Attacks | | | | | 0 | 0 | 0 | 0 | 0 | | | | 0 | | |
| | Platform Manipulation & Spam | 1 | 0 | 0 | 0 | 2 | 143 | 0 | 5 | 8 | 0 | 1 | | 3 | 0 | 0 |
| | Private Information & Media | | 1 | | | | 7 | | | 0 | | | | | | |
| | Sensitive Media | 1 | | 0 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | | 1 | | |
| | Suicide & Self Harm | | | 0 | | 0 | 2 | | 0 | 0 | | | | 0 | | |
| | Trademark | | | | | | 2 | | 1 | 0 | | | 0 | 0 | | |
| | Username Squatting | | | | | | 0 | | 0 | 0 | | | | 0 | | |
| | Violent & Hateful Entities | | 0 | | 0 | 0 | 43 | 1 | 6 | 4 | 0 | | | 0 | | |
| | Violent Speech | 6 | 12 | 53 | 71 | 431 | 4,582 | 31 | 1,653 | 802 | 35 | 31 | | 373 | 3 | |
| Own Initiative - Manual Review | Abuse & Harassment | | | | | | 0 | | | | | | | | | |

| TIUC Terms of Service and Rules Suspension Complaint Overturns - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
| Own Initiative - Automated Means | Child Sexual Exploitation | 0 | 0 | 0 | 0 | 1 | 75 | 0 | 13 | 7 | 0 | 0 | | 6 | 0 | |
| | Financial Scam | | | | | | 0 | | 0 | 0 | | | | | | |
| | Help with My Compromised Account | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Illegal or Certain Regulated Goods and Services | | | | | | 0 | | | 0 | | | | | | |
| | Other | | | | | | 0 | | | 0 | | | | 1 | | |
| | Perpetrators of Violent Attacks | | | | | | 0 | | | | | | | | | |
| | Platform Manipulation & Spam | 2 | 3 | 16 | 9 | 9 | 630 | 2 | 221 | 89 | 8 | 11 | | 65 | 2 | 0 |
| | Violent & Hateful Entities | | | | | 0 | 0 | | 0 | 0 | | | | 0 | | |
| User Report - Manual Review | Abuse & Harassment | 0 | 1 | 3 | | 5 | 64 | 0 | 12 | 11 | 2 | 1 | | 12 | 0 | |
| | Ban Evasion | | | | 0 | | 0 | 0 | 0 | 0 | | | | | | |
| | Child Sexual Exploitation | 0 | 0 | 0 | 1 | 0 | 20 | 0 | 5 | 2 | 0 | 0 | | 1 | 0 | |
| | Copyright | | | 0 | | 0 | 1 | 0 | 0 | 0 | 0 | | | 0 | 0 | |
| | Counterfeit | | | | | | 0 | | 0 | | | | | 0 | | |
| | Deceased Individuals | | | | | 0 | 0 | | | | | | | | | |

| Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Distribution of Hacked Materials | | | | | | 0 | | | | | | | | | |
| | Financial Scam | 0 | | | | 0 | 1 | | 0 | 0 | 0 | | | 0 | | |
| | Hateful Conduct | | | | | | 0 | | 1 | 0 | | | | 1 | | |
| | Illegal or Certain Regulated Goods and Services | | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | | | 0 | 0 | |
| | Misleading & Deceptive Identities | 1 | 1 | 0 | | 0 | 8 | 0 | 0 | 1 | 0 | 0 | | 0 | | |
| | Non-Consensual Nudity | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | |
| | Other | | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | | 0 | | 0 | | 0 |
| | Perpetrators of Violent Attacks | | | | | | 0 | 0 | 0 | 0 | 0 | | | 0 | | |
| | Platform Manipulation & Spam | 0 | 0 | 0 | 0 | 2 | 61 | 0 | 2 | 4 | 0 | 0 | | 2 | 0 | 0 |
| | Private Information & Media | | 0 | | | | 2 | | | 0 | | | | | | |
| | Sensitive Media | 0 | | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | | 0 | | |
| | Suicide & Self Harm | | 0 | | | 0 | 0 | | 0 | 0 | | | | 0 | | |
| | Trademark | | | | | | 0 | | 0 | 0 | | 0 | | 0 | | |
| | Username Squatting | | | | | | 0 | | 0 | 0 | | | | 0 | | |
| | Violent & Hateful Entities | | 0 | | 0 | 0 | 0 | 0 | 1 | 0 | 0 | | | 0 | | |
| | Violent Speech | 0 | 0 | 0 | 0 | 4 | 69 | 1 | 16 | 7 | 1 | 0 | | 4 | 0 | 0 |
| Own Initiative - Manual Review | Abuse & Harassment | | | | | | 0 | | | | | | | | | |

| TIUC Terms of Service and Rules Suspension Complaint Rate - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
| Own Initiative - Automated Means | Child Sexual Exploitation | 23% | 25% | 48% | 36% | 25% | 9% | 11% | 25% | 28% | 26% | 32% | | 32% | 40% | |
| | Financial Scam | | | | | | 0% | | 0% | 0% | | | | | | |
| | Help with My Compromised Account | | 0% | 38% | 0% | 29% | 16% | 50% | 27% | 34% | 25% | 33% | | 20% | 33% | |
| | Illegal or Certain Regulated Goods and Services | | | | | | 0% | | | 0% | | | | | | |
| | Other | | | | | | 0% | | | 0% | | | | 100% | | |
| | Perpetrators of Violent Attacks | | | | | | 12% | | | | | | | | | |
| | Platform Manipulation & Spam | 5% | 6% | 3% | 2% | 2% | 0% | 3% | 3% | 2% | 4% | 4% | | 1% | 14% | 0% |
| | Violent & Hateful Entities | | | | | 0% | 3% | | 33% | 0% | | | | 0% | | |
| User Report - Manual Review | Abuse & Harassment | 50% | 60% | 43% | | 60% | 3% | 0% | 49% | 40% | 25% | 33% | | 52% | | |
| | Ban Evasion | | | | 0% | | 0% | 0% | 0% | 0% | | | | | | |
| | Child Sexual Exploitation | 0% | 0% | 12% | 31% | 19% | 3% | 8% | 20% | 22% | 28% | 12% | | 22% | | |

| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Copyright |  |  | 0% |  | 50% | 24% | 100% | 60% | 60% | 100% |  |  | 59% |  |  |
|  | Counterfeit |  |  |  |  |  | 2% |  | 20% |  |  |  |  | 0% |  |  |
|  | Deceased Individuals |  |  |  | 0% |  | 0% |  |  |  |  |  |  |  |  |  |
|  | Distribution of Hacked Materials |  |  |  |  |  | 0% |  |  |  |  |  |  |  |  |  |
|  | Financial Scam | 0% |  |  |  | 0% | 1% |  | 14% | 0% | 0% |  |  | 0% |  |  |
|  | Hateful Conduct |  |  |  |  |  | 25% |  | 54% | 50% |  |  |  | 100% |  |  |
|  | Illegal or Certain Regulated Goods and Services |  |  | 0% |  | 0% | 0% | 0% | 4% | 0% | 0% |  |  | 5% |  |  |
|  | Misleading & Deceptive Identities | 50% | 50% | 0% |  | 4% | 5% | 0% | 7% | 7% | 0% | 0% |  | 10% |  |  |
|  | Non-Consensual Nudity | 67% | 0% | 100% |  | 80% | 14% | 0% | 42% | 40% | 86% | 50% |  | 55% |  |  |
|  | Other |  | 0% | 50% | 0% | 0% | 0% | 0% | 10% | 1% |  | 0% |  | 0% | 0% |  |
|  | Perpetrators of Violent Attacks |  |  |  | 0% |  | 0% | 0% | 0% | 0% |  |  |  | 0% |  |  |
|  | Platform Manipulation & Spam | 7% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 1% |  | 0% | 0% | 0% |
|  | Private Information & Media |  | 100% |  |  |  | 32% |  |  | 0% |  |  |  |  |  |  |
|  | Sensitive Media | 100% |  | 0% | 0% | 0% | 1% | 0% | 4% | 18% | 0% | 33% |  | 20% |  |  |
|  | Suicide & Self Harm |  |  | 0% |  | 0% | 4% |  | 0% | 0% |  |  |  | 0% |  |  |
|  | Trademark |  |  |  |  |  | 14% |  | 100% | 0% |  | 0% |  | 0% |  |  |
|  | Username Squatting |  |  |  |  |  | 0% |  | 0% | 0% |  |  |  | 0% |  |  |
|  | Violent & Hateful Entities |  | 0% |  | 0% | 0% | 3% | 17% | 8% | 9% | 0% |  |  | 0% |  |  |
|  | Violent Speech | 60% | 40% | 67% | 67% | 73% | 52% | 60% | 66% | 65% | 65% | 49% |  | 67% | 60% |  |
| Own Initiative - Manual Review | Abuse & Harassment |  |  |  |  |  | 0% |  |  |  |  |  |  |  |  |  |

| TIUC Terms of Service and Rules Suspension Complaint Overturn Rate - Aug 28 to Oct 20 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Detection Method - Enforcement Process | Policy | Bulgarian | Croatian | Czech | Danish | Dutch | English | Finnish | French | German | Greek | Hungarian | Irish | Italian | Latvian | Lithuanian |
| Own Initiative - Automated Means | Child Sexual Exploitation | 0% | 0% | 0% | 0% | 3% | 4% | 0% | 4% | 3% | 0% | 0% |  | 6% | 0% |  |
|  | Financial Scam |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Help with My Compromised Account |  |  | 0% |  | 0% | 0% | 0% | 0% | 0% | 0% | 0% |  | 0% | 0% |  |
|  | Illegal or Certain Regulated Goods and Services |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Other |  |  |  |  |  |  |  |  |  |  |  |  | 50% |  |  |
|  | Perpetrators of Violent Attacks |  |  |  |  |  | 0% |  |  |  |  |  |  |  |  |  |
|  | Platform Manipulation & Spam | 22% | 30% | 36% | 43% | 12% | 23% | 17% | 25% | 24% | 25% | 20% |  | 26% | 50% |  |
|  | Violent & Hateful Entities |  |  |  |  |  | 0% |  | 0% |  |  |  |  |  |  |  |
| User Report - Manual | Abuse & Harassment | 0% | 33% | 100% |  | 56% | 43% |  | 29% | 52% | 67% | 50% |  | 52% |  |  |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Review | Harassment | | | | | | | | | | | | | |
| | Ban Evasion | | | | | | | | | | | | | |
| | Child Sexual Exploitation | | | 0% | 25% | 0% | 4% | 0% | 6% | 3% | 0% | 0% | 3% | |
| | Copyright | | | | | 0% | 2% | 0% | 0% | 0% | | | 0% | |
| | Counterfeit | | | | | | 0% | | 0% | | | | | |
| | Deceased Individuals | | | | | | | | | | | | | |
| | Distribution of Hacked Materials | | | | | | | | | | | | | |
| | Financial Scam | | | | | | 100% | | 0% | | | | | |
| | Hateful Conduct | | | | | | 0% | | 14% | 0% | | | 100% | |
| | Illegal or Certain Regulated Goods and Services | | | | | | 0% | | 0% | | | | 0% | |
| | Misleading & Deceptive Identities | 100% | 100% | | | 0% | 16% | | 0% | 33% | | | 0% | |
| | Non-Consensual Nudity | 0% | | 0% | | 0% | 0% | | 0% | 0% | 0% | 0% | 0% | |
| | Other | | | 0% | | | 0% | | 33% | 0% | | | | |
| | Perpetrators of Violent Attacks | | | | | | | | | | | | | |
| | Platform Manipulation & Spam | 0% | | | 100% | | 43% | | 40% | 50% | | 0% | 67% | |
| | Private Information & Media | | 0% | | | | 29% | | | | | | | |
| | Sensitive Media | 0% | | | | | 50% | | 100% | 0% | | 0% | 0% | |
| | Suicide & Self Harm | | | | | | 0% | | | | | | | |
| | Trademark | | | | | | 0% | | 0% | | | | | |
| | Username Squatting | | | | | | | | | | | | | |
| | Violent & Hateful Entities | | | | | | 0% | 0% | 17% | 0% | | | | |
| | Violent Speech | 0% | 0% | 0% | 0% | 1% | 2% | 3% | 1% | 1% | 3% | 0% | 1% | 0% |
| Own Initiative - Manual Review | Abuse & Harassment | | | | | | 0% | | | | | | | |

Important Notes about indicators of accuracy:

1. For some official languages we did not collect data, such as Maltese, or very little data, including Irish, Lithuanian, and Slovenian.
2. The underlying volume of appeals and overturns for the enforcements shown may be low, which can result in relatively high overturn rates.
3. Overturn rates are calculated by dividing the number of overturned enforcements by the number of enforcement appeals.
4. For suspensions, appeals, and overturns used, we used the following measurement approach:
   - Within the time window
   - Review last suspension per user
   - Assign appeal on/after that date to that suspension
   - Log outcome of that appeal
5. The tables in the section INDICATORS OF ACCURACY FOR SUSPENSIONS have been updated on 1 November 2023 following updates to the tables COMPLAINTS OF ACTIONS TAKEN FOR TIUC TERMS OF SERVICE AND RULES VIOLATIONS RECEIVED/DECISIONS.

## Further Information on Suspensions

During the applicable reporting period (Aug 28 to Oct 20), there were zero actions taken for: provision of manifestly unfounded reports or complaints; or manifestly illegal content. While manifestly illegal content is not a category that we have taken action on during the reporting

period, we suspended 60,377 accounts for violating our Child Sexual Exploitation policy and 2,878 for violating our Violent and Hateful Entity policy.

## Disputes submitted to out-of-court dispute settlement bodies.

To date, zero disputes have been submitted to the out-of-court settlement bodies.

## Reports received by trusted flaggers.

To date, we have received zero reports from Article 22 DSA approved trusted flaggers. Once Article 22 DSA awarded trusted flaggers information is published, we are prepared to enrol them in our trusted flaggers program, which ensures prioritisation of human review.

## Human resources dedicated to Content Moderation

Today, we have 2,294 people working in content moderation. Our teams work on both initial reports as well as on complaints of initial decisions across the world (and are not specifically designated to only work on EU matters).

### Linguistics Expertise of our Content Moderation Team

X's scaled operations team possesses a variety of skills, experiences, and tools that allow them to effectively review and take action on reports across all of our rules and policies. X has analysed which languages are most common in reports reviewed by our content moderators and has hired content moderation specialists who have professional proficiency in the commonly spoken languages. The following table is a summary of the the number of people in our content moderation team who possess professional proficiency in the most commonly spoken languages in the EU on our platform:

| Primary Language | People |
|---|---|
| Arabic | 12 |
| Bulgarian | 2 |
| Croatian | 1 |
| Dutch | 1 |
| English | 2,294 |
| French | 52 |
| German | 81 |
| Hebrew | 2 |
| Italian | 2 |
| Latvian | 1 |
| Polish | 1 |
| Portuguese | 41 |
| Spanish | 20 |

### Qualifications of our Content Moderation Team

| Content Moderation Team Qualifications | |
|---|---|
| Years in Current Role | Headcount |
| 7 or more | 48 |
| 6 to 7 | 51 |
| 5 to 6 | 131 |
| 4 to 5 | 264 |
| 3 to 4 | 326 |
| 2 to 3 | 443 |
| 1 to 2 | 638 |
| 0 to 1 | 393 |

**Organisation, Team Resources, Expertise, Training and Support of our Team that Reviews and Responds to Reports of Illegal Content**

**Description of the team**

X has built a specialised team made up of individuals who have received specific training in order to assess and take action on illegal content that we become aware of via reports or other processes such as on our own initiative. This team consists of different tier groups, with higher tiers consisting of more senior, or more specialised, individuals.

When handling a report of illegal content or a complaint against a previous decision, content and senior content reviewers first assess the content under X's Rules and policies. If no violation of X's Rules and policies is determined warranting a global removal of the content, the content reviewers assess the content for potential illegality. If the content is not manifestly illegal, it can be escalated for second or third opinions. If more detailed investigation is required, content reviewers can escalate reports to experienced policy and/or legal request specialists who have also undergone in-depth training. These individuals take appropriate action after carefully reviewing the report or complaint and available context in close detail. In cases where this specialist team still cannot determine a decision regarding the potential illegality of the reported content, the report can be discussed with in-house legal counsel. Everyone involved in this process works closely together with daily exchanges through meetings and other channels to ensure the timely and accurate handling of reports.

Furthermore, all teams involved in solving these reports closely collaborate with a variety of other policy  teams at X who focus on safety, privacy, authenticity rules and policies. This cross-team effort is particularly important in the aftermath of tragic events, such as violent attacks, to ensure alignment and swift action on violative content.

Content reviewers are supported by team leads, subject matter experts, quality auditors and trainers. We hire people with diverse backgrounds in fields such as law, political science, psychology, communications, sociology and cultural studies, and languages.

**Training and support of persons processing legal requests**

All team members, i.e. all employees hired by X as well as vendor partners working on these reports, are trained and retrained regularly on our tools, processes, rules and policies, including special sessions on cultural and historical context. Initially when joining the team at X, each individual follows an onboarding program and receives individual mentoring during this period, as well as thereafter through our Quality Assurance program (for external employees), in house and external counsels (for internal employees).

All team members have direct access to robust training and workflow documentation for the entirety of their employment, and are able to seek guidance at any time from trainers, leads, and internal specialist legal and policy teams as outlined above as well as managerial support.

Updates about significant current events or rules and policy changes are shared with all content reviewers in real time, to give guidance and facilitate balanced and informed decision making. In the case of rules and policy changes, all training materials and related documentation is updated. Calibration sessions are carried out frequently during the reporting period. These sessions aim to increase collective understanding and focus on the needs of the content reviewers in their day-to-day work.

The entire team also participates in obligatory X rules and policies refresher training as the need arises or whenever rules and policies are updated. These trainings are delivered by the relevant policy specialists who were directly involved in the development of the rules and policy change. For these sessions we also employ the "train the trainer" method to ensure timely training delivery to the whole team across all of the shifts. All team members use the same training materials to ensure consistency.

Quality Assurance (QA) is a critical measure to the business to help ensure that we are delivering a consistent service at the desired level of quality to our key stakeholders, both externally and internally as it pertains to our case work. We have a dedicated QA Team within our vendor team to help us identify areas of opportunity for training and potential defect detection in our workflow or rules and policies. The QA specialists perform quality assurance checks of reports to ensure that content is actioned appropriately.

The standards and procedures within the QA team ensure the team's QA is assessed equally, objectively, efficiently and transparently. In case of any mis-alignments, additional training is scheduled, to ensure the team understands the issues and can handle reports accurately.

In addition, given the nature and sensitivity of their work, the entire team has access to online resources and regular onsite group and individual sessions related to resilience and well-being. These are provided by mental health professionals. Content reviewers also participate in resilience, self-care, and vicarious trauma sessions as part of our mandatory wellness plan during the reporting period.

## Training and Support provided to those Persons performing Content Moderation Activities for our TIUC Terms of Service and Rules

Training is a critical component of how X maintains the health and safety of the public conversation through enabling Trust and Safety agents to accurately and efficiently moderate content posted on our platform. Training at X aims to improve the agents' and X's policy enforcement performance and quality scores by enhancing agents' understanding and application of X rules through robust training and quality programs and a continuous monitoring of quality scores.

**TRAINING PROCESS**

There is a robust training program and system in place for every workflow to provide content moderators with the adequate work skills and job knowledge required for processing user cases.

All agents must be trained in their assigned workflows. These focus areas ensure that X agents are set up for success before and during the content moderation lifecycle, which includes:

- Training analysis/design focused on agent and learning needs;
- Classroom training with expert trainers;
- Nesting period to apply new skills;
- Cross-skilling opportunities;
- Upskilling opportunities;
- Refresher programs;
- New launch/update roll-outs process; and
- Remediation plans.

### TRAINING ANALYSIS & DESIGN

Before commencing design work on any agent program or resource, a rigorous learner analysis is conducted in close collaboration with training specialists and quality analysts to identify performance gaps and learning needs. Each program is designed with key stakeholder engagement and alignment. The design objective is to adhere to visual and learning design principles to maximise learning outcomes and ensure that agents can perform their tasks with accuracy and efficiency. This is achieved by making sure that the content is:

1. Easy to experience
2. Easy to understand
3. Easy to apply

X's training programs and resources are designed based on needs, and a variety of modalities are employed to diversify the agent learning experience, including:

- Self-led learning: microlearning, scenario-based learning, e-learning modules, and gamification (where appropriate);
- Virtual live instructor-led trainings;
- Face-to-face classroom training; and
- Videos.

### CLASSROOM TRAINING

Classroom training is delivered either virtually or face-to-face by expert trainers. Classroom training activities can include:

- Instructor-led policy training;

- Interactive e-learnings;

- Scenario-based learning sets;

- Shadowing sessions with seasoned agents;

- Guided casework sessions with trainers; and

- Knowledge checks, quizzes and assessments.

### NESTING (ON-THE-JOB TRAINING)

When agents successfully complete their classroom training program, they undergo a nesting period. The nesting phase includes case study by observation, demonstration and hands-on training on live cases. Nesting activities include agent shadowing, guided case work, Question and Answer sessions with their trainer, coaching, feedback sessions, etc. Quality audits are conducted for each nesting agent and agents must be coached for any mis-action spotted in their quality scores the same day that the case was reviewed. Trainers conduct needs assessment for each nesting agent and prepare refresher training accordingly. After the nesting period, content is evaluated on an ongoing basis with a team of Quality Analysts to identify gaps and address potential problem areas. There is a continuous feedback loop with quality analysts across the different workflows to identify challenges and opportunities to improve materials and address performance gaps.

### UP-SKILLING

When an agent needs to be upskilled they receive training of a specific workflow within the same pillar that the agent is currently working. The training includes a classroom training phase and nesting phase which is specified above.

### REFRESHER SESSIONS

Refresher sessions take place when an agent has previously been trained, has access to all the necessary tools, but would need a review of some ro all topics. This may happen for content moderators who have been on prolonged leave, transferred temporarily to another content moderation policy workflow, or ones who have recurring errors in the quality scores. After a needs assessment, trainers are able to pinpoint what the agent needs and prepare a session targeting their needs and gaps.

### NEW LAUNCH / UPDATE ROLL-OUTS

There are also processes that require new and/or specific product training and certification. These new launches and updates are identified by X and the knowledge is transferred to the agents.

### REMEDIATION PLANS

There are remediation plans in place to support agents who do not pass the training or nesting phase, or are not meeting quality requirements.

## Monthly Active Recipients

During the period from April 20th, 2023 through October 20th, 2023 there were an average of 115.2M active recipients of the service (AMARS) in the EU.

| | Logged In Users | Logged Out Users | Total AMARs |
|---|---|---|---|
| Austria | 753,735 | 999,100 | 1,752,835 |
| Belgium | 1,597,896 | 1,799,541 | 3,397,437 |
| Bulgaria | 450,528 | 321,878 | 772,406 |
| Cyprus | 180,205 | 210,831 | 391,036 |
| Czechia | 1,040,762 | 1,444,542 | 2,485,304 |
| Germany | 8,940,624 | 7,408,877 | 16,349,501 |
| Denmark | 769,813 | 613,974 | 1,383,787 |
| Estonia | 161,490 | 184,943 | 346,433 |
| Spain | 9,783,481 | 13,197,990 | 22,981,471 |
| Finland | 896,337 | 1,250,770 | 2,147,107 |
| France | 11,473,346 | 10,459,939 | 21,933,285 |
| Greece | 986,351 | 1,689,822 | 2,676,172 |
| Croatia | 291,167 | 725,785 | 1,016,951 |
| Hungary | 690,582 | 928,674 | 1,619,256 |
| Ireland | 1,451,149 | 1,868,565 | 3,319,714 |
| Italy | 5,128,290 | 4,017,433 | 9,145,723 |
| Lithuania | 385,819 | 227,342 | 613,161 |
| Luxembourg | 195,112 | 120,554 | 315,666 |
| Latvia | 228,835 | 236,542 | 465,376 |
| Malta | 83,311 | 67,049 | 150,360 |
| Netherlands | 4,011,930 | 4,917,265 | 8,929,195 |
| Poland | 6,447,687 | 7,489,627 | 13,937,314 |
| Portugal | 1,634,243 | 1,401,741 | 3,035,984 |
| Romania | 1,555,457 | 822,888 | 2,378,344 |
| Sweden | 1,648,209 | 1,553,716 | 3,201,925 |
| Slovenia | 198,566 | 499,247 | 697,813 |
| Slovakia | 272,136 | 405,259 | 677,395 |
| | 61,257,062 | 64,863,889 | 126,120,951 |

Important Note: Due to technical issues, for this report we were unable to provide the AMARS for each EU member state over the past six months. Instead, we provided AMARS for each EU member state from 19 September 2023 until 27 October 2023. We have resolved the technical issues for future transparency reports.

The AMARS for the entire EU over the past six months is 115.2M. The difference between the total AMARs for the EU and the cumulative total AMARs for all EU member states is due to double counting of logged out users accessing X from various EU countries within the relevant time period.

- - - - - - - - - - - - - - - - - Appendix - - - - - - - - - - - - - - - - - -

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TIUC Terms of Service and Rules Content Removal Actions - Sep 5 to Sep 23** | | | | | | | | | | | | | | | | |
| Enforcement Process | Policy | Austria | Belgium | Bulgaria | Croatia | Cyprus | Czechia | Denmark | Estonia | Finland | France | Germany | Greece | Hungary | Ireland | Italy |
| Automated Means | Abuse & Harassment | 2 | 3 | 2 | | | 1 | 2 | | 1 | 11 | 44 | 1 | 1 | 1 | 1 |
| | Hateful Conduct | | | 3 | | 3 | | | 2 | | 10 | 3 | 2 | | | | 3 |
| | Non-Consensual Nudity | | | | 1 | 1 | | | 5 | | | 2 | 1 | | 1 | | |
| | Other | | | 1 | | | | | | | 1 | 2 | 2 | | | 1 | 2 |
| | Private Information & media | | | | | | | | | | | 1 | 6 | | | | |
| | Sensitive Media | 41 | 103 | 54 | 25 | 11 | 68 | 68 | 6 | 46 | 1,002 | 723 | 82 | 78 | 61 | 42 |
| | Violent Speech | 114 | 286 | 71 | 64 | 20 | 116 | 151 | 32 | 109 | 3,326 | 1,054 | 114 | 87 | 311 | 347 |

3/20/24, 1:20 PM  transparency.twitter.com/dsa-transparency-report.html

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manual Review | Abuse & harassment | 195 | 124 | 42 | 26 | 41 | 169 | 269 | 4 | 119 | 2,169 | 1,311 | 65 | 53 | 115 | 36( |
| | Child Sexual Exploitation | | 1 | 1 | 1 | | | 2 | | | 15 | 6 | | | 4 | 1( |
| | Counterfeit | | 1 | | | | | | | | 2 | 8 | | | 1 | |
| | Deceased Individuals | | | | | | 2 | | | | 3 | 2 | | | | |
| | Hateful Conduct | 17 | 42 | 4 | 6 | | 14 | 16 | 3 | 22 | 678 | 337 | 16 | 8 | 34 | 6 |
| | Illegal or certain regulated goods and services | 24 | 32 | 10 | 1 | 5 | 55 | 33 | | 3 | 414 | 336 | 4 | 71 | 29 | 3 |
| | Misleading & Deceptive Identities | | 1 | 1 | | | 1 | | | | 7 | 8 | 2 | 1 | 2 | 3 |
| | Non-Consensual Nudity | 11 | 11 | 9 | | 9 | 16 | 8 | | 12 | 112 | 192 | 36 | 23 | 9 | 4( |
| | Perpetrators of Violent Attacks | | | | | | | | | | 2 | 1 | | | | |
| | Private information & media | 12 | 15 | 1 | 1 | 1 | 4 | 2 | | | 118 | 66 | 10 | | 8 | 1( |
| | Sensitive Media | 53 | 180 | 44 | 33 | 21 | 145 | 83 | 20 | 77 | 1,226 | 932 | 108 | 110 | 87 | 46 |
| | Suicide & Self Harm | 7 | 13 | 7 | 5 | 1 | 10 | 11 | 1 | 10 | 107 | 96 | 4 | | 25 | 4 |
| | Violent & Hateful Entities | | | | | 1 | | | | | | | | | | |
| | Violent Speech | 53 | 47 | 7 | 9 | 6 | 49 | 36 | 7 | 26 | 774 | 1,062 | 30 | 12 | 68 | 16( |
| Grand Total | | 529 | 863 | 254 | 175 | 116 | 650 | 688 | 73 | 436 | 9,974 | 6,189 | 472 | 445 | 756 | 1,99( |

Important Note: Due to a data extraction limitation that is currently under review data ranging from Aug 28 to Sept 5 is not included above.