**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| X CORP., | No. 24-271 |
| *Plaintiff - Appellant*, | D.C. No. 2:23-cv-01939-WBS-AC |
| v. | |
| ROBERT BONTA, in his official capacity as Attorney General of California, | OPINION |
| *Defendant - Appellee*. | |

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted July 17, 2024
San Francisco, California

Filed September 4, 2024

Before: MILAN D. SMITH, JR., MARK J. BENNETT,
and ANTHONY D. JOHNSTONE, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### First Amendment / Social Media Platforms

The panel reversed the district court's order denying social media platform owner X Corp.'s motion for a preliminary injunction to enjoin enforcement of California Assembly Bill AB 587 (AB 587), which requires large social media companies to post their terms of service and to submit reports to the Attorney General of California (the State) about their terms of service and their content-moderation policies and practices.

The Content Category Report provisions of AB 587 require social media companies to submit to the State a semiannual report detailing whether and how they define six categories of content: hate speech or racism, extremism or radicalization, disinformation or misinformation, harassment, foreign political interference, and controlled substance distribution.

The panel held that X Corp. was likely to succeed on the merits of its claim that the Content Category Report provisions facially violate the First Amendment. A facial challenge is permissible because the Content Category Report provisions raise the same First Amendment issues for every social media company. The Content Category Report provisions compel non-commercial speech, and are subject to strict scrutiny because the provisions are content-based. The Content Category Report provisions likely fail strict scrutiny because they are not narrowly tailored to serve

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the State's purported goal of requiring social media companies to be transparent about their policies and practices.

The panel held that the remaining factors weighed in favor of a preliminary injunction.

Accordingly, the panel reversed the district court's denial of a preliminary injunction, and remanded with instructions to enter a preliminary injunction consistent with the opinion and to determine whether the Content Category Report provisions are severable from the remainder of AB 587 and, if so, which, if any, of the remaining challenged provisions should also be enjoined.

## COUNSEL

Joel L. Kurtzberg (argued), Floyd Abrams, Jason D. Rozbruch, and Lisa J. Cole, Cahill Gordon & Reindel LLP, New York, New York; William R. Warne and Meghan M. Baker, Downey Brand LLP, Sacramento, California; for Plaintiff-Appellant.

Gabrielle D. Boutin (argued), Deputy Attorney General; Anthony R. Hakl, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Deputy Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Sacramento, California; for Defendant-Appellee.

Robert Corn-Revere and Joshua A. House, Foundation for Individual Rights and Expression, Washington, D.C., for Amicus Curiae Foundation for Individual Rights and Expression.

Trenton H. Norris, Mark W. Brennan, J. Ryan Thompson, Sophie Baum, and Alexander Tablan, Hogan Lovells LLP, San Francisco, California; Cory L. Andrews and John M. Masslon II, Washington Legal Foundation, Washington, D.C.; for Amicus Curiae Washington Legal Foundation.

Gene C. Schaerr, Schaerr Jaffe LLP, Washington, D.C., for Amici Curiae Professor Eugene Volokh and Protect the First Foundation.

Megan L. Brown, Jeremy J. Broggi, and Boyd Garriott, Wiley Rein LLP, Washington, D.C.; Jonathan D. Urick and Maria C. Monaghan, United States Chamber Litigation Center; Washington, D.C.; for Amicus Curiae United States of America Chamber of Commerce.

Bruce D. Brown, Katie Townsend, Gabe Rottman, Grayson Clary and Emily Hockett, Reporters Committee for Freedom of the Press, Washington, D.C.; for Amicus Curiae Reporters Committee for Freedom of the Press.

David A. Greene and Aaron Mackey, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

Jacob M. Karr, Technology Law and Policy Clinic at New York University, New York, New York; G.S. Hans, Cornell Law School, Ithaca, New York; for Amici Curiae First Amendment and Internet Law Scholars.

Michelle Quist and Lauren D. Wigginton, Buchalter APC, Salt Lake City, Utah; Jon M. Greenbaum, Edward G. Caspar, and Marc P. Epstein, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; for Amicus Curiae Lawyers' Committee for Civil Rights Under Law.

Viviana M. Hanley and Nathanial I. Levy, Deputy Attorneys General; Michael L. Zuckerman, Deputy Solicitor General; Jeremy Feigenbaum, Solicitor General; Matthew J. Platkin, Attorney General of New Jersey; Office of the New Jersey Attorney General, Trenton, New Jersey; Kristin K. Mayes, Attorney General of Arizona, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Attorney General of Colorado, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Attorney General of Connecticut, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General of Delaware, Office of the Delaware Attorney General, Wilmington, Delaware; Brian L. Schwalb, Attorney General of the District of Columbia, Office of the District of Columbia Attorney General, Washington, D.C.; Kwame Raoul, Attorney General of Illinois, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Attorney General of Maine, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Attorney General of Maryland, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Attorney General of Massachusetts, Office of the Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Attorney General of Michigan, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Attorney General of Minnesota, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Attorney General of Nevada, Office of the Nevada Attorney General, Carson City, Nevada; Letitia James, Attorney General of New York, Office of the New York Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General of Oregon, Office of the Oregon Attorney General, Salem, Oregon;

6                              X CORP. V. BONTA

Michelle A. Henry, Attorney General of Pennsylvania, Office of Harrisburg, Pennsylvania; Charity R. Clark, Attorney General of Vermont, Office of the Vermont Attorney General, Montpelier, Vermont; Robert M. Ferguson, Attorney General of Washington, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae States of New Jersey, Arizona, Colorado, Connecticut, Delaware, The District of Columbia, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Vermont, and Washington.

Jason S. Harrow and Charles Gerstein, Gerstein Harrow LLP, Los Angeles, California, for Amicus Curiae Institute for Strategic Dialogue.

Megan Iorio and Schuyler Standley, Electronic Privacy Information Center, Washington, D.C., for Amicus Curiae Electronic Privacy Information Center.

Kristen G. Simplicio and Cort T. Carlson, Tycko & Zavareei LLP, Washington, D.C.; John Yang, Niyati Shah, and Noah Baron, Asian Americans Advancing Justice, Washington, D.C.; for Amicus Curiae Asian Americans Advancing Justice.

## OPINION

M. SMITH, Circuit Judge:

The California State Legislature enacted Assembly Bill 587 (AB 587) in September 2022. Cal. Bus. & Prof. Code §§ 22675–81. The law requires large social media companies to, *inter alia*, post their terms of service and to submit, on a semiannual basis, reports to the Attorney General of California (the State) about their terms of service and content-moderation policies and practices. X Corp., the owner of the large social media platform X (formerly known as Twitter), moved for a preliminary injunction to enjoin enforcement of AB 587 on free speech and federal preemption grounds. The district court denied X Corp.'s motion, finding that X Corp. failed to establish a likelihood of success on the merits. X Corp. appeals. For the reasons below, we reverse and remand to the district court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

AB 587 has three primary elements: (1) a requirement that social media companies[1] publicly post their terms of service, including processes for flagging content and potential actions that may be taken with respect to flagged content (Terms of Service (TOS) Posting), *see* Cal. Bus. & Prof. Code § 22676, (2) a requirement that social media

---

[1] AB 587 does not apply to social media companies with gross annual revenues of less than $100 million, Cal. Bus. & Prof. Code § 22680, nor to "an internet-based service or application for which interactions between users are limited to direct messages, commercial transactions, consumer reviews of products, sellers, services, events, or places, or any combination thereof," *id.* § 22681.

X CORP. V. BONTA

companies submit to the State a semiannual report detailing their TOS and content-moderation practices including, if at all, how the terms of service define and address (a) hate speech or racism; (b) extremism or radicalization; (c) disinformation or misinformation; (d) harassment; and (e) foreign political interference, as well as statistics on content that was flagged by the social media company as belonging to any of the categories (TOS Report), *see id.* § 22677,[2] and (3) a penalty provision, whereby the social media company may be sued in court for, *inter alia*, materially omitting or misrepresenting required information and may be liable to pay up to $15,000 per violation per day, *see id.* § 22678.[3]

On September 8, 2023, X Corp. filed a complaint against the State seeking declaratory relief and injunctive relief barring the law's enforcement. The complaint alleges three causes of action challenging the TOS Posting, TOS Report, and penalty provision of AB 587 as: (1) a violation of the free speech clauses of the U.S. and California Constitutions; (2) a violation of the Dormant Commerce Clause; and (3) federally preempted pursuant to the Communications Decency Act, 47 U.S.C. § 230(c). X Corp. filed a motion for preliminary injunction based on its free speech and

---

[2] AB 587 was subsequently amended to add to this list "[c]ontrolled substance distribution." 2023 Cal. Legis. Serv. 7680 (West).

[3] In assessing the amount of any penalty, a court is to consider whether the social media company has made a reasonable, good faith attempt to comply with the provisions of the statute. Cal. Bus. & Prof. Code § 22678(a)(3).

preemption claims, seeking to enjoin the State from enforcing the challenged provisions of AB 587.[4]

On December 28, 2023, the district court denied X Corp.'s motion. The court began its analysis with X Corp.'s First Amendment claim.[5] The court held that X Corp. was unlikely to prevail because the TOS Posting and TOS Report requirements appeared constitutionally permissible in light of *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), the Supreme Court's test for compelled commercial speech. *See X Corp. v. Bonta*, No. 23-cv-01939, 2023 WL 8948286, at *1–2 (E.D. Cal. Dec. 28, 2023).

The court's analysis of the TOS Report requirement focused primarily on the provisions requiring that social media companies report whether and how they define and address certain enumerated content categories. *Id.* at *2. The court acknowledged that such reports do "not so easily fit the traditional definition of commercial speech" because they "are not advertisements" and because "social media companies have no particular economic motivation to provide them." *Id.* However, the court applied *Zauderer* to those provisions nevertheless so as to "follow[] the lead of the Fifth and Eleventh Circuits." *Id.* (citing *NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022), *rev'd on other grounds sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 2383

---

[4] X Corp. did not seek a preliminary injunction based upon the Dormant Commerce Clause.

[5] The district court did not analyze X Corp.'s free speech claim under Article I, Section 2, of the California Constitution, nor do the parties meaningfully address this claim on appeal. Because we hold that X Corp. is likely to succeed on its First Amendment claim, we do not reach X Corp.'s free speech claim pursuant to the California Constitution.

10                    X CORP. V. BONTA

(2024) ("*NetChoice (Tex.)*"), and *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1230 (11th Cir. 2022), *rev'd on other grounds sub nom. Moody*, 144 S. Ct. 2383 ("*NetChoice (Fla.)*")). The court then concluded that the TOS Report requirement satisfies *Zauderer*. *Id.* The court reasoned that the provisions require speech that is "purely factual" and "uncontroversial" because they "merely require[] social media companies to identify their existing content moderation policies, if any, related to the specified categories" and the "mere fact that the reports may be 'tied in some way to a controversial issue' does not make the reports themselves controversial." *Id.* (quoting *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("*CTIA II*")). The court rejected X Corp.'s argument that the TOS Report requirement is "unduly burdensome," explaining that "AB 587 does *not* require that a social media company adopt any of the specified categories" of speech, and that in any event "*Zauderer* is concerned not merely with logistical or economic burdens, but burdens on *speech*." *Id.* It further held that the TOS Report requirement is "reasonably related to a substantial government interest in requiring social media companies to be transparent about their content moderation policies and practices so that consumers can make informed decisions about where they consume and disseminate news and information." *Id.*

The district court also determined that X Corp. had failed to show a likelihood of success on its claim that AB 587 is preempted by 47 U.S.C. § 230(c). *Id.* at *3. The court observed that the purpose of section 230(c) "is to provide 'protection for "Good Samaritan" blocking and screening of offensive material'" so that a website may "self-regulate offensive third party content without fear of liability." *Id.*

(quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851–52 (9th Cir. 2016)). The court concluded that AB 587 is not preempted because, under its plain language, it "does not provide for any potential liability stemming from a company's content moderation activities per se," only for failing to make AB 587's required disclosures. *Id.*

On January 12, 2024, X Corp. timely filed notice of its appeal. The provision of AB 587 most relevant in this appeal is section 22677(a), which reads in its entirety:

> (a) On a semiannual basis in accordance with subdivision (b), a social media company shall submit to the Attorney General a terms of service report. The terms of service report shall include, for each social media platform owned or operated by the company, all of the following:
>
> (1) The current version of the terms of service of the social media platform.
>
> (2) If a social media company has filed its first report, a complete and detailed description of any changes to the terms of service since the previous report.
>
> (3) A statement of whether the current version of the terms of service defines each of the following categories of content, and, if so, the definitions of those categories, including any subcategories:
>
> > (A) Hate speech or racism.
> >
> > (B) Extremism or radicalization.
> >
> > (C) Disinformation or misinformation.

(D) Harassment.

(E) Foreign political interference.

(F) Controlled substance distribution.[6]

(4) A detailed description of content moderation practices used by the social media company for that platform, including, but not limited to, all of the following:

(A) Any existing policies intended to address the categories of content described in paragraph (3).

(B) How automated content moderation systems enforce terms of service of the social media platform and when these systems involve human review.

(C) How the social media company responds to user reports of violations of the terms of service.

(D) How the social media company would remove individual pieces of content, users, or groups that violate the terms of service, or take broader action against individual users or against groups of users that violate the terms of service.

(E) The languages in which the social media platform does not make terms of service available, but does offer product

---

[6] As noted above, section 22677(a)(3)(F) was added subsequent to X Corp. filing its lawsuit in the district court.

features, including, but not limited to, menus and prompts.

(5) (A) Information on content that was flagged by the social media company as content belonging to any of the categories described in paragraph (3), including all of the following:

(i) The total number of flagged items of content.

(ii) The total number of actioned items of content.

(iii) The total number of actioned items of content that resulted in action taken by the social media company against the user or group of users responsible for the content.

(iv) The total number of actioned items of content that were removed, demonetized, or deprioritized by the social media company.

(v) The number of times actioned items of content were viewed by users.

(vi) The number of times actioned items of content were shared, and the number of users that viewed the content before it was actioned.

(vii) The number of times users appealed social media company actions taken on that platform and the number of reversals of social media company actions on

14          X CORP. V. BONTA

appeal disaggregated by each type of action.

(B) All information required by subparagraph (A) shall be disaggregated into the following categories:

(i) The category of content, including any relevant categories described in paragraph (3).

(ii) The type of content, including, but not limited to, posts, comments, messages, profiles of users, or groups of users.

(iii) The type of media of the content, including, but not limited to, text, images, and videos.

(iv) How the content was flagged, including, but not limited to, flagged by company employees or contractors, flagged by artificial intelligence software, flagged by community moderators, flagged by civil society partners, and flagged by users.

(v) How the content was actioned, including, but not limited to, actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and actioned by users.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) to review the denial of a preliminary injunction. *Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851, 854 (9th Cir. 2024). We review the denial of a preliminary injunction for abuse of discretion, but we review de novo the underlying issues of law. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022).

"The appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that (1) [it] is likely to succeed on the merits of [its] claim, (2) [it] is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [its] favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because "the party opposing injunctive relief is a government entity" here, the third and fourth factors "merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ANALYSIS

On appeal, X Corp. challenges the district court's ruling on the TOS Report requirement and penalty provision as applied to the TOS Report requirement. X Corp. does not appeal the district court's denial of a preliminary injunction as to the TOS Posting requirement, Cal. Bus. & Prof. Code § 22676.

16          X CORP. V. BONTA

X Corp. argues that the district court erred by finding that X Corp. did not establish a likelihood of success on the merits because (1) the TOS Report requirement is compelled, non-commercial speech subject to strict scrutiny, not the lower tier of scrutiny in *Zauderer*, (2) regardless, the TOS Report requirement fails under any level of scrutiny, and (3) section 230's broad immunity precludes liability under AB 587.

X Corp. seeks to reverse the district court's ruling as to the entirety of the TOS Report requirement. But the thrust of the appeal concerns section 22677(a)(3), which requires that social media companies report whether and how they define six categories of content, and sections 22677(a)(4)(A) and (a)(5), which directly incorporate section 22677(a)(3). For ease of reference, we refer to these sections as the Content Category Report provisions.

For the reasons below, we hold that the Content Category Report provisions likely compel non-commercial speech and are subject to strict scrutiny, under which they do not survive. We reverse the district court on that basis. Because we reverse on free speech grounds, we need not reach X Corp.'s section 230 theory. We remand to the district court to determine in the first instance whether the Content Category Report provisions are severable from the remainder of AB 587, and if so, which, if any, of the remaining challenged provisions should also be subject to the preliminary injunction.[7]

---

[7] We do not decide whether sections 22677(a)(1), (2), and (4)(B)–(E)— which require that social media companies disclose the text of their TOS and describe their enforcement mechanisms, without mention of specific

## I. X Corp. is likely to succeed in showing that the Content Category Report provisions facially violate the First Amendment.

"For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Moody*, 144 S. Ct. at 2397. The Supreme Court "has therefore made facial challenges hard to win." *Id.* In a typical facial challenge, a plaintiff cannot succeed "unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Id.* (alterations in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

However, in First Amendment cases, the Supreme Court "has lowered that very high bar." *Id.* "To provide breathing room for free expression," the Supreme Court has "substituted a less demanding though still rigorous standard." *Id.* (cleaned up) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)); *see also Tucson v. City of Seattle*, 91 F.4th 1318, 1327 (9th Cir. 2024). "[I]f the law's unconstitutional applications substantially outweigh its constitutional ones," then a court may sustain a facial challenge to the law and strike it down. *Moody*, 144 S. Ct. at 2397. As *Moody* clarified, a First Amendment facial challenge has two parts: first, the courts must "assess the state laws' scope"; and second, the courts must "decide

---

content categories—are facially constitutional. Neither party—either below or on appeal—briefed what should happen to the remainder of section 22677 if the Content Category Report provisions were found to be likely unconstitutional.

which of the laws' applications violate the First Amendment, and . . . measure them against the rest." *Id.* at 2398.

"[N]o one has paid much attention to" the requirements for a facial challenge so far in this case. *Id.* at 2397. Nevertheless, we conclude that a facial challenge is permissible here. That is because all aspects of the Content Category Report, in every application to a covered social media company, raise the same First Amendment issues. As explained in further detail below, every Content Category Report must detail the company's policies and actions concerning certain state-specified categories of content (even if only to detail the company's decision not to define the enumerated categories of section 22677(a)(3)). In effect, the Content Category Report provisions compel every covered social media company to reveal its policy opinion about contentious issues, such as what constitutes hate speech or misinformation and whether to moderate such expression.[8]

---

[8] X Corp. cites legislative history and statements from the California State Attorney General in describing the indirect chilling effects AB 587 may have by generating public controversy about the actions of social media companies and thereby pressuring them to change their content moderation policies. No matter how a social media company chooses to moderate such content, the company will face backlash from its users and the public. That is true even if the company decides not to define the enumerated categories, because they will draw criticism for under-moderating their community. While we account for these effects in our analysis, whether State officials intended these effects plays no role in our analysis of the merits of this facial challenge. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 116 (9th Cir. 2024) (citing *United States v. O'Brien*, 391 U.S. 367, 383 n.30 (1968)) (rejecting "the idea that 'legislative motive'" of indirectly chilling speech "'is a proper basis for declaring a statute unconstitutional'").

Thus, the Content Category Report provisions raise the same First Amendment issues for every covered social media company. That is true from the face of the law; we need not "speculate about 'hypothetical' or 'imaginary' cases." *See Wash. State Grange*, 552 U.S. at 450. We therefore proceed to consider whether the Content Category Report provisions are likely to survive X Corp.'s First Amendment facial challenge.

## A. The Content Category Report provisions compel non-commercial speech and are subject to strict scrutiny.

One of the First Amendment's core purposes is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)). In evaluating whether a regulation violates the First Amendment, courts "distinguish between content-based and content-neutral regulations of speech." *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (internal quotation marks omitted) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). A content-based regulation "target[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "As a general matter," a content-based regulation is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163). When a state "compel[s] individuals to speak a particular message," the state "alter[s] the content of their speech," and engages in content-based regulation. *Id.* (cleaned up) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487

U.S. 781, 795 (1988)).  The First Amendment's guarantee of freedom of speech makes no distinction of "constitutional significance" "between compelled speech and compelled silence." *Riley*, 487 U.S. at 796–97.

In general, laws regulating commercial speech are subject to a lesser standard of scrutiny.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64–65 (1983) (discussing recognition and evolution of commercial speech doctrine). This holds true for both corporations and individuals alike. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).  Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  "Courts view this definition as just a starting point, however, and instead try to give effect to a 'common-sense distinction' between commercial speech and other varieties of speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (cleaned up) (quoting *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516–17 (7th Cir. 2014)).  Indeed, the "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 284 (4th Cir. 2013)).

Because of the difficulty of drawing clear lines between commercial and non-commercial speech, the Supreme Court in *Bolger* outlined three factors to consider.  463 U.S. at 64–67.  "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an

advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation*." Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66–67). These so-called *Bolger* factors are important guideposts, but they are not necessarily dispositive. *See Bolger*, 463 U.S. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial."); *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

Commercial speech is generally subject to intermediate scrutiny. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023). However, an exception applies to compelled commercial speech that is "purely factual and uncontroversial." *Id.*; *see Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1074 (9th Cir. 2020) (citing *Zauderer* as a variation in the treatment of speech "within the class of commercial speech"). "In that scenario, the government need only demonstrate the compelled speech survives a lesser form of scrutiny akin to a rational basis test." *Nat'l Wheat*, 85 F.4th at 1266.

State legislatures do not have "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Stevens*, 559 U.S. 460, 472, (2010). Thus, "without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.'" *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 (2011) (alteration in original) (quoting *Stevens*, 559 U.S. at 470).

22 X CORP. V. BONTA

Here, the Content Category Reports are not commercial speech. They require a company to recast its content-moderation practices in language prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be moderated. As a result, few indicia of commercial speech are present in the Content Category Reports.

First, the Content Category Reports do not satisfy the "usual[] defin[ition]" of commercial speech—i.e., "speech that does no more than propose a commercial transaction." *See United Foods, Inc.*, 533 U.S. at 409; *see also IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (2020) ("Because IMDb's public profiles do not 'propose a commercial transaction,' we need not reach the *Bolger* factors."). The State appears to concede as much in its answering brief.

To the extent our circuit has recognized exceptions to that general rule, those exceptions are limited and are inapplicable to the Content Category Reports here. For example, as identified by the First Amendment and Internet Law Scholars *amici*, we have characterized the following speech as commercial even if not a clear fit with the Supreme Court's above articulation: (i) targeted, individualized solicitations, *see Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 731–32 (9th Cir. 2017); contract negotiations, *see S.F. Apartment Ass'n v. San Francisco*, 881 F.3d 1169, 1177–78 (9th Cir. 2018); and retail product warnings, *see CTIA II,* 928 F.3d at 845. Though it does not directly or exclusively propose a commercial transaction, all of this speech communicates the terms of an actual or potential transaction. But the Content Category Reports go further: they express a view *about* those terms by conveying whether a company believes certain categories should be defined and proscribed.

Second, the Content Category Reports fail to satisfy at least two of the three *Bolger* factors. The compelled disclosures are not advertisements. *See Hunt*, 638 F.3d at 715. Nor do the Content Category Reports merely disclose existing commercial speech, so a social media company has no economic motivation in their content. *See id.* The district court found the same. The State does not dispute the district court's finding on appeal. Although the *Bolger* factors are not dispositive, they are "important guideposts" to the analysis and, here, further support the conclusion that the compelled speech is non-commercial. *See Ariix, LLC*, 985 F.3d at 1116.

Third, while a social media platform's existing TOS and content moderation policies may be commercial speech, its opinions about and reasons for those policies are different in character and kind. The Content Category Report provisions would require [9] a social media company to convey the company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization, and also convey how the company has applied its policies. The State suggests that this requirement is subject to lower scrutiny because "it is *only* a transparency measure" about the product. But even if the Content Category Report provisions concern only transparency, the relevant question here is: transparency into what? Even a pure "transparency" measure, if it compels non-commercial speech, is subject to strict scrutiny. *See*

---

[9] The State relies heavily on the fact that AB 587 does not affirmatively require any social media company to opine on these topics, instead requiring the company to convey its position only to the extent such a policy already exists. That fact, however, is immaterial or at least non-dispositive as to the *nature* of the speech being conveyed, which is fundamentally non-commercial.

24                    X CORP. V. BONTA

*Riley*, 487 U.S. at 796–97.  That is true of the Content
Category Report provisions.  Insight into whether a social
media company considers, for example, (1) a post citing
rhetoric from on-campus protests to constitute hate speech;
(2) reports about a seized laptop to constitute foreign
political interference; or (3) posts about election fraud to
constitute misinformation is sensitive, constitutionally
protected speech that the State could not otherwise compel a
social media company to disclose without satisfying strict
scrutiny.  The mere fact that those beliefs are memorialized
in the company's content moderation policy does not, by
itself, convert expression about those beliefs into
commercial speech.  As X Corp. argues in its reply brief,
such a rule would be untenable.  It would mean that basically
any compelled disclosure by any business about its activities
would be commercial and subject to a lower tier of scrutiny,
no matter how political in nature.  Protection under the First
Amendment cannot be vitiated so easily.[10]

The district court performed, essentially, no analysis on
this question.  In fact, the district court acknowledged that
the Content Category Reports "do not so easily fit the
traditional definition of commercial speech" as they "are not
advertisements, and social media companies have no

---

[10] For substantially the same reason, nor can the test for whether speech
is commercial or non-commercial turn on whether the speech is "directed
to potential consumers and may presumably play a role in the decision
of whether to use the platform," as the district court seemed to suggest.
Consider, for example, a state law that compels a social media company
to disclose the political affiliations of its managers.  That information
could conceivably "play a role in the [potential consumer's] decision of
whether to use the platform"—i.e., if the consumer is concerned about
the platform's content being politically skewed.  It could not be that such
a law compels only commercial speech subject to a lower tier of scrutiny.

particular economic motivation to provide them." Nevertheless, the court applied *Zauderer*, suggesting the compelled speech is commercial. *See Nat'l Wheat*, 85 F.4th at 1275 (identifying *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), and *Zauderer* as "two levels of scrutiny governing compelled *commercial* speech" (emphasis added)); *CTIA II*, 928 F.3d at 843 (endorsing proposition that *Zauderer* is merely the "exception to the general rule of *Central Hudson*"). The district court offered no reason for that decision except for wanting to "follow[] the lead of the Fifth and Eleventh Circuits."

But neither the Fifth nor Eleventh Circuit dealt with speech similar to the Content Category Reports. Unlike Texas HB 20 or Florida SB 7072, the Content Category Report provisions compel social media companies to report whether and how they believe particular, controversial categories of content should be defined and regulated on their platforms. Neither the Texas nor Florida provisions at issue in the *NetChoice* cases require a company to disclose the existence or substance of its policies addressing such categories. *See NetChoice (Tex.)*, 49 F.4th at 446 (requiring platforms to disclose "how they moderate and promote content" and provide "high-level statistics" about their moderation efforts without mention of controversial topics); *NetChoice (Fla.)*, 34 F.4th at 1206–07 (requiring platforms to disclose information about their content-moderation "standards" and "rule changes" without regard to particular content categories). Though perhaps relevant to an analysis of sections 22677(a)(1), (2), and (4)(B)–(E), these cases are unhelpful on the issue of the Content Category Reports and offer no compelling reason to apply *Zauderer*.

For these reasons, we conclude that the Content Category Report provisions compel non-commercial speech. Because the provisions are content-based, which the State does not contest, they are subject to strict scrutiny. *See Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766.[11]

### B. The Content Category Report provisions likely fail strict scrutiny.

Strict scrutiny "is a demanding standard." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000). A state must show that the statute "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at 171. "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *Playboy Ent. Grp., Inc.*, 529 U.S. at 813.

At minimum, the Content Category Report provisions likely fail under strict scrutiny because they are not narrowly tailored. They are more extensive than necessary to serve the State's purported goal of "requiring social media companies to be transparent about their content-moderation policies and practices so that consumers can make informed decisions about where they consume and disseminate news and information." Consumers would still be meaningfully informed if, for example, a company disclosed whether it

---

[11] X Corp. argues that strict scrutiny applies for the following additional reasons: because AB 587 is viewpoint discriminatory, interferes with a social media company's constitutionally protected editorial judgment, and regulates "speech about speech." Several of the *amici* raise similar arguments. Because we agree that strict scrutiny applies, we need not reach these arguments.

was moderating certain categories of speech without having to define those categories in a public report.  Or, perhaps, a company could be compelled to disclose a sample of posts that have been removed without requiring the company to explain why or on what grounds.**12**

In any event, the State does not attempt to argue that the law survives strict scrutiny.  For the reasons above, X Corp. has shown a likelihood of success on the merits of its First Amendment claim as to sections 22677(a)(3), (a)(4)(A), and (a)(5).

## C. The remaining *Winter* factors weigh in favor of a preliminary injunction.

With respect to the second factor, a loss of First Amendment freedoms constitutes an irreparable injury.  *See Fellowship of Christian Athletes*, 82 F.4th at 694 ("It is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citation omitted)).  Because X Corp. has a colorable First Amendment claim, it has demonstrated that it likely will suffer irreparable harm.  *See Am. Bev. Ass'n v. San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).

The third and fourth factors—balance of equities and public interest—also favor X Corp.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes*, 82 F.4th at 695 (citation omitted).  When a party "'raise[s] serious First Amendment questions,' that alone 'compels a

---

12 We do not opine on whether such laws would survive constitutional scrutiny.  They are offered only to illustrate that the Content Category Report provisions are not narrowly tailored to the State's interest.

28                    X CORP. V. BONTA

finding that the balance of hardships tips sharply in [its] favor.'" *Id.* (second alteration in original) (quoting *Am. Bev. Ass'n*, 916 F.3d at 758). The government reasonably has an interest in transparency by social media platforms. But even "undeniably admirable goals" "must yield" when they "collide with the . . . Constitution." *Id.*

Because X Corp. has shown a likelihood of success on the merits of its First Amendment claim, and the remaining *Winter* factors weigh in favor of an injunction, we reverse the district court's decision denying a preliminary injunction as to AB 587's Content Category Report provisions.

## II. We remand to the district court to determine whether the Content Category Report provisions are likely severable from the remainder of AB 587.

"Severability is . . . a matter of state law." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc) (alteration in original) (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam)). "In California, the presence of a severability clause in a statutory scheme that contains an invalid provision 'normally calls for sustaining the valid part of the enactment.'" *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1120 (9th Cir. 2021) (quoting *Cal. Redevelopment Ass'n v. Matosantos*, 267 P.3d 580, 607 (Cal. 2011)).

The parties did not brief severability on appeal, and the severability arguments below appear to have been cursory. During oral argument, counsel for the State suggested that, were we to find that any part of the statute should be enjoined, the issue of severability should be remanded. We agree and leave it to the district court to determine in the first instance whether the likely unconstitutional provisions of AB 587, sections 22677(a)(3), (a)(4)(A), and (a)(5), are

severable from its remainder. *See generally Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir. 2013) (en banc) (observing that it is "standard practice . . . to remand to the district court for a decision in the first instance without requiring any special justification for so doing"), *overruled on other grounds by Shinn v. Ramirez*, 596 U.S. 366 (2022).

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of a preliminary injunction as to California Business and Professions Code sections 22677(a)(3), (a)(4)(A), and (a)(5). We remand with instructions to enter a preliminary injunction consistent with this opinion and to determine whether these provisions are severable from the remainder of AB 587 and, if so, which, if any, of the remaining challenged provisions should also be enjoined.